**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| MISTY DUFF, individually and on behalf of R.D., a minor, | : |
| | : |
| AND | : |
| | : |
| KATHRYN ZINN, | : |
| | : |
| AND | :     Case No.: 1:19-cv-750 |
| | : |
| DAVID SWANK, | : |
| | : |
| AND | : |
| | :     Judge: |
| CHRISSY COX, individually and on behalf of A.C., a minor, | : |
| | : |
| PLAINTIFFS, | : |
| | : |
| | : |
| v. | : |
| | : |
| CENTENE CORPORATION, | :     CLASS ACTION COMPLAINT |
| | :     AND JURY DEMAND |
| AND | : |
| | : |
| CENTENE MANAGEMENT COMPANY, LLC., | : |
| | : |
| AND | : |
| | : |
| BUCKEYE COMMUNITY HEALTH PLAN, INC. d/b/a BUCKEYE HEALTH PLAN, | : |
| | : |
| | : |
| DEFENDANTS. | : |

Plaintiff Misty Duff, individually and on behalf of her minor daughter, R.D., Plaintiff

Kathryn Zinn, Plaintiff David Swank, and Plaintiff Chrissy Cox, individually and on behalf of

her minor daughter, A.C., by and through counsel, on their own behalf and on behalf of the proposed class identified herein, hereby submit this Class Action Complaint and Jury Demand against Defendants Centene Corporation, Centene Management Company, LLC ("Centene, LLC"), and Buckeye Community Health Plan, Inc., d/b/a Buckeye Health Plan ("Buckeye Health Plan") and allege as follows:

## **PARTIES**

1.      Plaintiff Misty Duff is a resident and citizen of Butler County, Ohio.

2.      Plaintiff R.D., a minor, is a resident and citizen of Butler County, Ohio.

3.      Plaintiff Katy Zinn is a resident and citizen of Hamilton County, Ohio.

4.      Plaintiff David Swank is a resident and citizen of Lucas County, Ohio.

5.      Plaintiff Chrissy Cox is a resident and citizen of Darke County, Ohio.

6.      Plaintiff A.C., a minor, is a resident and citizen of Darke County, Ohio.

7.      Defendant Centene Corporation is a Delaware corporation with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105.  Defendant Centene Corporation is a resident and citizen of Delaware and Missouri.

8.      Centene Corporation is, according to its 2017 Annual Report, "a diversified, multi-national healthcare enterprise that provides a portfolio of services to government sponsored and commercial healthcare programs, focusing on under-insured and uninsured individuals."

9.      One of Centene Corporation's business segments is Managed Care, which, according to its Annual Report, provides health plan coverage to individuals through government subsidized and commercial programs including the Health Insurance Marketplace (a.k.a. the Health Insurance Exchange).

10. Defendant Centene, LLC is a Wisconsin corporation with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene, LLC is registered in Ohio as a foreign limited liability company. Defendant Centene LLC is a resident and citizen of Wisconsin and Missouri.

11. Centene, LLC is a wholly owned subsidiary of Centene Corporation. Upon information and belief, Centene, LLC is the entity that Centene Corporation uses to implement and oversee Centene Corporation's Health Insurance Marketplace products across the nation.

12. The health insurance products that Centene Corporation offers through the Health Insurance Marketplace are referred to as Ambetter.

13. Defendant Buckeye Health Plan is an Ohio corporation with its principal place of business at 4349 Easton Way, #200, Columbus, Ohio, 43219. Buckeye Health Plan is licensed to sell health insurance in the state of Ohio. Defendant Buckeye Health Plan is a resident and citizen of Ohio.

14. Buckeye Health Plan is a wholly-owned subsidiary of Centene Corporation and offers the Ambetter insurance product in Ohio.

15. Upon information and belief, Centene, LLC oversees and controls the operations of Buckeye Health Plan.

16. Upon information and belief, Centene Corporation oversees and controls the operations of Centene, LLC and Buckeye Health Plan.

17. Plaintiffs purchased Centene's Ambetter Health Insurance Policy from Buckeye Health Plan through the Marketplace.

## JURISDICTION

18.     This Court has personal jurisdiction over Defendant Buckeye Health Plan because it is a citizen of Ohio.

19.     This Court has personal jurisdiction over Defendants Centene Corporation and Centene, LLC by virtue of their business transactions in, contracts to provide services to, and substantial revenue derived from the state of Ohio.

20.     This Court has subject matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, all members of the proposed class are citizens of Ohio and two of the Defendants are not, and the number of the members of the proposed class exceed 100.

21.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.  The Affordable Care Act and its Pertinent Health Plan Requirements

22.     The Affordable Care Act (ACA) was enacted by Congress in an attempt to provide "[q]uality, affordable healthcare for all Americans."  42 U.S.C. Ch. 157.  The ACA requires that every state have an exchange where consumers can buy individual health insurance policies.  Ohioans who do not have health insurance through their employer, Medicare or Medicaid may be eligible to purchase coverage through the exchange.

23.     Levels of insurance offered through the exchange are characterized as Bronze, Silver, Gold and Platinum.  The cost of premiums and out of pocket costs varies from Bronze to

Platinum, with Bronze policies offering lower premiums but higher out of pocket costs while Platinum policies offer higher premiums but lower out of pocket costs.

24.    The ACA includes two different types of subsidies to help make health insurance more affordable: the premium tax credit and cost sharing reductions. The premium tax credit is designed to reduce the insurance premiums paid by individuals, and the cost sharing reductions are designed to reduce the out-of-pocket expenses (deductibles, copayments, and coinsurance) paid by individuals.[1]

25.    Pursuant to the ACA, insurance companies offering qualified health plans through the exchange are required to reduce the out-of-pocket expenses for individuals qualified to take advantage of the cost sharing reductions. In return, the Secretary of Health and Human Services is required to make payments to the insurance companies as reimbursement for the cost sharing reductions they make for their qualified insureds.

26.    As a provider of insurance through the exchange, Centene would have received monetary reimbursement from the federal government for the cost sharing reductions made on its Ambetter policies offered through the exchange.

27.    To help ensure access to quality healthcare, the ACA places several requirements on insurance companies offering health plans through the exchange.

28.    One such requirement is that a plan maintain "a network that is sufficient in number and types of providers … to assure that all services will be accessible without unreasonable delay." 45 C.F.R. § 156.230(a)(2). Further, health plan providers "must publish an

---

[1] Deductibles are how much money an insured pays out of pocket before the insurance company starts to cover a larger portion of the healthcare bills. Co-pays are a predetermined rate of pay for healthcare services at the time of care; i.e., a $25 co-pay for doctor office visit. Coinsurance is the percentage of the medical charge an insured pays with the rest being paid by the health insurance company; i.e., for an 80/20 medical plan, the insurance company pays 80% of the healthcare provider bill, while the insured is responsible for 20% of the bill.

up-to-date, accurate, and complete provider directory … in a manner that is easily accessible to plan enrollees" and the directory "must identify providers that are not accepting new patients." 45 C.F.R. § 156.230(b).

