**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**MISTY DUFF, et al.,**

      **Plaintiffs,**

                    **Case No. 1:19-cv-750**
      **v.**                  **JUDGE DOUGLAS R. COLE**

**CENTENE CORPORATION, et al.,**

      **Defendants.**

## OPINION AND ORDER

This matter comes before the Court on Defendants' Motion to Dismiss (Doc. 10). For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion. Specifically, the Court **GRANTS** the Motion as to Count IV of the Complaint as it applies to Defendant Buckeye Community Health Plan. The Court **DENIES** the Motion in all other respects.

## BACKGROUND

For purposes of a motion to dismiss, the Court accepts as true the factual allegations in the Complaint. Thus, the Court reports, and relies on, those allegations here, but with the disclaimer that these facts are not yet established, and may never be.

This putative class action arises out of a dispute over the existence, scope, and handling of a health insurance policy held by plaintiffs Misty Duff, Duff's minor daughter, R.D., Kathryn Zinn, David Swank, Chrissy Cox, and Cox's minor daughter, A.C. (collectively, "Plaintiffs"). Plaintiffs all purchased (or had purchased on their behalf) insurance products from Defendant Buckeye Community Health Plan, Inc.

("Buckeye"), a wholly-owned subsidiary of Defendant Centene Corporation ("Centene").[1] (Compl., Doc. 1, #3).[2] Plaintiffs refer to these insurance products in the Complaint by the label "Ambetter," which Defendants concede is how the policies are sometimes marketed. (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #72, n.1). Centene offered these insurance products, and Plaintiffs purchased them, through the Affordable Care Act's ("ACA's") Health Insurance Marketplace. (Compl., Doc. 1, #3). Because Centene is a "qualified health plan issuer" under the ACA, ACA regulations require Centene to maintain "a network that is sufficient in number and types of providers … to assure that all services will be accessible without unreasonable delay." (*Id.* at #5 (quoting 45 C.F.R. § 156.230(a)(2)). Similar Ohio insurance regulations require Centene to "ensure that the format and content of a provider directory of a health benefit plan is sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive." (*Id.* at #6–7 (quoting Ohio Admin. Code § 3901-8-16)).

Plaintiffs further allege that, because Defendants offered the Ambetter plans on the Marketplace, Defendants have received from the Secretary of Health and Human Services certain payments as "reimbursement for the cost sharing reductions they make for their qualified insureds." (*Id.* at #5). Also, under the regulations, Plaintiffs received an "Evidence of Coverage" document, which they allege is a binding contract. (*Id.* at # 29). In this document, Centene lays out several policyholder

---

[1] Though there is some dispute as to the relationship between Buckeye, Centene Corporation, and Centene LLC, the Court will refer to them collectively as Centene.
[2] Refers to PAGEID #.

"rights," including the right to "a current list of network providers," "a right to receive the benefits for which [the policyholders] have coverage," and "[a]dequate access to qualified medical practitioners and treatment." (*Id.* at #30).

Plaintiffs allege that Centene's website makes various laudatory (but false) representations about the Ambetter products. For example, Plaintiffs allege that the website represents Ambetter plans as "Qualified Health Plan[s]" available "in the Health Insurance Marketplace," and states that the Ambetter plans are "designed to deliver high quality, locally-based healthcare services." (*Id.* at #8). The website represents that Ambetter contracts with a "full range" of practitioners, assuring policyholders that "providers of all types are available within a certain geographic mileage or driving time" from their homes. (*Id.* at #9). Centene represents on the website that it "regularly review[s] the provider network", and brochures advertise that Ambetter's "most up to date list of in-network providers is available on its website." (*Id.*). Plaintiffs stress that the advertising material makes clear that the providers, that is, doctors and facilities, listed in the online directory were "in-network."

But Plaintiffs allege that they and other putative class members were misled by Centene's website and brochures. According to Plaintiffs, "Ambetter policy holders report purchasing Ambetter plans because … their health care providers were … listed on Ambetter's online directory" (and, therefore, in-network). (*Id.* at #10). But "policy holders report later discovering that their providers were, despite being listed in the online directory, in fact out-of-network." (*Id.*). At least one named plaintiff,

Duff, alleges that she specifically relied on the website's provider directory, and in particular the presence of her preferred rheumatologist on that directory, in selecting Ambetter. (*Id.* at #14–15). After her first visit with that rheumatologist, though, she received a statement from Ambetter denying payment because he was an "out-of-network provider," notwithstanding his appearance on the directory. (*Id.* at #15). Plaintiff Duff asserts that she "would not have purchased" Ambetter had she known her rheumatologist was not in-network. (*Id.*).

Indeed, Plaintiffs allege that this directory, which Centene references in advertising materials and maintains on its website, contains hundreds of facilities and providers who do not, in fact, accept Ambetter insurance. (*Id.* at #10). Plaintiffs further allege that embellishing the directory in this way is part of Centene's business model, and that Centene "intentionally keeps an inadequate provider network and misrepresents" the extent of the network. (*Id.* at #11). Centene then denies the claims of policyholders who visit these listed providers and thereby "boost[s] profits." (*Id.*).

Plaintiffs also allege that Buckeye denies otherwise valid claims for "dubious" reasons, like coding errors, purported duplicate claims, and "failure to get preauthorization when, in fact, preauthorization was obtained." (*Id.* at #22). The Complaint supplies an example of the latter. In January 2019, Cincinnati Children's Hospital submitted and received preauthorization from Buckeye for R.D. (a minor) to undergo a certain outpatient procedure. (*Id.* at #16). After the procedure, however, Buckeye denied the claim notwithstanding the preauthorization, stating that the providers were out of network. (*Id.* at #16–17).

Again, in February of 2019, R.D. allegedly received preauthorization from Buckeye for a transthoracic echocardiogram. (*Id.* at #13). Some weeks later, Buckeye told Plaintiff Duff, R.D.'s mother, that it denied the claim because the physician's office coded the claim incorrectly by mistakenly inputting R.D.'s sister's information on the claim. (*Id.*). Plaintiff Duff allegedly confirmed with the physician's office, though, that the claim had been properly coded, and additionally claims that this physician had never seen R.D.'s sister. (*Id.*). Thus, it would have been "impossible" for the office to have input the sister's information. (*Id.*).

Likewise, Plaintiff David Swank alleges that Buckeye provided preauthorization for him to obtain bilateral foot orthotics (*i.e.*, one for each foot). (*Id.*). After he received the orthotics, however, Buckeye refused to pay as to one of the orthotics because it was a "duplicate claim." (*Id.*).

In 2018, Plaintiff Cox searched Ambetter's directory to find a pediatric rheumatologist for minor plaintiff A.C., only to find "no in-network pediatric rheumatologists listed within the state of Ohio." (*Id.* at #21). Instead, she received a referral to a pediatric rheumatologist from A.C.'s gastroenterologist, who then saw A.C. (*Id.* at #21–22). Buckeye thereafter denied the claim as out of network. (*Id.*). Plaintiff Cox responded by appealing the denial "because there were no in-network pediatric rheumatologists within a hundred-mile radius of their home," but Buckeye denied the appeal and Cox had to pay for this visit out-of-pocket. (*Id.*).

Plaintiff Cox asserts that she has been forced to pay for other procedures and medicines out-of-pocket because of delays in the preauthorization process. (*Id.* at

#22). Preauthorization can take "between three days and one month …, even when submitted for urgent review." (*Id.*). This delay, Cox alleges, has put her in a difficult position, because sometimes A.C. is prescribed medication that she needs "*now*." (*Id.*). Thus, Cox must choose whether to pay out-of-pocket for A.C.'s medicine (which has cost "as much as $1,500") or wait for Ambetter's decision "at the expense of A.C.'s health." (*Id.*). She further alleges that, even when she seeks preauthorization, it is usually "denied with little or no explanation." (*Id.*).