29.     Additionally, a health plan is required to provide a written summary of benefits and coverage to those who apply for health insurance within seven days of their application. 45 C.F.R. § 147.200(a)(1)(i,iv).   This written summary of benefits and coverage must include, among other things, a description of the coverage, the exceptions, reductions, and limitations of the coverage, the cost-sharing provisions of the coverage, including deductible, coinsurance, and copayment obligations, and an internet address where insureds can access a list of network providers.  45 C.F.R. § 147.200(a)(2)(i).

30.     Upon information and belief, Defendants provide its insureds a written summary of benefits and coverage known as the "Evidence of Coverage" document.

**B.  Pertinent Ohio Insurer Requirements**

31.     Ohio, like all states, has its own law that regulates insurance companies and the plans they offer.  Many of these laws are aimed at prohibiting unfair and deceptive insurance trade practices.

32.     For example, O.R.C. § 3901.21 makes it unlawful for insurers to, among other things "misrepresent the terms of any policy issued or to be issued or the benefits or advantages promised thereby."  O.R.C. § 3901.21(A). Additionally, it is unlawful for insurers to make an "assertion, representation, or statement … which is untrue, deceptive or misleading."  O.R.C. § 3901.21(B).

33.     The Ohio Administrative Code has interpreted O.R.C. § 3901.21 to require insurers to "ensure that the format and content of a provider directory of a health benefit plan is

sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive." OAC § 3901-8-16. To be "sufficiently complete and clear," insurers must, among other things:

a. review and update provider directories quarterly,

b. update its provider directory within 15 days of becoming aware of the addition, expiration, or termination of a provider or a facility from the plan's network,

c. "make it clear to an enrollee which providers and facilities belong to each network and which network or networks are applicable to each specific plan offered for sale by the insurer," and

d. "include a method by which enrollees can search for specific providers and facilities by name and receive a listing of all networks, and the applicable health plans, to which the provider and facility belongs."

**C. The Centene Entities**

34. The Centene Corporation is a large, publicly traded healthcare company that reported a total of $48.4 billion in total revenues for 2017.

35. In 2017, 95% of Centene Corporation's total external revenues were derived from its Managed Care segment, which includes its Marketplace customers.

36. Indeed, Centene Corporation reports that it is the nation's largest insurer on the Health Insurance Marketplace and that it serves approximately 1.5 million exchange members with its Ambetter product.

37. Centene Corporation uses its subsidiaries to implement its Managed Care plans throughout the nation. Centene Corporation described this business model in its Annual Report to the Security Exchange Commission as a "localized approach to managing our subsidiaries

[…] with a centralized infrastructure of support functions such as finance, information systems and claims processing."

38.     Indeed, on Ambetter's website, it states: "Ambetter products are offered by Centene Corporation - a multi-national Fortune 500 company with over 30 years of experience in the Managed Care industry […]." *About Us,* Ambetter, https://www.ambetterhealth.com/about-us.html (last visited Aug. 29, 2019).  Similarly, on Buckeye Health Plan's website, it states: "The [Centene Corporation] operates local health plans and offers a range of health insurance solutions." *Your    Guide    to    Better    Health,*    Buckeye    Health    Plan, https://www.buckeyehealthplan.com/about-us.html.

39.     Accordingly, Centene Corporation's subsidiaries Centene, LLC and Buckeye Health operate in concert and in a common enterprise with Centene Corporation.

40.     As used hereinafter, "Centene" and/or "Defendants" shall refer to the joint activities of Centene Corporation, Centene, LLC, and Buckeye Health Plan.

**D.  Ambetter Health Plans, Providers, and Marketing**

41.     Defendants' website represents Ambetter as "our suite of health insurance product offerings for the Health Insurance Marketplace.  Our family of Ambetter Health Plans are certified as Qualified Health Plan issuers in the Health Insurance Marketplace." *Your Guide to Better Health,* Buckeye Health Plan, https://www.ambetterhealth.com/about-us.html (last visited Aug. 29, 2019).

42.     Further, Defendants' website represents that "Ambetter health insurance plans are designed to deliver high quality, locally-based healthcare services to its members." *Id.*

43.     In Ohio, Ambetter offers two plans: Ambetter Balanced Care (Silver) and Ambetter    Secure    Care    (Gold).    *See    Our    Health    Plans,*    Buckeye    Health    Plan,

8

https://ambetter.buckeyehealthplan.com/health-plans.html (last visited Sept. 6, 2019). The network of healthcare providers is the same for both plans.

44.    Defendants' website represents that "no matter which Ambetter plan you choose, you can always count on access to high quality, comprehensive care that delivers services, support, and all of your Essential Health Benefits." *Id.*

45.    Additionally, Defendants' website represents that "Ambetter contracts with a full range of practitioners and providers including primary care doctors, behavioral health practitioners, specialty physicians, and providers including hospitals, pharmacies, and medical equipment companies." *Additional Information,* Buckeye Health Plan, https://ambetter.buckeyehealthplan.com/find-a-provider/provider-network-design.html (last visited Sept. 6, 2019).

46.    Defendants' website represents that "Ambetter makes sure practitioners and providers of all types are available within a certain geographical mileage or driving time from each of our members' homes to ensure [that members] receive quality care in a timely manner." *Id.*

47.    Defendants' website represents they "regularly review the provider network and make decisions about which providers remain in the network and if additional providers are needed, based on relevant factors that include," among other things, the availability of certain types of practitioners and hospitals in the member's area. *Id.*

48.    In its brochures, Defendants advertise that Ambetter's "most up to date list of in-network providers" is available online on its website under the "Find a Provider" option on the main menu. They further state that "[p]roviders listed in the Ambetter from Buckeye Health Plan online directory are in-network."

**E. Defendants' Provider Networks: Inadequate and Misleading**

49.     Contrary to Defendants' representations regarding Ambetter's online directory of providers, and in violation with state and federal law, Ambetter's online directory appears to be nothing more than a copy of a general medical directory comprised of both providers who do and do not accept Ambetter insurance plans and providers who do and do not accept new patients. For example, school nurses have been listed on Ambetter's online directory of providers, even though they do not see outside patients and generally do not take insurance.

50.     Indeed, as is set forth in further detail below, Ambetter policy holders report purchasing Ambetter plans because they believed their health care providers were in-network because they were listed on Ambetter's online directory.  Unfortunately, these policy holders report later discovering that their providers were, despite being listed in the online directory, in fact out-of-network.  Generally this discovery occurs after their claim for insurance coverage for seeing a provider has been denied.