Based on these facts (and others), Plaintiffs filed this putative class action lawsuit, asserting four claims: (1) a breach of contract; (2) a breach of the duty of good faith and fair dealing; (3) fraud/negligent misrepresentation; and (4) unjust enrichment. (*Id.* at #29–37). Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. They press first an argument that applies to the Complaint in its entirety and then alternatively assert that each individual claim suffers from various fatal infirmities, as well. (*See generally* Doc. 10).

The matter is now fully briefed and before the Court.

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, Plaintiffs must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is so, however, only as to factual allegations. The Court need not accept as true Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556, U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow a plaintiff to discover whether he or she has a claim, but to provide a process for discovering evidence to substantiate an already plausibly-stated claim.

## LAW AND ANALYSIS

### A. The Filed Rate Doctrine Does Not Warrant Dismissal Of This Case.

In their motion to dismiss, the Defendants first attempt to dispose of the entire Complaint by invoking the "filed rate doctrine." (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #75). Under this doctrine, any insurance rate "approved by the governing regulatory agency [] is per se reasonable and unassailable in judicial proceedings." *Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-cv-0548, 2008 WL 2230696, at *20

(S.D. Ohio May 28, 2008) (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2nd Cir. 1994)). *Webb* described the two underlying purposes of the doctrine as:

> (1) prohibit[ing] a regulated entity from discriminating between customers by charging a rate for its services other than the rate filed with the regulatory agency; and (2) preserv[ing] the authority and expertise of the rate-regulating agency by barring a court from enforcing the statute in a way that substitutes the court's judgment as to the reasonableness of the regulated rate.

*Id.* at *21. Defendants urge that this doctrine is "applied strictly," even in the face of apparent inequities, and regardless of the level of review engaged in by the regulating agency. (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #75 (citing *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 849–53 (N.D. Ohio 2010))). According to Defendants, this "doctrine of deference" precludes Plaintiffs' claims here, as the health insurance policies in question were submitted to and reviewed by the Ohio Department of Insurance. (*Id.* at #74). The Court disagrees.

Defendants' argument creates a bit of confusion right out of the gate, as Defendants decline to specify which sovereign's "filed rate doctrine" allegedly applies here. To be sure, the Defendants argue that "the filed-rate doctrine applies to claims for damages 'regardless of whether the regulating agency is state or federal,'" (*id.* at #75 (quoting *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d at 849)), but that doesn't resolve the choice-of-law issue. The question is whether Defendants are laying claim to the federal filed rate doctrine, or Ohio's. As to the former, the United States Supreme Court originally "derived the federal filed rate doctrine from federal statutory and regulatory schemes." *See Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1328 (11th Cir. 2018) (Jordan, J., dissenting) (citing *Louisville & N. R.R.*

*Co. v. Maxwell*, 237 U.S. 94 (1915); *Keogh v. Chi. & N.W. Ry. Co.*, 260 U.S. 156 (1922)). At its inception, courts mostly applied the doctrine to claims attacking rates filed with the Interstate Commerce Commission under the authority of the Interstate Commerce Act. *Id*. That is, courts invoked the doctrine to preclude *federal* antitrust claims attacking *federally* regulated rates. That being said, courts have since applied that same federal-law doctrine to bar state causes of action that challenge rates set by federal regulators, under a theory of federal preemption. *Clark v. Prudential Ins. Co. of Am.*, No. Civ. 08-6197 DRD, 2011 WL 940729, at *10 (D.N.J. Mar. 15, 2011).

But the "federal" filed rate doctrine does not automatically apply to *state* causes of action that challenge rates that *state* regulators set. *See id*. at *10 (concluding that, where no federal regulator nor federal question is implicated, "the applicability of the filed rate doctrine is entirely governed by the laws of each individual state"). This distinction is important where, as here, Plaintiffs assert only state law claims in a regulatory environment controlled by the Ohio Department of Insurance. Whether the filed rate doctrine precludes Ohio *state law* claims as to rates filed with a *state regulatory agency* is a matter of Ohio law. *See In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d at 849. It is "neither prudent nor appropriate for a federal court to impose the filed rate doctrine on a state which has not adopted it," or to "bend a state [filed rate] doctrine to more comfortably fit the contours of the federal rule." *Clark*, 2011 WL 940729 at *10.

9

As Ohio law controls on the issue here, two inquiries are necessary. First, the Court must determine whether Ohio law recognizes the filed rate doctrine at all. If so, then the Court must decide if this case falls within the contours of Ohio's rule.

Defendants rely heavily on *In re Title Ins. Antitrust Cases*, a federal case applying the filed rate doctrine to Ohio title insurance, for the argument that the doctrine should preclude the Plaintiffs' claims in this case. 702 F. Supp. 2d 840 (N.D. Ohio 2010). There, a court in the Northern District of Ohio, while noting that the Ohio Supreme Court had not passed on the issue, relied on the comprehensive nature of insurance regulation in Ohio, and specifically the authority of the Superintendent to determine "whether the rates are excessive, inadequate, or unfairly discriminatory," as a basis for its decision. *Id.* at 856 ("It is this authority that allows this Court to consider an Ohio title insurance rate a 'filed rate.'"). Based on that, the court concluded that Ohio law would likely apply the filed rate doctrine to preclude damages under the Valentine Act. *Id.* at 866.

But that Valentine Act claim, like the federal Sherman Act claim advanced in the same case, was a facial attack on the reasonability of the rates themselves. *Id.* at 845 ("[T]he allegation [is] that Defendants have conspired to fix prices for title insurance in violation of … Ohio's Valentine Act."). And the Ohio Supreme Court case on which the federal court primarily relied was concerned with an insurer charging a "modified" rate without first filing it with the Superintendent of Insurance— another act going to the heart of the Department of Insurance's regulatory authority.

*In re Investigation of Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 609 N.E.2d 156, 161 (Ohio 1993).

Plaintiffs in this case, by contrast, specifically disclaim such a facial attack. (Compl., Doc. #36, n.4). Thus, even if the Ohio Supreme Court would agree that rates filed with the Ohio Department of Insurance are subject to some form of the filed rate doctrine, an issue the Court need not reach, the claims at issue here are sufficiently distinguishable from those in *In re Title Ins. Antitrust Cases*. It is true that Plaintiffs here seek relief from the alleged breach in the form of damages, which in a sense could be characterized as a "reimbursement" on the filed rate. But the nature of the claim does not, contrary to Defendants' assertion, require the Court to "substitute its judgment as to reasonable rates" for that of the Department of Insurance. Rather, Plaintiffs' claims concern (primarily) the alleged existence and breach of the insurance contract between the parties. That is, Plaintiffs do not argue that Defendants charged an unreasonable premium for the promised insurance services, but rather that the Defendants failed to provide the insurance services that they had promised. Legal claims of that nature do not implicate either of the rationales underlying the filed rate doctrine (i.e., nondiscrimination between ratepayers or preserving the regulator's authority).

The Court draws further support for this view regarding Ohio's filed rate doctrine from the decision in *Lazarus v. Ohio Casualty Group*, 761 N.E.2d 649 (Ohio Ct. App. 2001). There, an Ohio Court of Appeals rejected the argument that the Ohio insurance regulator had primary jurisdiction over a case where '[t]he issues raised …

focus[ed] not on the actual rate charged but rather on the information provided by the insurance company regarding what the rates cover." *Id.* at 721. The insurer defendant in that case had argued—though without expressly invoking the phrase "filed rate doctrine"—that something akin to the doctrine should have prevented plaintiffs from bringing their lawsuit. "Because the payment in question is part of a premium," the defendant stressed, "the question raised is the rate the insurer charged," which was "in the exclusive jurisdiction of the superintendent and not within the jurisdiction of the courts." *Id.* at 720. The court disagreed: it found that the common pleas court had jurisdiction because the issues were "fraud and deceptive practices, unjust enrichment, conversion, breach of contract and fiduciary duty and negligence, not whether the rate charged was acceptable or not." *Id.* at 721.