51.     Upon information and belief, the Ambetter online directory lists hundreds of facilities and physicians who do not accept the insurance.  For example, neither the University of Cincinnati Medical Center nor University of Cincinnati Physicians accepts Ambetter insurance. *Accepted      Insurance      Plans,*      UC      Health,      https://www.uchealth.com/wp-content/uploads/2017/12/UCHealthInsuranceIndex_120417.pdf  (last  visited  Aug.  29,  2019). Yet, the online directory continues to list University of Cincinnati Medical Center and numerous physicians at University of Cincinnati as in-network providers.  Also, Cincinnati Children's Hospital does not accept Ambetter insurance.  *Hospital Resources,* Cincinnati Children's, https://www.cincinnatichildrens.org/patients/resources/billing/health-exchange (last visited Aug. 29, 019).  Yet, the online directory continues to list the Cincinnati Children's Hospital Liberty

campus as an in-network provider. Cleveland Clinic does not accept Ambetter insurance. *Health Insurance Marketplace*, Cleveland Clinic, https://my.clevelandclinic.org/patients/accepted-insurance#marketplace-tab (last visited Aug. 29, 2019). Yet, the online directory continues to list the Cleveland Clinic Lutheran Hospital location as an in-network provider.

52. Also contrary to Defendants' representations, Ambetter's supposed "full range" of medical providers frequently leaves Ambetter policy holders having to travel long distances to see a medical provider, if they can find a provider at all.

53. Centene's failure to provide an adequate provider network is not just a problem in Ohio. As is evidenced by nation-wide complaints and lawsuits in other states,[2] it is Centene's usual practice to misrepresent its inadequate provider network for its Ambetter insurance product wherever it is sold. *See Cynthia Harvey et al. v. Centene Management Co., LLC,* No. 2:18-cv-00012 (E.D. Wash.).

54. Indeed, following an investigation, the Washington State Office of the Insurance Commissioner ordered the stop of sales of the Ambetter insurance product for 2018. This investigation was prompted by over 100 complaints regarding the lack of in-network physicians and other deficiencies.

55. Upon information and belief, Centene intentionally keeps an inadequate provider network and misrepresents its provider network in order to boost profits. For example, consumers are more apt to purchase an insurance product if their provider is in-network. Thus, by misrepresenting its provider network, Centene attracts more customers. Then, once

---

[2] Currently the Ambetter insurance product is available in eighteen states: Washington, Nevada, Arizona, Kansas, Texas, Missouri, Arkansas, Illinois, Mississippi, Indiana, Ohio, Tennessee, Florida, Georgia, South Carolina, North Carolina, Pennsylvania, and New Hampshire.

consumers purchase the Ambetter product and visit their healthcare provider, Centene denies the insureds' claims as "out of network," thus saving Centene money it would otherwise pay on claims.

56.     Centene's actions largely have gone unchecked because consumers are reluctant to fight back against insurance companies.  Indeed, available data indicates that 95% of Marketplace consumers do not appeal denied claims.  Karen Pollitz et al., *Claims Denials and Appeals in ACA Marketplace Plans,* Henry J. Kaiser Family Foundation, https://www.kff.org/private-insurance/issue-brief/claims-denials-and-appeals-in-aca-marketplace-plans/ (last visited Aug. 29, 2019).  Of those who did appeal, only 14% of the denials were overturned. *Id.*  Upon information and belief, Centene knows, and takes advantage of, these facts.

57.     Further, Centene's scheme takes advantage of the "once purchased, you are stuck" nature of Marketplace insurance products.  Once the open enrollment period for the Marketplace is closed, consumers cannot change their insurance plans unless a qualified life event occurs, such as marriage or having a baby.  *See Keep or Update Your Plain,* HealthCare.gov, https://www.healthcare.gov/have-coverage/ (last visited Aug. 29, 2019).  Therefore, most Marketplace consumers are stuck with the plan they purchased during open enrollment for one year.  Accordingly, those who purchase the Ambetter insurance product generally cannot switch insurance plans once they learn their providers are not in-network or there are no providers in their area.

**F.  Defendants' Failure to Pay Claims Adds to Network Problems**

58.     Ambetter policy holders also frequently experience claim denials based on purported improper coding or lack of documentation by the provider's office.

59.     For example, minor Plaintiff R.D. received pre-authorization from Buckeye Health Plan to have a transthoracic echocardiogram, which was performed on February 5, 2019. On February 25, 2019, R.D.'s mother, Plaintiff Misty Duff, received a notification from Buckeye Health Plan denying coverage for the echocardiogram, stating: "DENIED: NO RECORD OF PRIOR AUTHORIZATION FOR SERVICE BILLED."  Ms. Duff called Buckeye Health Plan to find out why the claim was denied.  After several calls, she was told the physician's office coded the claim incorrectly by inputting R.D.'s sister's information on the claim by mistake, which is why it is showing up as "no record of prior authorization."  When Ms. Duff went to R.D.'s physician's office to clarify the coding issue, she verified the office had indeed submitted the correct patient information multiple times.  Further, as R.D.'s sister was never seen by R.D.'s physician, it would be impossible for them to have the sister's information to begin with. Nonetheless, the insurance claim for the echocardiogram was applied to the sister, and denied.

60.     Similarly, Plaintiff David Swank received pre-authorization through Buckeye Health Plan for *bilateral* foot orthotics (i.e., for both feet).  After he received the orthotics, however, Mr. Swank received a notice from Buckeye Health Plan that the claim for one orthotic was approved, but the other was denied as a duplicate claim.

61.     Plaintiffs R.D. and David Swank's experience is not unique.  In fact, Centene Corporation was sued in 2016 by a group of providers who alleged their patients' claims were wrongfully denied.

62.     As a result of the frequent denials of legitimate claims, many healthcare providers will not accept the Ambetter insurance product, which further reduces Ambetter insureds' access to in-network providers.

### G.  Plaintiffs' and Class Members' Experiences with Ambetter

<u>Plaintiff Misty Duff</u>

63.     Plaintiff Misty Duff began shopping for insurance products listed on the Marketplace in November of 2018.

64.     While investigating the individual products, Ms. Duff reviewed the Ambetter plan options available by Buckeye Health Plan through the website.

65.     Additionally, Ms. Duff reviewed Ambetter's online provider directory to see whether her rheumatologist, Dr. Gregory Delorenzo, was listed.  He was, and therefore he was an in-network provider.

66.     Indeed, Dr. Gregory Delorenzo was listed on Ambetter's online provider directory, and continued to be listed as late as June 18, 2019:



*Find a Healthcare Provider,* AMBETTER, *https://providersearch.ambetterhealth.com/search-results* (last visited June 18, 2019).

67.     In reliance on Defendants' representations that Dr. Delorenzo was in-network, Ms. Duff purchased an Ambetter insurance plan from its subsidiary Buckeye Health on the Marketplace in December 2018.

68.     Subsequently, Ms. Duff had an outpatient office visit with Dr. Delorenzo on March 13, 2019.

69.     Approximately two weeks later, she received a statement from Ambetter denying payment to Dr. Delorenzo because "out-of-network provider not covered per HMO/EPO policy."