Thus, although the breach of contract claim relates to insurance and is therefore "incidentally connected to a regulated service, this dispute does not involve a regulated matter." *Gary Phillips & Assoc. v. Ameritech Corp.*, 759 N.E.2d 833, 837 (Ohio Ct. App. 2001) (filed rate doctrine did not bar claims against telephone company where the issue was deceptive advertising). Accordingly, the filed rate doctrine does not mandate dismissing the claims here.

## B.   Plaintiffs Have Plausibly Alleged a Claim for Breach of Contract.

Having concluded that the filed rate doctrine does not preclude Plaintiffs' claims, the Court now turns to Defendants' arguments as to specific claims. Let's start with the breach of contact claim. As noted above, to proceed on such a claim, Plaintiffs must plausibly allege each of four elements: (1) that the insurance policy is valid;

(2) that Plaintiffs materially performed under the policy; (3) that Defendants breached the policy; and (4) that Defendants' breach damaged Plaintiffs. *See, e.g., Liberty Ins. Corp. v. Anderson*, No. 1:16-cv-2249, 2017 WL 2962333, at *3 (N.D. Ohio July 12, 2017) (applying Ohio breach of contract law when the contract at issue was an insurance policy). Defendants offer four reasons why Plaintiff's breach of contract claim fails as a matter of law. They first argue that the breach of contract claim must be dismissed because Plaintiffs failed to exhaust contractually-provided remedies. (Mem. in Supp. of Mot. To Dismiss, Doc. 10, #77). Second, they assert (albeit only in a footnote) that the Court should dismiss Centene Corporation and Centene Management Company, LLC, at least as to the contract claim, as these entities were not signatories to the policy at issue. (*Id.* at # 77 n.2) (citing *Khamis v. Atlas Oil Co.*, No. 04-CV-73750, 2005 WL 2319001, at *3 (E.D. Mich. Sept. 21, 2005)). Third, they argue that Plaintiffs have failed to allege any facts plausibly establishing an "actual breach of the cited contractual provisions." (*Id.* at #77). And finally, they argue Plaintiffs have failed to allege any facts plausibly establishing "damages resulting from any such breach." (*Id.*). The Court will address each of these four issues in turn.

## 1. Failure To Exhaust Internal Grievance Mechanisms Does Not Require Dismissal.

Defendants' first argument for dismissing the breach of contract claim is that the insurance contract at issue required Plaintiffs to exhaust certain contractual remedies before instituting a lawsuit. (Mot. To Dismiss, Doc. 10, #77). To that end, Defendants argue that courts "routinely" dismiss breach of contract claims when a plaintiff has failed to exhaust the "internal administrative remedies" a contract

provides. (*Id.*). They claim the same result should follow here. The Court, while acknowledging that this is a close call, ultimately disagrees.

While this seems a relatively straightforward argument, on closer examination, a host of thorny problems emerge. Let's start with one the parties did not raise—is the outcome on the exhaustion question governed by state or federal law? This case is in federal court pursuant to diversity jurisdiction. Thus, under *Erie R.R. v. Tompkins*, state law controls on substantive questions, but federal law on procedural ones. 304 U.S. 64, 78–80 (1938). Exhaustion requirements do not fit comfortably in either camp. The parties apparently treat the question as one of state law (as they cite Ohio cases), but do not discuss the issue. The Ohio law cases that they cite do not suggest that failure to exhaust means that a breach of contract did not occur. Rather, the cases (at most) suggest that a party must pursue the internal contractual remedies before filing a case in court. *See, e.g.*, *Al-Sadeq Islamic Edn. Ctr. v. Lucas Cty. Educ. Serv. Ctr.*, No. L-03-1089, 2003 WL 23167249 (Ohio Ct. App. Dec. 31, 2003). That sounds in many ways like a claim-processing rule, which is typically considered a procedural rule, rather than a substantive rule of contract law. If that is the case, though, the parties have not cited any federal law regarding the scope of the contractual exhaustion requirements that apply in federal court.

But, while the view that exhaustion requirements are procedural has some initial appeal, the Court has located at least some federal cases holding that exhaustion requirements (or at least administrative exhaustion requirements—a distinction that may be significant, and to which the Court returns below) are

14

substantive law. In *Lamar Company, LLC v. Mississippi Transportation Commission*, 786 F. App'x 457, 460 (5th Cir. 2019), for example, the court noted that "the line between substance and procedure can be a murky one" and that exhaustion requirements "are rationally capable of classification as either." But the court nonetheless concluded that it should "treat administrative exhaustion as substantive for *Erie* purposes." *Id.*; *see also Autobahn Imports, L.P. v. Jaguar Land Rover N. Am., L.L.C.*, 869 F.3d 340, 345 (5th Cir. 2018). The Fifth Circuit based that holding on "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Lamar*, 786 F. App'x at 460. According to that court, "it would be unfair for non-diverse litigants to be able to proceed in state court when diverse but otherwise identically situated litigants could not proceed because their case was in federal court." *Id*. Those observations make some sense. As this Court has not identified any Sixth Circuit precedent to the contrary, and as the parties treat the issue as one of Ohio law, the Court will do likewise.

But that immediately leads to the next snag—trying to decipher the contours of Ohio law on the topic. Part of the problem may be the label that Defendants use: "administrative exhaustion." As a general matter, administrative exhaustion refers to situations where there is an administrative agency that supplies a forum to provide potential redress for a given type of claim, such as the EEOC for employment discrimination claims. The administrative exhaustion doctrine requires claimants to press their claims with those administrative agencies before proceeding to court. And that is typically as a result of a statutory command, not a common-law directive.

To be sure, courts sometimes also apply the label when the decisionmaker is private. For example, an ERISA plan may require a claimant to "administratively exhaust" a claim with the plan fiduciary, or a collective bargaining agreement may require a union member to follow grievance procedures before filing suit. But, even then, the exhaustion requirement is the result of a statutory command (under ERISA or the LMRA in the examples above), either express or implied.

Here, by contrast, the "administrative exhaustion doctrine" to which Defendants refer involves neither an administrative agency, nor a statutory command. That is, the insurance policies here are ACA policies, not ERISA plans, so ERISA's "statutory requirement" to exhaust does not apply. *See Mills v. Bluecross Blueshield of Tennessee, Inc.*, No. 3:15-CV-552, 2017 WL 78488, at *4 (E.D. Tenn. Jan. 9, 2017) ("Marlena's policy is not covered by ERISA. She purchased her individual plan on a health-insurance exchange set up by the Affordable Care Act. ERISA does not apply to these plans. *See* 29 U.S.C. §§ 1002(1), 1003(a); *Productive MD, LLC*, 857 F. Supp. 2d at 694 n.6. There is no statutory requirement that she undergo the grievance procedure before suing BlueCross.").

Absent such statutory command, Defendants are left to argue that some other source of law requires Plaintiffs to avail themselves of the contractually specified dispute resolution process of raising their concern with the insurer itself before heading to court. Defendants principally rely on *Nemazee v. Mt. Sinai Medical Center*, 564 N.E.2d 477 (Ohio 1990), to fill that role. (They cite one other case that did not involve true "administrative exhaustion," but it relies on *Nemazee*.) In *Nemazee*, a

physician sued claiming that a private hospital had terminated him in breach of his employment agreement. The hospital defended on the ground that the physician had failed to exhaust the internal remedies at the hospital available to him to challenge that termination. The Ohio Supreme Court acknowledged that the case did not "involve a governmental agency or any administrative procedures prescribed by statute." *Id*. at 480. But the Court nonetheless determined that the doctor's failure to avail himself of the contractually provided remedies precluded his court action. Interestingly, though, in arriving at that result, the Ohio Supreme Court cited the same type of "administrative expertise" concerns that underlie the more typical application of the administrative exhaustion doctrine. In particular, the court said the physician was required to follow the procedures based on the long-standing view that courts "should defer to the judgment of hospital administrators in matters relating to staffing privileges." *Id*. at 482.