70.     Despite Defendants' representation on the website that Dr. Delorenzo was an in-network provider, Ambetter denied the claim resulting in damages to Plaintiff Duff.  Since Dr. Delorenzo was not an in-network provider, Ms. Duff may have to pay $235.00 out of pocket for her office visit.[3]



Misty Duff

Paid Date:  03/25/2019
Member ID: ████████
Claim Number: ████
Provider of Service: DELORENZO, GREGORY

| BILLING LINE | DATES OF SERVICE | BILLED | | | PAID | | | OUT OF POCKET COSTS | | | REMARK |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | AMOUNT BILLED | AMOUNT ALLOWED | AMOUNT DENIED | PAID BY PLAN | PAID BY MEDICARE | PAID BY OTHER INSURANCE | CO-PAY | CO-INSURANCE | DEDUCTIBLE | |
| 01 | 03/13/2019 - 03/13/2019 | $235.00 | $104.64 | $235.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | y1 |
| | Service Details : OFFICE/OUTPATIENT VISIT EST | | | | | | | Provider Status : NON-NETWORK | | | |
| | Totals | $235.00 | $104.64 | $235.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

Remark Codes     y1   DENIED: OUT-OF-NETWORK PROVIDER NOT COVERED PER HMO/EPO POLICY

71.     Since Ms. Duff has discovered her rheumatologist was out-of-network, she now has to find a new rheumatologist that is in-network in order to continue to receive care.

72.     Ms. Duff would not have purchased an Ambetter insurance product if she had known her rheumatologist was out-of-network.   Indeed, she was very pleased with her

---

[3] Ms. Duff has appealed the denial of this claim.

rheumatologist, whom she has seen for a long time, and she laments not being able to see him due to lack of insurance coverage.

Plaintiff R.D.

73.    Plaintiff Misty Duff has a minor daughter, R.D., who requires care from a pediatric neurologist.

74.    Plaintiff R.D. has for years seen a pediatric neurologist and other specialists through Cincinnati Children's Hospital.  Accordingly, when Ms. Duff was shopping for an insurance product, she checked Ambetter's online provider list to see whether Cincinnati Children's Hospital was listed on Ambetter's online provider directory.

75.    When she checked Ambetter's online provider directory in November 2018, Cincinnati Children's Hospital and R.D.'s specialists were listed as in-network providers.

76.    Relying on Defendants' representation that Cincinnati Children's Hospital and R.D.'s specialists were in-network providers, Ms. Duff purchased an Ambetter insurance plan from its subsidiary Buckeye Health Plan on the Marketplace in December 2018.

77.    In January of 2019, Cincinnati Children's Hospital submitted a preauthorization to Buckeye Health Plan for R.D. to undergo certain outpatient procedure.  On January 23, 2019, Ms. Duff received a letter from Buckeye Health plan approving the procedure.

78.    Also in January of 2019, R.D. underwent surgery at Cincinnati Children's Hospital.

79.    Despite Defendants' representations on the website that Plaintiff R.D.'s providers were in-network and their approving the procedure, Ambetter subsequently denied Ms. Duff's claim for coverage for R.D.'s outpatient procedure and surgery, stating the providers were out-

of-network. As a result, Plaintiff Duff has suffered damages as she may be responsible for paying full price for these services.

80. Once Ms. Duff discovered that Cincinnati Children's Hospital and the specialists treating her minor daughter R.D. were out of Ambetter's plan network, Ms. Duff had to find new specialists that were in-network in order for R.D. to continue to receive care.

81. Ms. Duff would not have purchased an Ambetter insurance product if she had known that R.D.'s providers were out-of-network.

82. Since Plaintiff R.D. has had to change healthcare providers, her care has effectively "started all over again," as the new providers do not have a treatment history with R.D. and have to learn about her and her condition. Further, Ms. Duff and her daughter R.D. were very pleased with, and preferred, the care R.D. received at Cincinnati Children's Hospital.

Plaintiff Katy Zinn

83. Plaintiff Katy Zinn purchased an Ambetter insurance plan from Buckeye Health Plan on the Marketplace in November or December 2018.

84. Once the policy took effect in January 2019, Ms. Zinn sought mental health treatment. Accordingly, she went to Ambetter's online provider directory to locate an in-network psychiatrist or psychologist in the Cincinnati area where she lives that specializes in mental health treatment and could prescribe medications to help her symptoms.

85. Ambetter's online provider directory listed dozens, if not hundreds, of applicable in-network providers. Ms. Zinn contacted every single provider listed on Ambetter's online provider directory. However, they all said that they do not accept Ambetter insurance, essentially rendering her unable to get the medical treatment she needed under her insurance policy.

86.     Ms. Zinn then contacted Buckeye Health Plan, who provided her with names of additional providers to contact; however, when Ms. Zinn contacted the additional providers, they too said that they do not accept Ambetter insurance.

87.     By late February or early March 2019, Buckeye Health Plan conceded to Ms. Zinn that they did not have any in-network psychiatrists or psychologists in the Cincinnati area.

88.     Frustrated, Ms. Zinn contacted the Ohio Department of Insurance and filed a complaint.

89.     It was only after Ms. Zinn filed a complaint with the Ohio Department of Insurance that Buckeye Health Plan worked out a single-case agreement with a provider so Ms. Zinn could obtain in-network care in the Cincinnati area.

90.     Although Ms. Zinn was ultimately able to receive care, it took over two months and a lot of effort on Ms. Zinn's part to do so.

91.     Indeed, those two months were two months that she could have, and should have, received treatment, but instead she was forced to deal with the stress of trying to obtain care and fighting with Buckeye Health Plan to do so.

92.     Unfortunately, Ms. Zinn has encountered similar difficulty finding in-network providers for other specialties as well. Indeed, she has found Ambetter's online provider directory to be useless.

Plaintiff David Swank

93.     Plaintiff David Swank, after confirming with his primary care physician that she did accept the Ambetter insurance plan, purchased an Ambetter policy during the Marketplace's 2019 open enrollment (approximately November 2018).

94.     Not long after Mr. Swank purchased the insurance, he called Buckeye Health Plan to set up his primary care provider.   To Mr. Swank's surprise, the Buckeye Health Plan representative he reached stated that his primary care physician was not in-network.

95.     Confused and frustrated by the conflicting statements, Mr. Swank went back and forth between his provider and Buckeye Health Plan for weeks in order to clarify his provider's network status.   Ultimately, it was discovered that his primary care provider was indeed in-network, but she had not been listed on the provider directory that the Buckeye Health Plan representative utilized.

96.     Unfortunately, that was not the end of Mr. Swank's problems with his Ambetter insurance plan.  In June 2019, Mr. Swank's physician  told Mr. Swank to see a speech-language pathologist.  Accordingly, Mr. Swank consulted Ambetter's online directory to find an in-network speech-language pathologist.  The following is what he saw:



*Find a Healthcare Provider,* AMBETTER,  https://providersearch.ambetterhealth.com/search-results (last accessed 8/20/19).

97.     Disappointed that the closest location was over 30 miles away, Mr. Swank nonetheless called the first three telephone numbers listed for Susan Brouse, CCC-SLP.  When Mr. Swank called those numbers, however, all stated that they had never heard of Ms. Brouse.