The question here, then, on which the Court is to make an "*Erie* guess," *see, e.g.*, *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 334 (6th Cir. 2018), is whether the Ohio Supreme Court would apply that same reasoning to the contractually specified dispute process here. No party has identified any Ohio case extending *Nemazee* to the insurer/insured setting. And, while some Ohio courts appear to have applied it to employment cases outside the hospital staff-privileges context, the only Ohio case the Court has located applying a similar doctrine outside the employment setting is *Powell v. Airstream, Inc.*, 140 N.E.3d 1172, 1186 (Ohio Ct. App. 2019), in which the court prevented a warranty holder from proceeding with an

action until he had "exhausted his remedies under the warranty." But that case involved an automobile warranty, and both federal law and Ohio state law statutorily require exhaustion of internal remedies in connection with warranties. *See* 15 U.S.C. § 2310(a)(3); O.R.C. 1345.44(B).

Given the lack of case law directly on point, the Court concludes that *Nemazee* does not require dismissal of Plaintiffs' claim. Indeed, the Ohio Supreme Court itself later noted that *Nemazee*'s rule turned, in no small part, on the deference afforded hospital administrators "in matters relating to staffing decisions." *Dworning v. Euclid*, 119 Ohio St. 3d 83, 89 (Ohio 2008) ("Finally, the holding in *Nemazee* was based upon this court's opinions and case law from other jurisdictions that courts should defer to the judgment of hospital administrators in matters relating to staffing decisions.") (citation omitted). Those considerations simply are not present here.

A related point further supports this outcome. As a general matter, failure to exhaust (which is how Defendants label their argument here) is an affirmative defense. And the law is settled that a plaintiff need not "anticipate and attempt to plead around" an affirmative defense at the motion to dismiss stage. *United States v. N. Tr. Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)); *Cristino v. Bureau of Workers' Comp.*, 977 N.E.2d 742, 752 (Ohio Ct. App. 2012).

For these reasons, the Court concludes that Plaintiffs' "failure" to specifically allege in their Complaint compliance with the contracts' internal grievance processes does not require dismissal of their breach of contract claim under the "administrative

exhaustion" theory that the Ohio Supreme Court adopted in *Nemazee*, which is the only exhaustion theory that Defendants press in their motion. In reaching that result, the Court does not address whether other aspects of Ohio contract law may have implications for Plaintiffs' breach of contract claim now or down the road. For example, the Court notes that the availability of internal grievance mechanisms may present issues for Plaintiffs in their efforts to show that a breach occurred, and also in showing that any breach is amenable to treatment on a class-wide basis. As to the former, a non-final decision, absent more, may not constitute a "breach," when there are remaining avenues that an insured person could pursue under the contract. And, as to the latter, the availability of a grievance mechanism through which Plaintiffs could raise their claims may raise at least the possibility that individual issues may predominate over class issues. But the Court need not, and thus does not, reach such issues yet.

### 2. Plaintiffs Have Alleged A Relationship Between Buckeye, Centene Corporation, And Centene Management Company, LLC, Sufficient to Sustain A Breach Of Contract Claim.

Defendants' next contract-specific argument is that Centene Corporation and Centene Management Company, LLC, should be dismissed because these entities did not sign the insurance policy. (Doc. 10, #77). It is generally—but not absolutely—true that non-signatories to a contract cannot be liable for breach of that contract. Yet, that general principle does not hold in some cases. For example, it is possible for a non-party parent company to be liable for a subsidiary's breach, e.g., on an agency, alter ego, or veil-piercing theory. *See Boyd v. Archdiocese of Cincinnati*, No. 25950,

2015 WL 1600303 at *7 (Ohio Ct. App. April 10, 2015) (noting that nonparties to a contract could nonetheless be liable through a "theory like assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, [or] waiver and estoppel") (internal quotations omitted).

In this case, Plaintiffs have alleged that Centene Corporation, "a diversified, multi-national healthcare enterprise," is the sole owner of Centene Management Company, LLC, a Wisconsin corporation with its principal place of business in Missouri. (Compl., Doc. 1, #2–3). Plaintiffs continue that "[u]pon information and belief, Centene, LLC is the entity that Centene Corporation uses to implement and oversee Centene Corporation's Health Insurance Marketplace products across the nation." (*Id.* at #3). Plaintiffs also assert that Buckeye Health Plan, the only counterparty on the insurance policies, is another wholly-owned subsidiary of Centene Corporation, and that Centene Corporation "oversees and controls the operations of Centene, LLC and Buckeye Health Plan." (*Id.*). Plaintiffs state that the Centene Corporation "uses its subsidiaries to implement" its insurance plans throughout the nation and takes a "localized approach to managing [its] subsidiaries … with a centralized infrastructure of support functions such as finance, information systems and claims processing." (*Id.* at #7–8). Further, "on Buckeye Health Plan's website, it states: 'The [Centene Corporation] operates local health plans and offers a range of health insurance solutions.'" (*Id.* at #8). According to Plaintiffs, the three entities "operate in concert and in a common enterprise." (*Id.*). These factual allegations about the interrelationships between the corporations suffice, if just

20

barely, to raise a plausible inference that Centene Corporation and/or Centene Management Company, LLC are proper defendants under an alter ego, veil-piercing, or agency theory.

In short, although a parent company is not liable for a subsidiary's breach merely by dint of its ownership of the subsidiary, the Court finds that, viewing the complaint in the light most favorable to Plaintiffs (and resolving inferences in their favor), Plaintiffs have alleged enough to survive dismissal on this point. Dismissal is proper only where "the complaint does not make out a cognizable legal theory or does not allege sufficient facts to support a cognizable legal theory." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Neither is the case here.

### 3. Plaintiffs Have Adequately Pled A Breach.

Defendants next assert in their motion to dismiss that Plaintiffs failed to allege "actual breach." (Doc. 10, #79). In that regard, Defendants appear to argue that the allegations are too general, failing to cite specific contractual provisions and how they were breached. (*See id.* at #79–80). That argument starts on firm legal footing. "Threadbare recitals of the elements" of breach of contract accompanied by conclusory claims do not amount to a plausibly-pled claim. *Iqbal*, 556 U.S. at 678. That is, alleging only that (1) the contract covered the alleged claims, and (2) that Defendant breached the contract by denying the claim and failing to pay, is insufficient to state a claim for breach of contract. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, No. 8:15-CV-1821-T-17TBM, 2016 WL 8943313, at *2 (M.D. Fla. Feb. 4, 2016) ("[I]t is not

sufficient under *Iqbal* to merely plead that the Defendant breached the Policy by failing to pay the benefits owed under the Policy."); *Wohl Built, Inc. v. Maxum Indem. Co.*, No. 17-CV-80867, 2017 WL 10410373, at *2 (S.D. Fla. Dec. 21, 2017).

In pressing this argument, though, Defendants overstate Plaintiffs' burden at this stage. Plaintiffs allege that the Evidence of Coverage document, which Defendants do not contest is a valid contract, promises Plaintiffs "a current list of network providers," "a right to receive the benefits for which [the policyholders] have coverage," and "[a]dequate access to qualified medical practitioners and treatment." (Compl., Doc. 1, #29–30). Plaintiffs further allege Defendants have failed to honor these obligations in various specifically identified ways. For example, plaintiffs Swank, Zinn, and Duff all allege their claims have been denied as out of network despite having visited providers listed as "in-network" on Defendants' provider list. Plaintiffs Duff and Zinn allege that they sought and received preauthorization for certain services, only to later have payment denied on the supposedly preauthorized claims. Plaintiff Zinn alleges contacting "dozens, if not hundreds" of providers listed on the Ambetter website only to find that, despite their being listed, none accepted Ambetter insurance, "essentially rendering her unable to get the medical treatment she needed under her insurance policy." (*Id.* at #17).