98.     Frustrated and dismayed, Mr. Swank contacted a Buckeye Health Plan representative in order to locate a closer provider.  The Buckeye Health Plan representative with whom Mr. Swank spoke was not able to provide assistance, but said he was going to "escalate the issue" and that someone would call him back within 24 hours.

99.     After three days had passed with no response, Mr. Swank again called Buckeye Health Plan.  This time, after being on hold for twenty minutes, he was disconnected.

100.    After   two months and numerous calls- with frequent long-holds and disconnections- to Buckeye Health Plan,  the only progress that was made was that a Buckeye Health Plan representative  finally admitted what Mr. Swank he had learned months before: that their only listed in-network speech-language pathologist was not at the locations the provider directory listed.

101.    Indeed, Ms. Brouse is not employed by Northern Ohio Medical Specialists, LLC as listed on the provider directory, nor does she see "off the street" patients.  Instead, she works in Ohio schools through a company called North Point Educational Service Center. *Staff Directory,* North Point Educational Service Center, https://www.npesc.org/vnews/display.v/SEC/Administration%7CStaff%20Directory (last visited Aug. 29, 2019).

102.    To date, Buckeye Health Plan has not provided Mr. Swank with an in-network speech-language pathologist within a reasonable distance from him.

103.    Frustrated, Mr. Swank asked his primary care physician to refer him to a speech-language pathologist that accepts Ambetter insurance. His primary care physician referred him to a provider that is approximately 14 miles from Mr. Swanks' house: Promedica Total Rehab. Although Promedical Total Rehab has told Mr. Swank that they accept Ambetter insurance, this provider is not listed on Ambetter's provider directory, nor were any Buckeye Health Plan representatives with whom Mr. Swank spoke able to verify its in-network status. Accordingly, Mr. Swank is justifiably concerned that he will end up facing out-of-network charges, but at a loss as to how he could avoid such as result as his dealings with Buckeye Health Plan over months have been not just futile, but infuriating.

104.    To make matters worse, as set forth above, Mr. Swank has also been denied valid claims by Ambetter and continues to fight to have these claims paid.

<u>Plaintiffs Chrissy Cox and A.C.</u>

105.    Plaintiff Chrissy Cox began shopping for insurance coverage during the Martketplace's open enrollment for 2018 (approximately November 2017).  Ms. Cox purchased the Ambetter plan to cover her minor daughter, A.C.

106.    In 2018, A.C.'s gastroenterologist recommended that she be evaluated by a pediatric rheumatologist. Ms. Cox, therefore, accessed Ambetter's online provider directory to locate an in-network pediatric rheumatologist. To Ms. Cox's shock, there were no in-network pediatric rheumatologists listed within the state of Ohio.

107.    Ms. Cox then sought a referral to a pediatric rheumatologist from A.C.'s, gastroenterologist.  Ultimately A.C. was referred to and saw a pediatric rheumatologist located in Cincinnati.

108.    The claim for the pediatric rheumatologist visit, however, was denied because the pediatric rheumatologist was out of Ambetter's network. Ms. Cox appealed the denial because there were no in-network pediatric rheumatologists within a hundred-mile radius of their home, but that appeal was denied. The Buckeye Health Plan representative told Ms. Cox that she cannot appeal the location of a provider after an appointment has been made. Therefore, Ms. Cox had to pay for this visit out of pocket. Ms. Cox, who lives within 40 miles of a major metropolitan area, should not be expected to 100+ miles to see an in-network pediatric rheumatologist.

109.    Unfortunately, this was not the only time Ms. Cox has had to pay out-of-pocket for A.C.'s care despite having insurance. For example, many of A.C.'s appointments, medications, and procedures require preauthorization under the Ambetter plan. The preauthorization process can take anywhere between three days and one month (although it typically takes at least two weeks) to be completed, even when submitted for urgent review. Therefore, when A.C. is prescribed medication that she needs *now*, Ms. Cox has a choice: pay for the medicine her daughter needs out-of-pocket or wait two to three weeks, at the expense of A.C.'s health, to see whether it will be approved. Obviously, the only choice Ms. Cox can make is to pay for the medication, which has been as much as $1,500.

110.    Even when Ms. Cox seeks preauthorization, most of the time it is denied with little or no explanation, again forcing Ms. Cox to pay out-of-pocket for her daughter's care.

111.    Similarly, claims are frequently denied or not paid by Buckeye Health Plan due to dubious reasons, including coding errors, purported duplicate claims when, in fact, they were separate claims for separate procedures, and failure to get preauthorization when, in fact, preauthorization was obtained.

112.    Despite these ongoing problems with the Ambetter insurance plan, Ms. Cox had to purchase it again for the 2019 year because there was no other health plan available on the Marketplace that would cover A.C.'s healthcare needs.

113.    Unfortunately, the problems Ms. Cox had encountered with the Ambetter plan in 2018 continued into 2019. For example, when Ms. Cox purchased the Ambetter plan, Dayton Children's Hospital and the majority of A.C.'s specialists accepted Ambetter insurance; however, this changed mid-year.  Despite a major healthcare provider like Dayton Children's Hospital no longer accepting Ambetter insurance, Defendants failed to provide notice of this change to its policyholders, including Ms. Cox.  Defendants also failed to timely update its online directory of network providers and, as a result, many of A.C.'s providers at Dayton Children's Hospital and the hospital itself continued to be listed in the directory as in-network.

114.    Based on the lack of notice from Defendants and the continued listing of the providers in the online directory, Ms. Cox's daughter A.C. continued to receive care and treatment from her specialists at Dayton Children's Hospital.  It was only after Defendants denied several claims for Plaintiff A.C. that Plaintiff Cox learned that Dayton Children's Hospital and many of its treating physicians were no longer in-network providers.

115.    Since learning that many of A.C.'s healthcare providers are no longer in network, Ms. Cox has gone back and forth with Buckeye Health Plan and Dayton Children's Hospital to have the matter resolved.  Despite Ms. Cox's spending hours upon hours trying to resolve the issue, it never was resolved: Dayton Children's Hospital eventually wrote off the unpaid claims in or around July 2019.

116.    Ms. Cox has devoted and continues to devote a significant amount of time battling with Buckeye Health Plan over claims that were wrongfully not paid for various reasons.

Ambetter Reviews

117.    Plaintiffs' experiences are not isolated events.  Indeed, in Ohio, Ambetter has an "F" rating- the lowest rating possible- from the Better Business Bureau ("BBB").  On the BBB's website, multiple complaints are listed, including the following:

> The hospital where I had surgery last year had received in writing from Ambetter pre approval for this surgery last February 2018.  Ambetter has yet to pay the hospital 13 months later.

> Aside from sending me multiple messages trying to tell me my payment is past due when [it is] up to date, [Ambetter is] currently not covering my new doctor that I [waited] until January for my insurance to kick in so I could see. They tried telling me when I called them about the bill that the * ***** ***** ***** Health center is not covered. If I go onto the Website and search for a provider the * ***** ***** building shows up. If this is not covered, then why do they have it on their directory map?