These allegations are not mere conclusions, but instead offer factual support. They implicate both the alleged contractual entitlement to a current list of network providers and, perhaps, a right to "adequate access to qualified medical practitioners" (although the Court at this point does not attempt to interpret the meaning of

"adequate"). Put another way, if the allegations in the Complaint are true (and absent other facts that Defendants may be able to show), a reasonable juror could conclude that the Defendants have failed to provide an accurate list of in-network providers, failed to provide adequate access to medical providers, and have not delivered to the insureds benefits consistent with their supposed coverage, in breach of the policy.

Though perhaps a closer call than some, Plaintiffs' complaint gives Defendants "fair notice of what the … [alleged breach] is and the grounds upon which it rests." *Keys v. Humana*, Inc., 684 F.3d 605, 608 (6th Cir. 2012).

### 4.     Plaintiffs Have Adequately Pled Damages.

Finally, Defendants argue that Plaintiffs' breach of contract claim fails because the Complaint fails to allege damages. (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #80). Defendants are correct that a claimant seeking to recover for breach of contract must allege, and ultimately show, damage as a result of the breach. *Logsdon v. Ohio N. Univ.*, 587 N.E.2d 942, 946–47 (Ohio Ct. App. 1990). "Damages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996).

It is also true that, at this point, Plaintiffs have yet to specifically quantify any losses. And it may be true that some of alleged harms are still speculative. (*See generally* Compl., Doc. 1) ("Ms. Duff *may* have to pay $235.00 out of pocket for her office visit"; "Plaintiff Duff has suffered damages as she *may be* responsible for paying

full price for these services"; "Mr. Swank is justifiably concerned that he *will end up* facing out-of-network charges.") (emphasis added)).

That being said, Plaintiffs need not quantify or prove their damages at this point in the litigation. Rather, the question is only whether they have plausibly alleged cognizable damages flowing from the alleged breach of contract. That they have done.

Part of the damages they allege are that they have been denied the benefit of their bargain; that is, they have been paying premiums for their insurance but have been denied the coverage promised under the policy. Their allegedly valid (in-network) claims have been denied, preauthorizations ignored, and at least Plaintiff Cox concretely alleges that she "had to pay out of pocket" for several claims that otherwise should have been covered. These harms flow from the allegedly inaccurate network directory and inadequate network. To survive a motion to dismiss, a "complaint must contain either direct or *inferential allegations* respecting all the material elements to sustain a recovery under *some* viable legal theory." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 704 (6th Cir. 2005) (quoting *Scheid v. Fanny Farmer Candy Shops*, Inc., 859 F.2d 434, 436 (6th Cir. 1988)). Plaintiffs' Complaint contains such allegations regarding damages.

In sum, Plaintiffs have pled all that is required at this juncture to move forward with their breach of contract claim. That claim may well fail on the merits, of course, but that is a question for another day.

**C.     Plaintiffs Have Plausibly Alleged A Breach Of The Duty Of Good Faith.**

In Ohio, insurers owe their insureds the "duty to act in good faith in the handling and payment" of claims. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). Although this duty arises from the contractual relationship between the parties, liability for a breach of the duty is not dependent on a breach of the underlying insurance contract. *Captain v. United Ohio Ins. Co.*, No. 09CA14, 2010 WL 2354025, at *6 (Ohio Ct. App. June 3, 2010); *see also Eastham v. Nationwide Mut. Ins. Co.*, 586 N.E.2d 1131, 1133 (Ohio Ct. App. 1990). Adhering to this duty requires a "reasonable justification" for denying a claim, *Eastham*, 586 N.E.2d at 1320, and breach of the duty sounds in tort rather than in contract. The question is "not whether the defendant's conclusion to deny benefits was correct, but whether the decision to deny benefits was arbitrary or capricious." *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992).

Examples assist in illustrating the point. Bad faith has been found where an insurance company denied a claim but its "investigators failed to locate certain key suspects, verify alibis, [or] follow up with witnesses." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994). Indeed, failure to adequately investigate a loss is a common basis of bad faith insurance claims. *See Motorists Mut. Ins. Co. v. Said*, 590 N.E.2d 1228, 1236 (Ohio 1992) (overruled on other grounds by *Zoppo*, 644 N.E.2d 397). As the court put it in *Motorists*, "[t]he absence of any diligence concerning a claim and the insurer's refusal to determine the nature and extent of the liability may, in certain instances, evidence bad faith." *Id.* (citing *Anderson v. Continental Ins. Co.*, 271 N.W.2d 368, 375 (Wis. 1978)).

25

Here, Plaintiffs allege that Defendants breached the duty of good faith by "den[ying] claims and/or fail[ing] to pay claims for providers that were listed as in-network in the directory." (Compl., Doc. 1, #31). That allegation alone will not suffice. Such a claim alleges "nothing more than a breach of contract," which is not bad faith. *Bailey v. Hartford Life & Accident Ins. Co.*, No. 5:15CV406, 2016 WL 760431, at *4–5 (N.D. Ohio Feb. 26, 2016).

Other factual allegations may, however, plausibly show a breach of the duty. In particular, Plaintiffs allege that Defendants have denied claims even where preauthorization was acquired. Plaintiff Duff and minor R.D. allege this happened twice, while Plaintiff Swank alleges it happened once. And Plaintiff Duff asserts that Buckeye's proffered justification for denial (that the physician had input R.D.'s sister's information) was "impossible," given that R.D.'s sister had never been seen by the physician in question. (Compl., Doc. 1, #13). Repeated denials in the face of preauthorization makes plausible the claim that these denials were arbitrary or capricious, in that "preauthorization" ostensibly means the Defendants considered the services and approved them in advance, only to later deny payment, at least plausibly reflecting caprice or whim. *See McKenzie v. State Farm Fire & Cas. Co.*, No. 4:04 CV 1196, 2006 WL 8448476, at *1 (N.D. Ohio Mar. 31, 2006) (breach of duty of good faith is "the assertion that the insurer acted on caprice or whim and not on conduct that was reasonably justified").

Further, a breach of the duty of good faith can exist even absent outright denial of a claim; an insurer has a duty of good faith and fair dealing in carrying out its

26

responsibilities under the policy. *Unklesbay v. Fenwick*, 855 N.E.2d 516, 520–21 (Ohio Ct. App. 2006). Thus, even an insurer's "foot-dragging in the claims-handling and evaluation process could support a bad-faith cause of action." *Id.* at 521. To this end, Plaintiff Cox alleges that the preauthorization process can take up to one month "even when submitted for urgent review," which has led to her paying out-of-pocket for medicine and procedures. (Compl., Doc. 1, #23). She also alleges that Defendants failed to timely update their directory when Dayton Children's Hospital, a major healthcare provider, stopped accepting Ambetter insurance. (*Id.*).

For their part, Defendants assert that the denials "[a]t most … reflect honest mistakes." (Mem. in Supp. of Mot. to Dismiss, Doc. 10, # 81). They approvingly cite *Bailey*, where the court granted dismissal of a bad faith claim in part because the plaintiff "ha[d] not alleged that [the insurer] misrepresented the terms of the Policy, or otherwise misle[d] plaintiff as to coverage." 2016 WL 760431 at *5. But Plaintiffs in this case have pressed exactly the type of allegations that were missing in *Bailey*. For example, Plaintiffs allege that, in providing incorrect or out of date network directories, Defendants have misrepresented the scope of coverage: "Centene intentionally keeps an inadequate provider network and misrepresents its provider network in order to boost profits." (Compl., Doc. 1, # 11). This is more than a mere "refusal to pay a claim." This, combined with the factual allegations recited above, supports a plausible claim for breach of the duty of good faith. Defendants' Motion to Dismiss Count II of the Complaint is therefore denied.