> I chose Ambetter from Buckeye Health Plan through the market place because they matched my healthcare providers. I received a book and called Ambetter to verify that these Doctors were in Network. I was told that the Provider is in Network. She is also listed in the book and I called the Doctor's office to check. Everyone I contacted from Ambetter to the Doctor said that they were in Network. I went to my appointment 11/21/16. Ambetter denied the claim stating that the doctor was out-of-network.

> I just received a call from my doctor saying that Ambetter did not accept the billing for my appointment with my doctor. I only go do the doctor three times a year - it has been the same doctor my [entire] life - and the only reason to which I even chose Ambetter was so I could continue to go to my family doctor. Now I am being told that this in incorrect!

*Complaints,* Better Business Bureau, https://www.bbb.org/us/oh/columbus/profile/health-insurance/ambetter-from-buckeye-health-plan-0302-70090257/complaints (last visited Aug. 29, 2019).

118.    Similarly, Ambetter customers have posted their complaints on the crowd-sourced review forum Yelp:

> The Ambetter Buckeye product (Marketplace/ObamaCare) has terrible customer service.  They initially denied claims as out of network which was an error.  They

were so far behind in adding the newly contracted providers into their system (months behind) causing claims to deny incorrectly. We just now (within the last 5 days) have received payments for dates of service from July 2017 forward! That's 14 months! Completely unacceptable. I had contacted them numerous times which did no good. Only AFTER I filed a complaint with the Ohio Insurance Commission did we receive payment. Anybody looking to purchase health insurance through the Marketplace AVOID Ambetter Buckeye. If they deny claims incorrectly, then you will receive a bill for these services. What's the use in having insurance then? (Posted 10/1/2018)

STAY AWAY! We signed up for AMBETTER SILVER PLAN. We have filed a complaint with the Ohio Insurance Board. Most providers on their website have either dropped them or have not heard of them. That's just the tip of the iceberg of this disaster. Pay a few more dollars and buy a reputable plan or you are stuck with a nightmare.

They will refuse to pay what they're legally obligated to knowing that most people cannot afford the legal costs of getting their costs recouped. Absolute scum.

They are not covered by many hospitals and doctors as mentioned in their site. Either that or they do not accept Ambetter insurance or they do not accept new patients. Their customer service is horrible, an hour of my break time goes just trying to reach the customer service and making them understand the situation with crazy amount of holds.

*Buckeye Community Health Plan,* YELP, https://www.yelp.com/biz/buckeye-community-health-plan-columbus (last visited Aug. 29, 2019).

119.    Indeed, the Ohio Department of Insurance has received multiple complaints regarding Ambetter, the majority of which report lack of providers and/or providers being listed as "in-network" when they in fact were not.

120.    As the above reviews demonstrate, Defendants' conduct has affected many Ohioans, and their complaints mirror the complaints of the Plaintiffs.

## H. CLASS ACTION ALLEGATIONS

121.    Plaintiffs bring a lawsuit on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3). Plaintiffs seek to act as Class Representatives. The proposed Rule 23 Class ("Proposed Class") is defined as: All persons in the state of Ohio

who were insured by Defendants' Ambetter insurance product, which was purchased through the Marketplace from September 9, 2015 to present. Excluded from the class are Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to which this case is assigned and the immediate family of the Judge(s) to which this case is assigned.

122. The class definition may be amended or modified as warranted by discovery or other activities in the case hereafter.

123. <u>Numerosity.</u> The Proposed Class is so numerous that joinder of all members of the class is impractical. Upon information and belief, over fifteen thousand people have purchased the Ambetter Insurance product from its subsidiary Buckeye Health on the Marketplace in 2018 alone. *See* Louise Norris, *Ohio Health Insurance Marketplace: History and News of the State's Exchange*, (Jan. 2, 2019), https://www.healthinsurance.org/ohio-state-health-insurance-exchange/. This Proposed Class is easily ascertainable from Defendants' records.

124. <u>Commonality.</u> Common questions of both law and fact exist as to all members of the Proposed Class. These common questions predominate over any questions affecting individual Class Members. For example, some common questions of law and fact which can be determined on a class wide basis include, but are not limited to:

      a. Whether Defendants' Evidence of Coverage document constitutes a contract between Defendants and Plaintiffs / Class Members;

      b. Whether Defendants breached their contracts with Plaintiffs / Class Members by failing to provide in-network plan coverage for physicians listed in their provider directory;

      c. Whether Defendants breached their contracts with Plaintiffs / Class Members by failing to provide a sufficient network of providers;

d.  Whether Defendants breached their contracts with Plaintiffs / Class Members by failing to provide the insurance coverage promised;

e.  Whether Defendants breached their duty of good faith and fair dealing by denying claims for providers listed as in-network in the directory;

f.  Whether Defendants had a duty to maintain a network of providers sufficient in number and type to assure that all services will be accessible without unreasonable delay.

g.  Whether Defendants had a duty to maintain and publish an up-to-date, accurate, and complete provider directory in a manner easily accessible to plan enrollees and identifying providers no longer accepting new patients.

h.  Whether Defendants had a duty to ensure that the format and content of a provider directory of a health benefit plan is sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive.

i.  Whether Defendants' misrepresentation of their insurance plan's providers and/or coverage constituted fraud and/or negligent misrepresentation;

j.  Whether Defendants intentionally or negligently failed to comply with the terms of their insurance contracts.

k.  Whether Centene Corporation operated Centene, LLC, and/or Buckeye Health Plan as a shell or alter ego such that the law should disregard their separate business identities;

l.  Whether Plaintiffs and Class Members are entitled to monetary damages, injunctive relief, and/or other remedies and, if so, the nature of any such relief.

Answers to these and other common questions will resolve the claims of both Plaintiffs' and the Proposed Class Members.

125.    Predominance. The common questions of law and fact predominate over any questions affecting individual Class Members.  Although the individual damages suffered by each Class Member may differ, common questions of law and fact predominate as the damages sustained by Plaintiffs and Class Members all stem from the same misconduct by Defendants.

126.    Typicality. Plaintiffs' claims are typical of the claims of the Proposed Class Members.  Plaintiffs and Class Members purchased Defendants' health insurance through the Marketplace.  Plaintiffs and Class Members suffered damages by Defendants' inadequate network of providers, inaccurate and misleading provider directory, and denial of claims for providers listed as in-network in the directory.  Plaintiffs and Members of the Class also have the same interest in preventing Defendants from engaging in unlawful conduct in the future.

127.    Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the Proposed Class.  Plaintiffs do not foresee any difficulty in managing this action as a class action.  Furthermore, Plaintiffs have retained counsel who is competent and experienced in class action litigation.

128.    Superiority. Class action treatment is superior to other alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such common treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort or expense that numerous individual actions would entail.