**D.     Plaintiffs Have Plausibly Alleged A Fraud Claim Independent Of The Breach Of Contract Claim.**

Count III of the Complaint is styled "Fraud/Negligent Misrepresentation." The Court will begin with the claim for fraud. To state a claim for fraudulent misrepresentation in Ohio, Plaintiffs must establish (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862, 873 (N.D. Ohio 2011).

Plaintiffs point to seven representations as bases for their fraud claim. The first five allegedly come from Defendants' website. Plaintiffs claim that Defendants represented there: (a) that "Ambetter health insurance plans are designed to deliver high quality, locally-based healthcare services to its members."; (b) that "no matter which Ambetter plan you choose, you can always count on access to high quality, comprehensive [c]are that delivers services, support, and all of your Essential Health Benefits."; (c) that "Ambetter contracts with a full range of practitioners and providers including primary care doctors, behavioral health practitioners, specialty physicians, and providers including hospitals, pharmacies, and medical equipment companies."; (d) that "Ambetter makes sure practitioners and providers of all types are available within a geographical mileage or driving time from each of our members'

homes to ensure [that members] receive quality care in a timely manner."; and (e) that Defendants "regularly review the provider network and make decisions about which providers remain in the network and if additional providers are needed, based on relevant factors that include, among other things, the availability of certain types of practitioners and hospitals in the member's area." (Compl., Doc. 1, #9).

The sixth representation comes from an alleged brochure: (f) "[p]roviders listed in the Ambetter from Buckeye Health Plan online directory are in-network." (*Id.*). And the seventh actually comes from the contract: (g) that policyholders have a right to "[a] current list of network providers. A listing of network providers is available online at Ambetter.BuckeyeHealthPlan.com. You can find any of our network providers by visiting our website and using the 'Find a Provider' function." (*Id.* at #10).

Against that backdrop, Defendants contend that Plaintiffs' fraud allegations are defective in three ways. First, Defendants argue that the fraud/negligent misrepresentation claim is duplicative of the breach of contract claim. Second, they argue that Plaintiffs have not alleged any cognizable damages or, in the alternative, that their damages are duplicative of those alleged in the breach of contract claim. Finally, they argue that Plaintiffs have failed to allege reliance (element five above). (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #81–82).

To state a viable fraud claim under Ohio law, a plaintiff must do more than merely duplicate the factual and legal allegations of a breach of contract claim. *RAE Assocs., Inc. v. Nexus Commc'ns, Inc.*, 36 N.E.3d 757, 763 (Ohio Ct. App. 2016). That

is, Ohio law requires Plaintiffs to identify something beyond the alleged breach of contract to recover in fraud. This creates a potential problem for Plaintiffs. In comparing the contentions between the Plaintiffs' breach of contract and fraud counts, some overlap is readily apparent. In particular, the sixth purported misrepresentation in the complaint is that: "Defendants represented in its contracts … that policyholders have a right to '[a] current list of network providers. A listing of network providers is available online at Ambetter.BuckeyeHealthPlan.com. You can find any of our network providers by visiting our website and using the 'Find a Provider' function.'" (Compl., Doc. 1, # 33). This alleged misrepresentation, then, essentially argues that Defendants failed to honor the contract. As noted above, that is insufficient to state a viable fraud claim. Nor would allegations of intent fix that problem. Under Ohio law, a plaintiff cannot create a fraud claim simply by alleging an "intentional breach." *The Salvation Army v. Blue Cross & Blue Shield of N. Ohio*, 636 N.E.2d 399, 403 (Ohio Ct. App. 1993) ("It is not a tort to breach a contract, no matter how willful or malicious the breach.").

In their briefing on the matter, Plaintiffs seem to concede this overlap. (*See* Doc. 14, #273). They argue, however, that their fraud claim should survive because, in addition to breaching the contract, Defendants also breached a duty "owed separately from that created by the contract, that is, a duty even if no contract existed." (*Id.* (citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996)); Resp., Doc. 14, #273 (citing *B&B Contrs. & Developers, Inc. v. Olsavsky Jaminet Architects, Inc.*, 984 N.E.2d 419, 427 (Ohio Ct. App. 2012))). What

duty might this be? Plaintiffs point to three potential sources: two in the Code of Federal Regulations ("CFR") pertaining to the ACA (45 C.F.R. § 156.230(a)(2); 45 C.F.R. § 156.230(b)), and one in Ohio's Administrative Code (Ohio Admin. Code § 3901-8-16). (Compl., Doc. 1, #32, 152–54). Defendants respond by arguing that these regulations are immaterial because they do not create an independent cause of action for a private insured to prosecute a violation. (Reply, Doc. 16, #298–99). Plaintiffs counter that the regulations need not confer an independent cause of action, but only a duty sufficient to support a tort claim. (Resp., Doc. 14, #273).

The cases Plaintiffs cite do not support their position that a party can rely on the regulations at issue to create a public duty that will support a fraud claim. These cases instead stand for the proposition that a statute might create a duty to disclose (or codify an already existing duty to disclose) sufficient to support a claim for fraudulent *non*disclosure. *See Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-CV-00018, 2006 WL 3359448, at *16 (N.D. Ohio Nov. 17, 2006) (holding plaintiff alleged a proper duty to disclose based on salvage title law) (citing *Lee v. Chrysler Corp.*, No. 2004CA00164, 2005 WL 449762, at *2 (Ohio Ct. App. 2005) (holding that a law requiring disclosure of lemon law buyback vehicles created a duty to disclose sufficient to support a fraud claim)); *Montgomery v. Vargo*, No. 102830, 60 N.E.3d 709, 712 (Ohio Ct. App. 2016) ("The statute merely codifies a party's duty to disclose certain facts for the purposes of residential real estate transactions.") (citing *Jordan v. Bordan*, No. 90758, 2008 WL 4681837, at *3 (Ohio Ct. App. 2008)).

31

Here, though, Plaintiffs do not allege any concealment or nondisclosure. They assert affirmative (whether intentional or negligent) misrepresentation. (*See* Compl., Doc. 1, # 32–35). Indeed, what Plaintiffs seem to argue in their briefing is that these regulations create a substantive duty to the general public to keep their network provider lists current and free of the possibility of deception, and that this duty should be enforceable by way of a tort claim. (*See id.* at #32 ("Defendants had a duty to maintain "a network that is sufficient in number and type of providers … to assure that all services will be accessible without unreasonable delay.") (quoting 45 C.F.R. § 156.230(a)(2))). But to so hold would be tantamount to indirectly creating a private right of action to enforce the regulations—regulations that do not themselves create such a private cause of action. The court in *Strack v. Westfield Companies*, 515 N.E.2d 1005, 1008 (Ohio Ct. App. 1986), identified the problem with that approach. It observed that inferring a private cause of action from the deceptive sales practices regulations in Title 39 of the Ohio Administrative Code (the Title that Plaintiffs invoke here) "would be inconsistent with the existing administrative enforcement scheme" and would "not necessarily further the policy behind" the code. *Id*. The same is true here.

And the ACA regulations Plaintiffs cite come from the "Qualified Health Plan Minimum Certification Standards," which are the requirements issuers must abide by in order to list their plans on the Marketplace Exchange. *See* 45 C.F.R. § 156.200 ("In order to participate in an Exchange, a health insurance issuer must have in effect a certification issued or recognized by the Exchange to demonstrate that each health

plan it offers in the Exchange is a QHP."). While this regulation does set out substantive requirements that Plaintiffs allege Defendants failed to meet, once again the regulation nowhere confers enforcement rights upon the general public. *See Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, No. 4:16-CV-00266, 2018 WL 2422314, at \*3 (E.D. Ark. May 29, 2018), aff'd, 931 F.3d 647 (8th Cir. 2019) ("Neither the applicable ACA provisions nor its regulations create an explicit private cause of action."). Because Plaintiffs cannot point to any independent duty (apart from the contract) that Defendants allegedly breached, their fraud claim, at least as to the sixth purported misrepresentation, is merely duplicative of the breach of contract claim.