129. Furthermore, the amounts at stake for Plaintiffs and Class Members, while substantial, may not enable them to maintain separate lawsuits against Defendants. Utilizing the class action mechanism allows Plaintiffs and Class Members to have their day in court.

130. Prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual Members of the Class that would establish incompatible standards of conduct for Defendants.

131. Without a class action, Defendants will likely retain the benefits of their wrongdoing and will continue a course of action which will only harm more individuals.

132. <u>Manageability.</u> No difficulties are likely to be encountered in the management of this class action and no superior alternatives exist for the fair and efficient adjudication of the controversy.

**COUNT I**
**Breach of Contract**

133. Plaintiffs incorporate by reference, as if fully set forth herein, the preceding paragraphs of the Complaint and further allege as follows.

134. In accordance with ACA regulations (45 C.F.R. § 147.200(a)(1)(i, iv)), Defendants provided Plaintiffs and Class Members with a written summary of benefits and coverage – i.e., Ambetter's "Evidence of Coverage" document. Defendants' Evidence of Coverage document states: "[i]n consideration of *your* application and the timely payment of premiums, *we* will provide benefits to *you*, the *member*, for covered *loss* due to *illness* or bodily *injury* as outlined in this *contract.*"

135. Defendants' Evidence of Coverage document constitutes a valid and binding written contract between Plaintiffs / Class Members and Defendants for the purchase of Ambetter health insurance coverage.

136.    As is stated in Defendants' contract, Ambetter policy holders have a "right to: … receive the benefits for which [the policyholders] have coverage."

137.    As stated in Defendants' contract, Ambetter policy holders have a right to "[a] current list of network providers.  A listing of network providers is available online at Ambetter.BuckeyeHealthPlan.com. You can find any of our network providers by visiting our website and using the "Find a Provider" function."

138.    As stated in Defendants' contract, Ambetter policy holders have a right to "[a]dequate access to qualified medical practitioners and treatment or services regardless of age, race, creed, sex, sexual preference, national origin, or religion."

139.    As stated in Defendants' contract, "[a] listing of network providers is available online at Ambetter.BuckeyeHealthPlan.com.  We have plan physicians, hospitals, and other medical practitioners who have agreed to provide you healthcare services.  You can find any of our network providers by visiting our website and using the 'Find a Provider' function."

140.    As stated in Defendants' contract, their "website can be accessed at Ambetter.BuckeyeHealthPlan.com.  It also gives you information on your benefits and services such as . . . [f]inding a network provider."

141.    Plaintiffs and Class Members have performed all conditions precedent to the application of the policies.

142.    As described above, Defendants breached the contract by failing to provide accurate and current list of network providers from whom Plaintiffs and Class Members could receive health care services and benefits; failing to provide Plaintiffs and Class Members adequate access to qualified medical practitioners, treatment, and/or services; failing to provide

Plaintiffs and Class Members the insurance coverage promised; and denying claims and/or failing to pay claims for providers listed as in-network in the directory.

143.     Breach of each of the aforementioned rights / contractual provisions constitutes a material breach of contract.

144.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs and Class Members have suffered damages including, but not limited to, consequential and incidental damages.

145.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs and Class Members are entitled to damages including, but not limited to, a return of their premiums, benefit of the bargain damages, the difference in the value of the policy as represented and the value of the policy actually delivered, and/or damages incurred for having to pay for services that should have been covered by the insurance contract.

## <u>COUNT II</u>
## Breach of Duty of Good Faith & Fair Dealing

146.     Plaintiffs incorporate by reference, as if fully set forth herein, the preceding paragraphs of the Complaint and further allege as follows.

147.     Under Ohio law, Defendants, as insurers, had a duty to Plaintiffs and Class Members to act in good faith in the handling and payment of claims for Plaintiffs and Class Members.

148.     As described above, Defendants breached their duty to Plaintiffs and Class Members when they denied claims and/or failed to pay claims for providers that were listed as in-network in the directory.

149.     As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiffs and Class Members have suffered damages.  Defendants' breach of

their duty of good faith and fair dealing gives rise to a cause of action in tort, irrespective of any liability that may arise from breach of the underlying insurance contract.

150.    As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiffs and Class Members are entitled to damages including, but not limited to damages incurred for having to pay for services and claims that should have been covered by the insurance contract.

## COUNT III
### Fraud / Negligent Misrepresentation

151.    Plaintiffs incorporate by reference, as if fully set forth herein, the preceding paragraphs of the Complaint and further allege as follows.

152.    Under the ACA, Defendants had a duty to maintain "a network that is sufficient in number and type of providers . . . to assure that all services will be accessible without unreasonable delay."  45 C.F.R. § 156.230(a)(2).

153.    Under the ACA, Defendants had a duty to maintain and "publish an up-to-date, accurate, and complete provider directory . . . in a manner that is easily accessible to plan enrollees" and the directory "must identify providers that are not accepting new patients."  45 C.F.R. § 156.230(b).

154.    Under Ohio law, Defendants had a duty to "ensure that the format and content of a provider directory of a health benefit plan is sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive."  OAC § 3901-8-16.

155.    Defendants represented on its website that "Ambetter health insurance plans are designed to deliver high quality, locally-based healthcare services to its members."

156. Defendants represented on its website that "no matter which Ambetter plan you choose, you can always count on access to high quality, comprehensive are that delivers services, support, and all of your Essential Health Benefits."

157. Defendants represented on its website that "Ambetter contracts with a full range of practitioners and providers including primary care doctors, behavioral health practitioners, specialty physicians, and providers including hospitals, pharmacies, and medical equipment companies."

158. Defendants represented on its website that "Ambetter makes sure practitioners and providers of all types are available within a geographical mileage or driving time from each of our members' homes to ensure [that members] receive quality care in a timely manner."

159. Defendants represented on its website that they "regularly review the provider network and make decisions about which providers remain in the network and if additional providers are needed, based on relevant factors that include," among other things, the availability of certain types of practitioners and hospitals in the member's area."

160. Defendants represented in its contracts with Plaintiffs and Class Members that policyholders have a right to "[a] current list of network providers. A listing of network providers is available online at Ambetter.BuckeyeHealthPlan.com. You can find any of our network providers by visiting our website and using the 'Find a Provider' function."

161. In direct violation of their duty under the law and in direct contradiction to the statements made on their website and in their contract with Plaintiffs and Class Members, Defendants misrepresented to Plaintiffs and Class Members:

      a. That all providers Defendants listed in its provider directory were in-network providers.

b.  That Defendants' listing of network providers was accurate and current.

c.  That Defendants' network of providers included practitioners and providers of all types, and within a certain geographical distance, to ensure policy holders receive quality care in a timely manner.

d.  That Plaintiffs and Class Members would receive the benefits of their insurance plan for which they have coverage, which includes access to in-network providers.

162.  In the alternative, Defendants were reckless or negligent in making these representations, as they were either deliberately indifferent to their truth or falsity or they should have known that the representations were untrue.

163.  Defendants' representations were uniform, standardized practices in that they were online, accessible by Plaintiffs and all Class Members, and in standardized materials and contracts provided to Plaintiffs and all Class Members.