That being said, to the extent that Plaintiffs are instead claiming that Defendants misrepresented present facts about their insurance plan prior to contracting, and that such misrepresentations induced Plaintiffs to enter into the contract, that is perhaps a different story. Such a claim may not be duplicative of the breach claim. Plaintiffs partially take this tack in their briefing, arguing their misrepresentation claim should stand—even if it is somewhat duplicative of a breach of contract—because "Ohio law permits an exception to the general rule that a party cannot recover in tort for a breach of contract claim when the claim alleges defendants' negligent misrepresentations induced plaintiffs into entering a contract." (Resp., Doc. 14, #274) (citing *Owner's Mgmt. Co. v. Arthur J. Gallagher & Co.*, No. 1:17CV881, 2017 WL 5971697, at \*4 (N.D. Ohio Dec. 1, 2017)).

One problem right off the bat, though, arises from Plaintiffs' labeling, and in particular their use of the phrase "negligent misrepresentation." That is because

under Ohio law, negligent misrepresentation "is a business tort related to professional malpractice." *Thornton*, 2006 WL 3359448 at \*16. "Thus, [t]he elements for negligent misrepresentation clearly require (1) a defendant who is in the business of supplying information; and (2) a plaintiff who sought guidance with respect to his business transactions from the defendant." *Id.* (internal quotations omitted). And, importantly, as to the first element, not all parties who supply information as part of the services they offer are in the "business of supplying information." Rather, the class of defendants contemplated by such an action "is limited to certain professionals, such as attorneys, surveyors, abstractors of title and banks dealing with non-depositors' checks." *Levy v. Seiber*, 57 N.E.3d 331, 340 (Ohio Ct. App. 2016) (internal quotations omitted). Defendants fall into none of those categories. Likewise, Plaintiffs do not fall within the type of parties contemplated to assert such a tort. Plaintiffs here are private consumers who purchased personal health insurance on the ACA's Healthcare Marketplace. Like the court in *Thornton*, this Court "will not expand the tort into the realm of simple consumer transactions. To do so would wholly remove a tort originally founded in concepts of professional liability from its foundations." 2006 WL 3359448 at \*16. Thus, to the extent that Plaintiffs are in fact alleging negligent misrepresentation, that claim fails.

But, in reading the allegations in the light most favorable to Plaintiffs, another possibility emerges. The first six misrepresentations described above relate to alleged precontractual conduct. As Plaintiffs suggest, Ohio law recognizes a claim for fraudulent inducement based on such conduct, and the elements of such a claim are

"essentially the same" as those recited above for fraud. *Cantlin v. Smythe Cramer Co.*, 114 N.E.3d 1260, 1270 (Ohio Ct. App. 2018) (quoting *Pendone v. Demarchi*, No. 88667, 2007 WL 4442660, at \*4 (Ohio Ct. App. 2007)). Of course, a fraudulent inducement claim requires a specific *type* of reliance, that is, the plaintiffs must have relied on the misrepresentation *in entering the contract. See Pub. Loan Corp. v. Hood*, 125 N.E.2d 770, 774 (Ohio Com. Pl. 1955) ("[I]t is not necessary … that a misrepresentation be the sole cause or inducement of the contract … so long as it does constitute a material inducement."). And separately, because such a claim sounds in fraud, Plaintiffs must allege the elements with particularity, although intent may be alleged generally. Fed. R. Civ. P. 9(b). This means a plaintiff must at least "allege the time, place, and content of the alleged misrepresentation on which he or she relied." *Premier Business Group, LLC v. Red Bull of N.A., Inc.*, No. 08-cv-01453, 2009 WL 3242050, at \*8 (N.D. Ohio Sept. 30, 2009).

Plaintiffs fare well with the first four of the six elements of fraud described above: they allege specific representations appearing on Defendants' website and brochure, that the representations were material to (at least Plaintiff Duff's) purchase of the Ambetter plan, and that Defendants made the representations with knowledge of their falsity and with the intent to mislead Plaintiffs. (*See* Compl., Doc. 1, #34–35). Defendants take issue, though, with the fifth and sixth requirements: justifiable reliance and resulting injury. As to justifiable reliance, Defendants argue that Plaintiffs could not have justifiably relied because the representations "are what courts often describe as puffery, opinions, or too vague to be the basis of a fraud or

misrepresentation claim." (Mem. in Supp. of Mot. to Dismiss, Doc. 10, #85 (citing *Red Bull*, 2009 WL 3242050, at *10)).

In order to qualify as actionable misrepresentation, a statement typically must refer to a past or present fact—something that is susceptible of knowledge. *Lundeen v. Smith-Hoke*, No. 15AP–236, 2015 WL 8196506, at *6 (Ohio Ct. App. Dec. 8, 2015) ("To constitute actionable 'fraud,' the misrepresentation must be of a fact existing when the misrepresentation was made or one which had previously existed."). Predictions about the future or statements of opinion, by contrast, are not actionable, because a person cannot justifiably rely upon them. *Levy v. Seiber*, 57 N.E.3d at 339; *see also Hayes v. Computer Assocs. Int'l, Inc.*, No. 3:02CV7452, 2003 WL 21478930, at *4 (N.D. Ohio June 24, 2003).

In *Red Bull*, the alleged misrepresentation at issue was that a particular distribution company was "reliable and trustworthy." *Red Bull*, 2009 WL 3242050, at *10. In dismissing the claim, the court held that such a representation amounted to no more than opinion and, because plaintiffs could not have justifiably relied on such opinion, they failed to adequately plead a fraud claim. *Id.*

Certain of Plaintiffs' alleged representations suffer from the same infirmity as the bare opinion at issue in *Red Bull*. In particular, representations (a) and (b) above appear no more than laudatory "sales talk." Statements that Ambetter is "designed to deliver high quality … healthcare services," and that consumers could "count on access to high quality, comprehensive [c]are," (Compl., Doc. 1, #32–33), are simply not the type of concrete factual representation on which a party can rely. The other

36

representations, however, at least plausibly—and that is the only question at this stage—fall on the other side of the (admittedly fuzzy) line between puffery and actionable misrepresentation. In these latter four representations, Defendants assert what are at least arguably present facts about Ambetter: that it "contracts with a full range of practitioners," "makes sure practitioners … of all types are available," and "regularly review[s] the provider network." (*Id.* at #33). Defendants state in a brochure that "[p]roviders listed in the Ambetter from Buckeye Health Plan online directory are in-network." (*Id.* at #9). Such statements are arguably more than opinion or puffery, and therefore are the types of statements upon which a person may justifiably rely.

And Plaintiffs do allege that they relied on these representations, as well as the representations that certain providers were on the directory, in deciding to purchase insurance. (*See id.* at #35 ("Plaintiffs and Class Members justifiably relied on Defendants' misrepresentations as it is reasonable to assume that an insurance provider on the Marketplace would comply [with] their own representations."); *id.* at #34 ("[T]hese representations are prominently displayed on Defendants' website as reasons why consumers … should purchase … Ambetter.")). Specifically, Plaintiff Duff asserts that she visited the website prior to purchasing Ambetter. (*Id.* at #14). She further alleges she purchased Ambetter in reliance on the appearance of her rheumatologist and her daughter's specialists on the provider directory, and "would not have" absent the representations regarding in-network providers. (*Id.* at #14–18). Although not all plaintiffs allege that they reviewed all the materials prior to

purchasing Ambetter insurance, Plaintiffs' burden at this stage is only to raise the right to relief to a degree of plausibility, which "is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678.