164.  Defendants' representations were material to the transaction and contract between Plaintiffs and/or Class Members and Defendants.  Indeed, Plaintiffs and Class Members who received medical treatment from a provider represented by Defendants as in-network, but who was later discovered to be out of network resulted in higher out of pocket costs to Plaintiffs and Class Members.

165.  Defendants made these representations with the intent to induce Plaintiffs' and Class Members' reliance.  Indeed, these representations are prominently displayed on Defendants' website as reasons why consumers, such as Plaintiffs and Class Members, should purchase a health insurance policy through the Marketplace from Ambetter.

166.    Plaintiffs and Class Members justifiably relied on Defendants' misrepresentations as it is reasonable to assume that an insurance provider on the Marketplace would comply their own representations.  Indeed, it is presumed that Plaintiffs and Class Members would have relied on Defendants' representations about which health care providers were in-network as going to an out of network provider would have resulted in greater out of pocket costs to Plaintiffs and Class Members.

167.    Plaintiffs and Class Members relied on Defendants' representations to their detriment.  Plaintiffs and Class Members did not receive access to the network of providers that Defendants portrayed.  As a result, Plaintiffs and Class Members had to go without care and/or were delayed in getting care, they had to travel significant distances to receive care, they had to change physicians upon learning their providers were in fact out of network, and/or they had to pay out of pocket costs when Defendants denied claims for providers listed as in-network on the directory.

168.    As a direct and proximate result of Defendants' fraud and negligent misrepresentation, Plaintiffs and Class Members have suffered damages including, but not limited to, consequential and incidental damages.

169.    As a direct and proximate result of Defendants' fraud and negligent misrepresentation, Plaintiffs and Class Members are entitled to damages including, but not limited to, a return of their premiums, the difference in the value of the policy as represented and the value of the policy actually delivered, and/or damages incurred for having to pay for services that should have been covered by the insurance contract.

170.    Defendants' actions as described herein constitute malice, aggravated or egregious fraud, oppression, or insult such that Plaintiffs and Class Members are entitled to punitive damages.

## COUNT IV
### Unjust Enrichment

171.    Plaintiffs incorporate by reference, as if fully set forth herein, the preceding paragraphs of the Complaint and further allege as follows.

172.    Plaintiffs and Class Members conferred benefits upon Defendants. Plaintiffs and Class Members paid premiums for their insurance policies purchased through the Marketplace.[4]

173.    In addition to the premiums paid by Plaintiffs and Class Members, Plaintiffs also conferred benefits upon Defendants through the cost saving reductions. For those individuals who were qualified to receive cost savings reductions, those cost savings reductions conferred additional benefits upon Defendants in the form of monetary reimbursement payments by the federal government to Defendants.[5]

174.    In return for the payment of premiums and cost savings reduction payments, Defendants promised to offer insurance coverage as represented and promised, as well as reduce the out-of-pocket costs paid by qualified individuals. Those out-of-pocket costs include payments for such items as deductibles, co-pays, and coinsurance.

---

[4] Plaintiffs do not take issue with the rate that was charged for the Ambetter insurance product. Plaintiffs do not contend that the rates for the Ambetter insurance products were unacceptable, but rather that the information provided by Defendants regarding what the rates included was unacceptable.

[5] Although the Trump Administration halted the payment of cost savings reductions to insurance companies in October 2017, Defendants would have received such reimbursement payments in 2015, 2016 and the majority of 2017. Furthermore, numerous lawsuits challenging the decision to halt such reimbursement payments are currently pending in the Federal Court of Claims, which may result in such payments being restored to insurance companies offering insurance through the Marketplace.

175. As described above, Defendants failed to provide an adequate network of healthcare providers, failed to provide a current and accurate directory of healthcare providers, failed to provide insurance coverage as promised, and failed to pay claims for providers listed as in-network on the directory.

176. As a direct and proximate result of Defendants' failures, Defendants did not deliver the insurance product promised and did not deliver reduced out-of-pocket costs. In fact, Defendants' failures resulted in Plaintiffs and Class Members paying for medical care costs which should have been covered by their insurance plan and paying higher costs when Defendants denied claims for healthcare providers who were listed as in-network on the directory.

177. Defendants knowingly and voluntarily accepted and retained the benefits conferred upon them by Plaintiffs through the payment of premiums and reimbursement by the federal government of cost saving reduction payments.

178. For the reasons described above, it would be unequitable and unjust for Defendants to retain the benefits Plaintiffs and Class Members conferred for services that Defendants did not provide.

## **INJUNCTION**

179. Plaintiffs incorporate by reference, as if fully set forth herein, the preceding paragraphs of the Complaint and further allege as follows.

180. As set forth above, Defendants have provided and continue to provide an inadequate network of healthcare providers and inaccurate provider directory, inducing unwitting consumers to purchase the Ambetter insurance product only to discover that their medical

provider is not in network and/or there is not a medical provider available within a reasonable distance.

181.    As a victims of Defendants' unlawful conduct, Plaintiffs and Class Members specifically request injunctive relief enjoining Defendants from listing healthcare providers on the provider directory if they are, in fact, out-of-network and/or from denying member's claims for providers listed as in-network on the provider directory.   Absent such an injunction, Defendants will continue to engage in the conduct described herein, defrauding individuals of healthcare benefits they are contractually entitled to and denying them of their choice of medical care provider.

182.    Such injunctive relief would not harm any third parties.   In fact, the requested injunctive relief would benefit third parties, such as medical providers, and the public interest by allowing for more accuracy regarding the network and coverage of the Ambetter insurance product.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, jointly and/or severally, as follows:

a)    Designation of this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure;

b)    Designation of Plaintiffs Misty Duff and Kathryn Zinn as Representatives of the Rule 23 Class;

c)    Designation of undersigned counsel as Rule 23 Class counsel;

d)    Injunctive relief;

e) An award of compensatory damages in excess of $5,000,000.00 (Five Million Dollars) plus interest, and all other monetary damages to which Plaintiffs and Class Members are entitled;

f) An award of punitive damages in an amount to be determined by the trier of fact;

g) An order disgorging Defendants of all fees and premiums, and all profits of therefrom, they collected for services promised but not performed;

h) An award of reasonable attorneys' fees and costs; and

i) An award of all other legal and equitable relief to which Plaintiffs and Class Members may be entitled.

Respectfully submitted,

*/s/ Janet G. Abaray*
Janet G. Abaray (0002943)
Melanie S. Bailey (0075821)
Jessica L. Powell (0098458)
BURG SIMPSON
ELDREDGE HERSH & JARDINE, PC
312 Walnut Street, Suite 2090
Cincinnati, OH 45202
(513) 852-5600
(513) 852-5611 (fax)
jabaray@burgsimpson.com
mbailey@burgsimpson.com
jpowell@burgsimpson.com

*Trial Attorneys for Plaintiff*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

*/s/ Janet G. Abaray*
Janet G. Abaray