Finally, Defendants contend that Plaintiffs have alleged no damages beyond those requested for the breach of contract action. To compare, Plaintiffs request damages for the breach of contract claim including: "a return of their premiums, benefit of the bargain damages, the difference in the value of the policy as represented and the value of the policy actually delivered, and/or damages incurred for having to pay for services that should have been covered by the insurance contract." (*Id.* at #31). The claim for damages for fraud includes "a return of their premiums, the difference in the value of the policy as represented and the value of the policy actually delivered, and/or damages incurred for having to pay for services that should have been covered by the insurance contract." (*Id.* at #35).

While these recitations are nearly identical, the Court notes that "[t]he distinction between fraud in performing a contract and fraud in inducing that contract may be significant." *Ajibola v. Ohio Med. Career Coll., Ltd.*, 122 N.E.3d 660, 669–70 (Ohio Ct. App. 2018) (citing *Curt Collins Co., Inc. v. Dudich*, C.A. No. 8022, 1976 WL 188882, *4 (Ohio Ct. App. Aug. 18, 1976)). A party fraudulently induced into entering a contract may seek rescission of the contract or seek damages based on the tort, which may include out-of-pocket losses incurred due to the parties' contract. *Id.* Plaintiffs have also alleged that they are entitled to punitive damages, which are not available for a breach of contract action, but can be for fraudulent inducement. *Simon*

*Prop. Grp., L.P. v. Kill*, No. 1-09-30, 2010 WL 1266835, at \*12 (Ohio Ct. App. April 5, 2010) ("[F]raudulent inducements are … valid tort claims and can lead to both compensatory damages and punitive damages.") (citing *Curran v. Vincent*, 885 N.E.2d 964, (Ohio Ct. App. 2007).

Of course, these measures of damages are all subject to proof, and Plaintiffs are "aware they may not collect duplicate damages for breach of contract and fraud." (Resp., Doc. 14, #277). This Court will not hesitate to dispose of this claim in the future should non-duplicate damages fail to materialize. On the face of the Complaint, however, it is not a legal certainty that Plaintiffs will be unable to recover damages for the alleged fraudulent inducement.

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss as to Count III of the Complaint to the extent that Plaintiffs allege fraudulent inducement.

### E. Plaintiffs Have Plausibly Alleged A Claim For Unjust Enrichment Against Defendants Centene Corporation and Centene Management Company, LLC.

To state a claim for unjust enrichment in Ohio, Plaintiffs must plausibly allege that (1) they conferred a benefit on the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he has conferred upon another, not to

compensate him for a loss suffered. *Hughes v. Oberholtzer*, 123 N.E.2d 393, 397 (Ohio 1954).

In this case, Plaintiffs point to two alleged "benefits" they claim to have conferred upon Defendants. The first is certain cost sharing reduction payments ("CSRs") (alternatively referred to as "cost saving reduction payments" in the briefs). (Compl., Doc. 1, #5). But Plaintiffs plead themselves out of a case as to those payments when they alleged that the payments come directly from the federal government as reimbursement for insurance companies reducing out-of-pocket costs for insureds. (*Id.*). In other words, by Plaintiffs' own allegation, it was the federal government, not Plaintiffs, that conferred this benefit on Defendants.

Although Plaintiffs claim that an "indirect" benefit can suffice, and point the Court to certain case law allegedly supporting that argument, that case law does not allow a claim of unjust enrichment when, as here, the benefit does not originate from the plaintiff *at all*. So, for example, Plaintiffs point to language to the effect that the "benefit conferred merely requires a 'tie of causation between the plaintiff's loss and the defendant's benefit.'" *Paikai v. Gen. Motors Corp.*, No. CIV S-07-892, 2009 WL 275761, at *5 (E.D. Cal. Feb. 5, 2009). A closer examination of that case, though, reveals the problem with Plaintiffs' argument.

In *Paikai*, plaintiffs bought a car from a manufacturer-authorized dealer, but sought to hold the manufacturer (GM) liable on a theory of unjust enrichment because GM thereafter refused to perform warranty maintenance work. *Id.* at *4–5. GM argued that this supposed benefit was too indirect to satisfy the first element of an

unjust enrichment claim. *Id.* at *5. The court disagreed, concluding that such an indirect benefit was sufficient, at least to survive a motion to dismiss. *Id.* But the "tie of causation" in *Paikai* still required that the benefit in fact have come *from the plaintiff*, even if indirectly. *Id.*

The Court declines to interpret "tie of causation" to mean any attenuated, but-for relationship will suffice. See *City of Cleveland v. Sohio Oil Co.*, No. 78860, 2001 WL 1479233, at *7 (Ohio Ct. App. Nov. 21, 2001) ("[T]he City could not satisfy, as a matter of law, the essential element regarding conferring a benefit on a defendant by a plaintiff because the benefit … had been conferred on BP by its customers [rather than by the City]."). And in any case, even if the Defendants were unjustly retaining the CSRs, the proper remedy would not be restitution to Plaintiffs (as Plaintiffs admit the CSRs originated from the federal government). The CSRs thus cannot support a claim of unjust enrichment under Ohio law.

Second, Plaintiffs argue that the premiums paid under the insurance policies are a benefit for purposes of unjust enrichment. (Compl., Doc. 1, # 36). The trouble with that, of course, is that a contract indisputably governs the payment of premiums, and an unjust enrichment claim will not lie when it "arises *directly* from the parties' agreements." *Jones v. Petland*, Inc., No. 2:08-CV-1128, 2010 WL 536894, at *6 (S.D. Ohio Feb. 11, 2010).

That being said, alternative pleading is permissible under federal law, meaning that a party may plead both a breach of contract claim and an unjust enrichment claim, in the alternative, without negating the validity of either, at least

so long as the existence of a contract claim is in dispute. *Ortega v. Wells Fargo Bank, N.A.*, No. 3:11CV01734, 2012 WL 275055, at *11 (N.D. Ohio Jan. 31, 2012) ("[U]njust enrichment claims may be pled in the alternative to a breach of contract claim when the existence of a contract is in dispute.") (citing *Resource Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F.Supp.2d 763, 772 (N.D. Ohio 2004)); Fed. R. Civ. P. 8(d).

Here, while Defendants do not dispute the existence of *a* contract, they do contest whether Centene Corporation and Centene Management Company, LLC, can be liable on that contract. (Resp., Doc. 14, #280). Ostensibly, this is a "dispute as to the existence or enforceability of the contract," at least as to those parties. *See id.*; *see also Astar Abatement, Inc. v. Cincinnati City Sch. Dist. Bd. of Educ.*, No. 1:11-CV-587, 2012 WL 481799, at *5 (S.D. Ohio Feb. 14, 2012). If Defendants are correct in their view, then the unjust enrichment claim against those two parties is not doing double-duty with a breach of contract claim. *See Nationwide Heating & Cooling, Inc. v. K & C Const., Inc.*, No. 87AP-129, 1987 WL 16802, at *2 (Ohio Ct. App. Sept. 10, 1987) ("Circumstances may exist to support an unjust enrichment claim against a noncontracting third-party who benefits from … one of the parties to the contract.").

Given this possibility, the Court declines to dismiss the unjust enrichment claim as to Centene Corporation and Centene Management Company, LLC, but dismisses the claim as to Buckeye, as it is a counterparty to the contract. *Res. Title Agency, Inc.*, 314 F. Supp. 2d at 772 ("Ohio law generally does not permit recovery under the theory of unjust enrichment when an express contract covers the same

subject."). While the claim may proceed, however, it will be incumbent upon Plaintiffs to show that they actually conferred a benefit on Centene Corporation and Centene Management Company, LLC, to prevail on that claim. If the Centene entities can show that no such benefit accrued, the Court will not hesitate to grant summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Doc. 10). Specifically, the Court **GRANTS** the Motion as to Count IV of the Complaint as it applies to Defendant Buckeye Community Health Plan. The Court **DENIES** the Motion in all other respects.

**SO ORDERED.**

October 4, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**