# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Misty Duff et al.,

          Plaintiffs,

   v.

Centene Corporation,
Centene Management Company, LLC, and
Buckeye Community Health Plan, Inc.,

          Defendants.

Case No.: 1:19-CV-750

District Judge Jeffery P. Hopkins

Magistrate Judge Stephanie K. Bowman

*Oral argument requested*

## DEFENDANTS' AMENDED OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Table of Contents**

Preliminary Statement ............................................................................................................. 1

Background ................................................................................................................................ 2

      A.     The Insurance and the Market ............................................................................ 2

      B.     Relevant Policy Provisions ................................................................................ 3

      C.     The Provider Directory ...................................................................................... 4

      D.     Relevant Regulations ......................................................................................... 5

      E.     Plaintiffs' Allegations ....................................................................................... 6

      F.     Plaintiffs' Models .............................................................................................. 7

      G.     Provider Count and Network Breadth ................................................................ 9

      H.     Plaintiffs' Motion ............................................................................................ 10

Legal Standards ...................................................................................................................... 11

Argument ................................................................................................................................ 12

I.      No Fit Under *Comcast*: Plaintiffs' Damages Model Ignores Their Theory of
      Liability and Relies on Leaps in Logic. ...................................................................... 13

      A.     Plaintiffs' Damages Model Fails To Translate Their Theory of Liability Into
             a Reliable Measure of Damages. ..................................................................... 14

      B.     Logical Leaps and Baseless Assumptions Further Separate Plaintiffs'
             Damages Model from Their Theory of Liability. ............................................. 16

             1.     Dr. Block's model conflates provider count and network breadth. .......... 17

             2.     Dr. Block's model conflates correlation and causation. .......................... 18

             3.     Dr. Block's model falsely assumes that Buckeye made a
                 representation regarding how many providers were in-network
                 statewide. ................................................................................................ 20

II.     No Predominance: Individualized Issues Overwhelm Common Issues. ...................... 21

      A.     The "Primary Class" Fails Because Individual Analyses Would Be
             Required To Determine Which Customers Were Harmed (if Any), and To
             Measure Their Damages. .................................................................................. 22

             1.     Breach of contract: unsuitable for certification because only
                 individual inquiry can prove performance, breach, or damages. ............. 22

             2.     Fraudulent inducement: unsuitable for certification because only
                 individual inquiry can prove reliance. .................................................... 28

i

       3.     Good faith and fair dealing: unsuitable for certification because only individual inquiry can prove "bad faith." .................................................. 30

    B.    The "Sub Class" Fails Because Individual Analyses Would Be Required To Determine Which Customers Paid Unjustified, Unremedied Out-of-Pocket Costs.................................................................................................................... 32

III.    No Superiority: Alternative Mechanisms Can Resolve Disputes Without the Problems Created by Class Treatment. ............................................................... 33

    A.    The Contract's Dispute-Resolution Process Is Superior to a Class Action. ......... 34

    B.    The Health Insurance Assistance Program Is Superior to a Class Action. ........... 35

IV.    No Indivisibility: The Injunctive Relief Plaintiffs Seek Is Atomistic and Monetary. ...... 37

Conclusion ....................................................................................................................... 38

## Table of Authorities

### Cases

*Algarin v. Maybelline, LLC*, 300 F.R.D. 444 (S.D. Cal. 2014) .................................................14, 21

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).....................................................11, 21, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)...........................................11

*Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424 (6th Cir. 2013)...............................................................................................................................5

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................................30

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) .......................................................27

*Bender v. Logan*, 76 N.E. 3d 336 (Ohio Ct. App. 2016) ..............................................................29

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ...............................................................27

*Bond v. Antero Res. Corp.*, 328 F.R.D. 187 (S.D. Ohio 2018)......................................................11

*Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559 (N.D. Cal. May 30, 2014).................16

*Brown v. Blue Cross & Blue Shield of Mich., Inc.*, 167 F.R.D. 40 (E.D. Mich. 1996) ................35

*Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225 (11th Cir. 2016) ....................................26

*Cantlin v. Smythe Cramer Co.*, 114 N.E.3d 1260 (Ohio Ct. App. 2018) .....................................29

*Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254 (6th Cir. 2018) .............................12

*Cody J. v. Kijakazi*, 2023 WL 2745121 (N.D. Ill. Mar. 31, 2023) ...............................................10

*Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002) .................................34

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .................................................................. *passim*

*Comcast. Miami Prods. & Chem. Co. v. Olin Corp.*, 2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023) ..............................................................................................................................17, 18

*Contech Bridge Sols., Inc. v. Keaffaber*, 2011 WL 5037210 (S.D. Ohio Oct. 24, 2011) .............10

*Davis v. City of Columbus*, 2022 WL 4310852 (S.D. Ohio Sept. 19, 2022) ................................10

*Desai v. Geico Cas. Co.*, 574 F. Supp. 3d 507 (N.D. Ohio 2021) ................................................33

*Dudley v. Stonecroft Ministries, Inc.*, 142 F. Supp. 3d 653 (S.D. Ohio 2015) ............................13

*Faktor v. Lifestyle Lift*, 2010 WL 271346 (N.D. Ohio Jan. 15, 2010) ............................................30

*Fleming v. Select Portfolio Servicing*, 342 F.R.D. 361 (D. Mass. 2022) ......................................27

*Fox v. Saginaw County*, 67 F.4th 284 (6th Cir. 2023) ....................................................................23

*Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061 (N.D. Cal. July 29, 2022) ..............14, 20, 21

*Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) .................................................11

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..........................................13

*Hanuman Chalisa, LLC v. BoMar Contracting, Inc.*, 187 N.E.3d 1108 (Ohio Ct. App. 2022) ........................................................................................................................................26

*Hicks v. Leffler*, 695 N.E.2d 777 (Ohio Ct. App. 1997) ................................................................31

*Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452 (6th Cir. 2020) ......................................13, 25

*Holland v. Goodyear Tire & Rubber Co.*, 75 F.R.D. 743 (N.D. Ohio 1975) ................................35

*Hooker v. Citadel Salisbury LLC*, 2023 WL 3020967 (M.D.N.C. Apr. 20, 2023) .......................26

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) .............................17

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ................................................................34

*In re Auto Parts Antitrust Litig.*, 2019 WL 626143 (E.D. Mich. Jan. 7, 2019) ......................13, 14

*In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64 (S.D.N.Y. 2017) ................................................27

*In re POM Wonderful LLC*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ...........................14, 17

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) ........................................................................................................................................13, 25

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ..13, 21

*Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579 (6th Cir. 2021) .............................27

*J&R Passmore, LLC v. Rice Drilling LLC*, 2023 WL 2667749 (S.D. Ohio Mar. 28, 2023) .........13

*Ladd v. Nashville Booting, LLC*, 2023 WL 3400485 (M.D. Tenn. May 11, 2023) ......................26

*Levy v. Seiber*, 57 N.E.3d 331 (Ohio Ct. App. 2016) ....................................................................28

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597 (C.D. Cal. Aug. 4, 2022) ................14

*Metz v. Unizan Bank*, 2009 WL 10713772 (N.D. Ohio Mar. 24, 2009) ........................................28

*Mier v. CVS Health*, 2023 WL 4837851 (9th Cir. July 28, 2023) ..................................18, 19, 20

*Molecular Tech. Corp. v. Valentine*, 925 F.2d 910 (6th Cir. 1991).............................................30

*Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011) ...............................25, 26

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618 (6th Cir. 2011) .......................................................................................................................................33, 34

*Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679 (S.D. Fla. 2014) ................................................14

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) ....................................................29

*Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918 (6th Cir. 2002) ......................................6

*Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...............................19

*Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023) ..........................................13

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017) ............................................................................................................................................23

*SFR Servs., LLC v. Colony Ins. Co.*, 2021 WL 12095073 (S.D. Fla. Jan. 25, 2021)....................10

*Shook v. Bd. of Cnty. Comm'rs of El Paso*, 543 F.3d 597 (10th Cir. 2008) ................................12

*Singleton v. PSA Airlines, Inc.*, 2021 WL 1209592 (S.D. Ohio Mar. 31, 2021) ..........................10

*Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506 (N.D. Ohio 2008)......................................30, 36

*Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) .........................................26

*Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000)..............................................................28, 29

*Stuckey v. Online Res. Corp.*, 819 F. Supp. 2d 673 (S.D. Ohio 2011) .........................................13

*Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101 (6th Cir. 2022)..........................24, 26, 27

*Thomas v. Allstate Ins. Co.*, 974 F.2d 706 (6th Cir. 1992) ....................................................30, 31

*Toldy v. Fifth Third Mortg. Co.*, 2011 WL 4634154 (N.D. Ohio Sept. 30, 2011)............11, 12, 17

*Tyson Foods v. Bouaphakeo*, 577 U.S. 442 (2016) .....................................................................21

*United States ex rel. Prather v. Brookdale Senior Living Communities., Inc.*, 892 F.3d 822 (6th Cir. 2018).......................................................................................................................30

*United States v. Knox*, 2023 WL 2599619 (N.D. Ill. Mar. 22, 2023) ..........................................10

*V & M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012) ...........................................22

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................11, 12, 22

*Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ............14

*Woodall v. Wayne County*, 2021 WL 5298537 (6th Cir. Nov. 15, 2021)...............................24, 26

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012)..............................................11

*Young v. Nationwide Mutual Insurance Co.*, 693 F.3d at 535–36................................................36

## Statutes, Rules, and Other Authorities

45 C.F.R. § 156.230 (2022) ........................................................................................................5, 25

Fed. R. Civ. P. 23(a) ................................................................................................................11, 21

Fed. R. Civ. P. 23(b)(2)........................................................................................................10, 11, 37

Fed. R. Civ. P. 23(b)(3)................................................................................................... *passim*

Ohio Admin. Code § 3901-8-16(E)(1)........................................................................................5, 32

7A Charles Alan Wright, Arthur Raphael Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 (3d ed.) (West 2023) ....................................................................37

7A Charles Alan Wright, Arthur Raphael Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1779 (3d ed.) ( 2023)..............................................................................34

1 McLaughlin on Class Actions § 4:19 (19th ed.)........................................................................26

2 Newberg and Rubenstein on Class Actions, § 4:58 (6th ed. 2023) ...........................................28

*File a Consumer Complaint*, OHIO DEP'T OF INS., https://insurance.ohio.gov/about-us/complaint-center/file-a-consumer-complaint ................................................................4, 36

*Get Coverage*, HEALTHCARE.GOV, https://www.healthcare.gov/get-coverage/ ............................2

**Summary of Argument Pursuant to L.R. 7.2**

**I.      No Fit Under *Comcast*: Plaintiffs' Damages Model Ignores Their Theory of Liability and Relies on Leaps in Logic.**

Under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), a plaintiff's damages model must translate the plaintiff's theory of liability into a reliable measure of damages on a class-wide basis. But the damages model offered in this case is nonsensical and unrelated to the Plaintiffs' theory of liability, and the model errs so often that its output is unreliable and arbitrary.

**A.      Plaintiffs' Damages Model Fails To Translate Their Theory of Liability Into a Reliable Measure of Damages.**

Plaintiffs' theory of liability is that Buckeye's provider directory contained inaccurate entries. But Plaintiffs' damages expert, Dr. Adam Block, based Plaintiffs' damages model on something different: whether there were fewer providers in Buckeye's statewide network than Buckeye "represented." Yet Buckeye's provider directory is a search engine that cannot be used to discern the number of providers. Buckeye does not communicate the number of providers to consumers *at all*, as Dr. Block conceded at his deposition, and the government does not provide that information to consumers on the government-run ACA marketplace. Because Dr. Block's model measures damages from information that customers do not have, and is different from Plaintiffs' theory of liability, it fails the *Comcast* "fit" test. *See* pp. 14–16, *infra*.

**B.      Logical Leaps and Baseless Assumptions Further Separate Plaintiffs' Damages Model from Their Theory of Liability.**

Dr. Block also makes at least three critical errors that exacerbate Plaintiffs' *Comcast* problem because they render Dr. Block's output even more arbitrary.

**1.      Dr. Block's model conflates provider count and network breadth.**

Dr. Block's model has two inputs: (i) a numerator: the number of providers he counted in the network, and (ii) the denominator: the number of providers that Buckeye "represented" to be

i

in the network.  Dr. Block purported to measure these two inputs, and found the difference to be 10.6% (i.e., the network has 10.6% fewer providers than represented).   He then attempted to calculate damages based on this difference, relying on two academic articles.  But while Dr. Block used provider *count* in his calculations, the two articles on which he relied addressed network *breadth*—a distinct concept that measures what percent of providers are in the network in a particular service area.  Because his model misuses the articles on which he relies, his model does not satisfy *Comcast*.  *See* pp. 17–18, *infra*.

### 2. Dr. Block's model conflates correlation and causation.

The two articles that Dr. Block used for his pricing output measured only *correlation* between network breadth and prices.  The articles expressly disavowed finding a *causal* relationship between network breadth and prices.  Dr. Block misused these articles as evidence of causation.  Dr. Block also failed to consider supply, demand, and regulatory factors particular to Buckeye and to the market for ACA insurance in Ohio.  A reliable model, however, requires consideration of such factors.  *See* pp. 18–20, *infra*.

### 3. Dr. Block's model falsely assumes that Buckeye made a representation regarding how many providers were in-network statewide.

Dr. Block also unjustifiably assumes that consumer behavior would have changed because of information consumers do not have.  His central claim that a network advertised to have fewer providers statewide would have been sold at lower prices fails to acknowledge that consumers do not know Buckeye's statewide provider count (or local breadth) in the first place.  Further, Dr. Block admits that Buckeye's network directory is more accurate than average but fails to consider how this might have impacted consumers' behavior.  *See* pp. 20–21, *infra*.

## II.  No Predominance: Individualized Issues Overwhelm Common Issues.

For a class to be certified, a plaintiff must prove that common questions predominate over individualized questions.  Rule 23(b)(3).  But here, common questions are swamped by individualized questions because Plaintiffs' theory of liability and Buckeye's provider search engine require considerations of each customer's unique circumstances, including where they live, what type of provider they searched for, and whether their search results were inaccurate.  Plaintiffs have offered no model for making these determinations on a class-wide basis.

### A.  The "Primary Class" Fails Because Only Individual Analyses Could Prove Members' Claims or Measure Their Damages.

Plaintiffs assert three causes of action: (i) breach of contract, (ii) fraudulent inducement, and (iii) breach of the covenant of good faith and fair dealing.  Each of these has elements that could be proven (or disproven) only with individualized evidence.

#### 1.  Breach of contract: unsuitable for certification because only individual inquiry can prove performance, breach, or damages.

Proving that Buckeye breached its insurance contracts with customers would require individualized evidence for several reasons, including because each customer sees a unique provider list when they use the directory search engine based on where they live, what type of provider they sought, and when.  Similarly, the question of whether Buckeye's network was adequate can be answered only by examining a particular service area at a particular time.  Plaintiffs also lack a common method for determining how many providers each customer thought was in Buckeye's statewide network, because no customer was told that information.  Moreover, individual analyses would be required to determine which customers performed their obligation under the contract to exhaust the internal dispute-resolution process before suing.  *See* pp. 22–28, *infra*.

**2.    Fraudulent inducement: unsuitable for certification because only individual inquiry can prove reliance.**

Individualized inquiries would be necessary as to each customer to determine reliance on any alleged misrepresentation, because the relevant "representations" were made via unique lists generated by the directory search engine. Plaintiffs' contrary argument relies on inapposite cases about standardized misrepresentations or objectively material omissions, which are inapplicable here. *See* pp. 28–30, *infra*.

**3.    Good faith and fair dealing: unsuitable for certification because only individual inquiry can prove "bad faith."**

Plaintiffs' good-faith-and-fair-dealing claim is based on the allegation that Buckeye wrongly denied claims for providers who were listed as in-network. To prove that claim, Plaintiffs must show such denials were made in "bad faith." That standard is extremely context-sensitive, and requires at least a complete understanding of why each claim was denied and whether such denials were final or ever resulted in out-of-pocket costs paid by a customer. *See* pp. 30–32, *infra*.

**B.    The "Sub-Class" Fails Because Only Individual Inquiry Can Prove a Member Incurred Unjustified, Unremedied Out-of-Pocket Costs.**

Plaintiffs propose a sub-class of customers who saw a provider that had a direct-bill claim denied by Buckeye on the basis that the provider was out-of-network. Plaintiffs unjustifiably assume that each such customer ended up paying such claims, but they are wrong. These claims usually are sorted out directly between Buckeye and the provider, and Buckeye holds customers harmless for out-of-pocket costs they pay that were the result of an inaccurate directory listing, in the unlikely event that occurs. Plaintiffs offer no model for answering these questions on a class-wide basis, because these questions are uniquely individualized. *See* pp. 32–33, *infra*.

iv

**III.    No Superiority: Alternative Mechanisms Can Resolve Disputes Without the Problems Created by Class Treatment.**

Rule 23(b)(3) also requires the Court to consider whether a class action is superior to other methods for resolving these disputes.  That is not true here because Plaintiffs have two speedy and effective methods for addressing allegations like those raised here, as another district court has held.

**A.    The Contract's Dispute-Resolution Process Is Superior to a Class Action.**

Buckeye's insurance contracts contain a mandatory dispute-resolution process, which is designed to resolve difficulties that customers may have.  That procedure is effective because it provides for external review under the supervision of the Ohio Department of Insurance, and it costs customers nothing.  Plaintiffs' own allegations show that this process can resolve the types of disputes actually implicated here.  *See* pp. 33–35, *infra*.

**B.    The Ohio Health Insurance Assistance Program Is Superior to a Class Action.**

Buckeye's customers can complain to the Department of Insurance, which assists customers like Plaintiffs with getting the coverage to which they are entitled.  *See* pp. 35–37, *infra*.

**Preliminary Statement**

Defendants (collectively known as Buckeye) offer health insurance to Ohioans under the Affordable Care Act.  Buckeye has an online provider search engine, which its customers can use if they need assistance finding in-network health care providers.  Buckeye promises its customers that the results generated by the search engine will show in-network providers, and that its network is adequate to cover the needs of its ACA customers.  Plaintiffs allege they had difficulty finding in-network providers to meet their particular healthcare needs, in part because they supposedly viewed search-engine results that included out-of-network providers.

From those allegations, Plaintiffs seek to construct an amorphous class action including all of Buckeye's customers for nearly a decade.  As a half-hearted fallback, Plaintiffs move to certify a "sub-class" of consumers who they allege paid claims out-of-pocket as a result of viewing provider search engine results that included an out-of-network provider.  Plaintiffs allege that Buckeye's provider search engine overstated its provider count so pervasively that every single consumer paid inflated premiums in every single month.

Scores of problems afflict this theory, but many are traceable to two related facts:  *First*, Buckeye's provider search engine generates unique results tailored to each search—and customers cannot search for "all"—so the search engine cannot be used to discern the number of providers in Buckeye's network.  *Second*, Buckeye does not promise a network of any particular number of providers (or breadth of providers—a distinct concept that Plaintiffs sometimes conflate with count).  Yet Plaintiffs' damages model hinges on these fallacies; it tries to measure damages by calculating the value of the difference between the number of providers that customers were "promised" compared to the number that Plaintiffs' expert says were actually in Buckeye's network.  But Buckeye never made such a promise, and Plaintiffs point to no such promise.

Moreover, no class can be certified in this case because by Plaintiffs' own estimates,

Buckeye's provider directory is more accurate than an average health insurer's provider directory. Thus, if their theory suffices to certify a massive federal class-action against Buckeye, it suffices to do so against every health insurer in the country on the same grounds. No court has ever endorsed that boundless liability theory—in this highly regulated space—and for good reason.

The evidence shows that the vast majority of Buckeye's customers are satisfied; they received the care they needed when they needed it. In rare instances where customers encountered a problem, Buckeye worked to resolve it and almost always succeeded. Plaintiffs' supposed class-wide overcharge is a fiction; it exists only in a sui generis model cooked up for this litigation, a model that crumbles even under the slightest scrutiny. So too does their "sub-class" based on erroneously denied claims, supported by no model to answer the numerous individualized questions that follow. For these reasons, and those explained below, this Court should deny Plaintiffs' motion for class certification.

## Background

### A.     The Insurance and the Market

Buckeye offers ACA insurance in the highly regulated government marketplace under the "Ambetter" brand. *See Get Coverage*, HEALTHCARE.GOV, https://www.healthcare.gov/get-coverage/. There, potential customers see information that the federal government deems relevant in choosing plans and providers. That information includes monthly price (net of government subsidies, which are significant), co-pay and co-insurance amounts, deductibles, and out-of-pocket maximums. Defendants' expert Brian Hoyt provides examples of the marketplace listings consumers see.



Ex. 1 (2d Hoyt Rpt.) at 17–18 (screenshot from healthcare.gov).

The ACA marketplace website does not show the number of healthcare providers in the network, nor does it show the local network breadth[1] of any plan's provider network. Ex. 1 (2d Hoyt Rpt.) ¶ 53. Instead, the website shows "the same standard language," which is "prescribed" by the government, to "describe [health-plans'] provider networks." *Id.* The government website includes a link to plans' websites, where potential customers can search for specific types of providers in specific towns or ZIP codes. *See id.* ¶ 57. The website thus provides no way to compare provider count or local network breadth among plans. *See id.* ¶¶ 51–58 & n.44. Nor does Buckeye indirectly provide such information, as explained further below.

**B.    Relevant Policy Provisions**

Buckeye's contracts with customers contain two relevant provisions.    Ex. 3 (2022

---

[1] Network breadth is defined as the percent of providers that are in-network in a given service area. Network breadth is an inherently local measure, and is different for each service area and necessarily varies to meet adequacy standards based on how many customers are in the particular area. Plaintiffs made no attempt to analyze this.

Contract) at 7.[2]  *First*, Buckeye customers are entitled to "[a] current list of network providers." *Id.* (emphasis omitted).  To find a provider, customers are instructed to use the "'Find a Provider' function" on Buckeye's website.  *Id.*  Customers are also informed that this function returns results "based on [their] search criteria," *id.*, and directed to "contact [Buckeye] so [it] can assist [customers] with access or in locating a contracted Ambetter provider," *id.* at 6 (emphasis omitted).  *Second*, Buckeye customers are entitled to "[a]dequate access to qualified medical practitioners."  *Id.* at 7.  Network adequacy is a regulatory term of art, as explained further below.

Buckeye's customers also assume an obligation via the contracts: they agree to abide by the contracts' dispute-resolution procedures.  Ex. 3 (2022 Contract) at 89–93.  Customers are advised first to contact Buckeye directly and informed that "most concerns can be resolved with one phone call."  *Id.* at 85, 89.  Buckeye's dispute-resolution procedures also provide for internal appeals of adverse decisions and binding external review at Buckeye's expense, under the Department of Insurance's supervision.  *Id.* at 90–91.[3]  Unless a customer "first completes all the [procedural] steps," she may not sue Buckeye "under the contract for any reason."  *Id.* at 88 (emphasis omitted).

## C.    The Provider Directory

During the relevant time period, Buckeye has not distributed a "provider directory" in hard-copy form, nor has it made a list of all providers available on its website.  Buckeye's contracts explain that it uses a provider search engine that "will produce a list of providers based on [a

---

[2] Buckeye's policies usually change slightly from year to year under the supervision of the Ohio Department of Insurance, but the attached Exhibit 3 is representative.  The language quoted here does not vary among contracts.

[3] Further, although not required by Buckeye's contracts, a customer may file a formal complaint with the Department of Insurance.  *File a Consumer Complaint*, OHIO DEP'T OF INS., https://insurance.ohio.gov/about-us/complaint-center/file-a-consumer-complaint.

4

customer's] search criteria." Ex. 3 (2022 Contract) at 9.  Buckeye's website further advises customers that "the providers available in-network may change," and it recommends that customers "review the provider directory for the latest information."  Ex. 4 (Directory Notice).  Customers can search the directory based on many criteria, resulting in innumerable potential combinations—each of which generates a unique list of local in-network providers.  Ex. 1 (2d Hoyt Rpt.) ¶ 62.  To search the directory, a customer must input at least a location and a provider specialty, and there is no way for the directory to "display all providers in the network" at once; instead, it displays 10 at a time.  *Id.*  Thus, Buckeye simply "makes no representation as to the size of its Ambetter provider network."  *Id.* ¶ 61.

### D.    Relevant Regulations

Buckeye's network is regulated jointly by the federal government and by the state of Ohio.  As mentioned above, one requirement is network adequacy: the inclusion of listed "essential community providers" and a network composition "that is sufficient in number and types of providers" to support customer concentrations in various areas.  *See* 45 C.F.R. § 156.230(a).  An adequate network "guarantees certain services are accessible to [Buckeye] members within specified times or distances from their homes."  *Cf. Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 427 (6th Cir. 2013) (discussing Medicaid network adequacy).  Federal regulation also requires Buckeye to "publish an up-to-date, accurate, and complete provider directory . . . in a manner that is easily accessible to plan enrollees [and] prospective enrollees."  45 C.F.R. § 156.230(b)(2).

Ohio requires Buckeye to hold its customers harmless for costs incurred in "reasonable reliance on an incorrect or misleading provider directory or [from a Buckeye] customer service representative's incorrect or misleading statements with respect to the directory."  Ohio Admin. Code § 3901-8-16(E)(1).  For that reason, Buckeye has an incentive to maintain an accurate

provider directory: to avoid paying such costs. Ex. 2 (1st Hoyt Rpt.) ¶ 26.

### E.     Plaintiffs' Allegations

Two of the four named Plaintiffs allege that they may have to pay out-of-pocket costs because of an error in Buckeye's provider directory. Plaintiff Duff claims she "may have to pay" or "may be responsible" for costs she incurred at purportedly out-of-network providers who were allegedly listed in Buckeye's provider directory. *See* ECF No. 1 ("Compl.") ¶¶ 66–70, 77–79. Similarly, Plaintiff Cox alleges that she incurred costs at providers she knew were out of network and at other providers who were allegedly removed from Buckeye's provider network without adequate notice. *See id.* ¶¶ 108–14. It is not clear whether Plaintiffs actually paid any such costs, and they do not appear to have asked Buckeye to reimburse any such costs. "Buckeye is unaware of any unresolved out-of-network costs associated with these complaints," but if it learns of any caused by an error on Buckeye's part, it will reimburse them. Ex. 5 (Lukaszewicz Decl.) ¶¶ 4, 8.

The two remaining named Plaintiffs allege that they faced difficulty finding in-network providers for certain specialties. Plaintiffs Zinn and Swank both allege that they contacted Buckeye for help finding in-network providers, but that Buckeye could not find any such providers matching their criteria. Compl. ¶¶ 85–87, 97–102. Yet Plaintiff Zinn further alleges that she "was ultimately able to receive care" after she contacted the Department of Insurance, which led to Buckeye negotiating an agreement with a provider that met her needs. *Id.* ¶¶ 88–89. Likewise, Plaintiff Swank alleges that he has located a provider who says "they accept Ambetter insurance." *Id.* ¶ 103.

Plaintiffs pleaded three relevant causes of action.[4]  The first is for breach of contract.

---

[4] Plaintiffs also pleaded a fourth claim for unjust enrichment. Compl. ¶¶ 171–78. But Plaintiffs' motion does not mention this claim. *See generally* ECF No. 36. "[C]lass certification must be addressed on a claim-by-claim basis," *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002)

Compl. ¶¶ 133–45. The essence of this claim is that Buckeye allegedly breached its contracts with customers by not providing "accurate and current list[s] of network providers," "adequate" provider networks, "the insurance coverage promised," or payments for claims from "providers listed as in-network in the directory." *See id.* ¶ 145. The second claim is for breach of an alleged covenant of good faith and fair dealing. *Id.* ¶¶ 146–50. The essence of this claim is that Buckeye allegedly "denied claims and/or failed to pay claims for providers that were listed as in-network in the directory." *See id.* ¶ 148. The third claim is for fraudulent inducement. *Id.* ¶¶ 151–70. The essence of this claim is that Buckeye allegedly "misrepresented" the accuracy of its provider directory, *see id.* ¶ 161, and that Plaintiffs' "justifiably relied" on those representations, *see id.* ¶ 166.

### F.  Plaintiffs' Models

Plaintiffs retained Dr. Adam Block to try to create a class-wide damages model to measure "benefit of the bargain" damages. *See* ECF No. 36 at 521; Ex. 6 (Block Rpt.). For this purpose, Dr. Block addressed two groups of customers. The first group comprised all Buckeye customers, on the theory that "every member of the plan received a lesser benefit than what the plan committed." Ex. 6 (Block Rpt.) at 31. The second group comprised only Buckeye customers "whose claims were denied based on an out-of-network provider who was listed as in-network on the provider directory." *Id.*

As to the first group, Dr. Block alleges that customers were damaged by a supposed difference between the "stated" number of providers in Buckeye's network and the "actual" number of providers. Ex. 6 (Block Rpt.) at 33–35. That difference—which he says is 10.6%—resulted, he says, in a "value differential" between the premiums customers actually paid and what he thinks the network was "worth" based on his count of the number of in-network providers. *See id.* To

---

(citation omitted), so Plaintiffs have waived certification on this claim.

7

model damages, Dr. Block attempted to answer two questions: (1) What was the difference be-tween Buckeye's stated provider count and its actual provider count? *See id.* at 36–44. (2) What was the "value" of that supposed difference? *See id.* at 35.

To answer the first question, Dr. Block started with an (incorrect) estimate of the number of providers in Buckeye's provider directory over a six-year period, inaccurately summing data produced during this litigation. He then performed what he called a "triangulation" analysis to count the number of out-of-network providers. Ex. 1 (2d Hoyt Rpt.) ¶¶ 65–111. He later submit-ted a supplemental report, which revised his estimated number of out-of-network providers down by nearly a quarter. Ex. 7 (Block Suppl. Rpt.) at 3–5. Those methods—described more thoroughly in Defendants' accompanying *Daubert* motion—are so error-riddled that the Court should exclude Dr. Block's model. ECF No. 52. Those methods ultimately led Dr. Block to conclude that about 10.6% of the providers in Buckeye's statewide network were not actually in network. Ex. 7 (Block Suppl. Rpt.) at 4.

To answer the second question—the "value" of the alleged difference in the number of providers—Dr. Block relied solely on two articles that he claims show "how consumers value networks of different sizes." Ex. 6 (Block Rpt.) at 35. These articles, he says, provide a point estimate of that relationship's magnitude. *Id.* He multiplied that point estimate by the 10.6% provider count "differential" he estimated, producing his estimate of $34.5 million in damages—the amount that Buckeye supposedly overcharged its customers. Ex. 6 (Block Rpt.) at 35, 37–38; Ex. 7 (Block Suppl. Rpt.) at 4.

As for the second group—customers who allegedly experienced an erroneous claim de-nial—Block did not create a model. Instead, he tried to simply sum the amount of relevant denied claims. Ex. 6 (Block Rpt.) at 38. Using data he compiled based solely on the stated reason for an

initial denial, Dr. Block summed the amount of billed charges that he thinks were denied because a provider was out-of-network, producing an estimate of $1.6 million. *Id.* at 37–38. That methodology, however, ignores events after an initial denial, such as appeals, resubmissions, and payments from Buckeye. Ex. 1 (2d Hoyt Rpt.) ¶ 96.

### G.    Provider Count and Network Breadth

Dr. Block's supposed overcharge calculation depends on his misuse of two articles. Ex. 6 (Block Rpt.) at 35 & nn.80–81. He claims these articles show that "a network that is 1% bigger [is] worth an additional 0.29%," which is the basis of his damages estimate for all Buckeye customers. *Id.* In fact, those articles report correlations between premiums and network *breadth*: the "*percentage* of physicians in a service area participating in a network." Ex. 1 (2d Hoyt Rpt.) ¶ 30 (emphasis added). But Dr. Block applied that figure only to provider *count*: simply the number of providers he concluded "were actually in the network" statewide in Ohio. Ex. 6 (Block Rpt.) at 34. In other words, Dr. Block ignored network breadth by omitting the total number of relevant providers in a service area, which made both his numerator and his denominator incorrect and his model's output meaningless. Ex. 1 (2d Hoyt Rpt.) ¶ 31. Dr. Block apparently did not understand the distinction between breadth and count, *see* Ex. 8 (Block Dep. Tr.) at 21:4–21, but they share "almost no relation," Ex. 1 (2d Hoyt Rpt.) ¶ 25.

Like provider count, network breadth cannot be determined from Buckeye's provider directory. The directory returns only the in-network providers responsive to a particular search. Ex. 5 (Lukaszewicz Decl.) ¶ 5. But discerning network breadth would also require a determination of "the number of out-of-network service providers operating in the same specialty in the same location at the time." Ex. 1 (2d Hoyt Rpt.) ¶ 63. Thus, network breadth "must be calculated county-by-county" using information both from Buckeye and from other sources. *Id.* ¶ 25.

## H.        Plaintiffs' Motion

Plaintiffs first sought certification of both a primary class and a "sub-class." ECF No. 36 at 483. The putative primary class comprises "[a]ll persons who were insured by Defendants' Ambetter insurance product offered in Ohio through the Marketplace [since] September 9, 2015." *Id.* The putative sub-class comprises those customers who "during the class period, had a health insurance claim denied for an out-of-network provider despite the provider being listed as in-network on Defendants' provider directory." *Id.*

Plaintiffs originally sought certification under both Rules 23(b)(2) (an injunctive class) and 23(b)(3) (a damages class). ECF No. 36 at 483. But the bulk of their brief addressed the putative damages class. *See id.* at 513–24. For the injunctive class, Plaintiffs cursorily requested orders "enjoining Defendants from (1) listing healthcare providers on their provider directory if they are, in fact, out-of-network; and (2) prohibiting Defendants from denying insurance claims due to the provider being out-of-network but listed on Defendants' provider directory." *Id.* at 524–25.

Plaintiffs later filed a supplemental brief with Dr. Block's supplemental report. ECF No. 49. That brief contends that Dr. Block's revised conclusions do not vitiate Plaintiffs' arguments regarding the primary damages class. *See id.* at 1821–25. It does not mention the putative sub-class or the putative injunctive class. Plaintiffs have thus abandoned those requests.[5] Even so, Defendants respond to each aspect of Plaintiff's initial motion below.

---

[5] *See, e.g.*, *Davis v. City of Columbus*, 2022 WL 4310852, at *13 (S.D. Ohio Sept. 19, 2022) (describing the failure to mention an argument in a reply as a "tacit concession"); *Contech Bridge Sols., Inc. v. Keaffaber*, 2011 WL 5037210, at *6 n.4 (S.D. Ohio Oct. 24, 2011) (noting that an argument had been abandoned where it was asserted in neither the proponent's reply or supplemental briefs but considering it anyway); *Singleton v. PSA Airlines, Inc.*, 2021 WL 1209592, at *5 (S.D. Ohio Mar. 31, 2021) (similar); *United States v. Knox*, 2023 WL 2599619, at *2 (N.D. Ill. Mar. 22, 2023) (declining to consider an "undeveloped argument[ ] that was "abandoned[ ] . . . in [a] supplemental memorandum"); *SFR Servs., LLC v. Colony Ins. Co.*, 2021 WL 12095073, at *4 (S.D. Fla. Jan. 25, 2021) (declining to consider an argument not mentioned in the proponent's reply brief); *Cody J. v. Kijakazi*, 2023 WL 2745121, at *6 (N.D. Ill. Mar. 31, 2023) (same).

## Legal Standards

For this case to be expanded to a class action, Plaintiffs must demonstrate that it meets the requirements of Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). That is not "a mere pleading standard." *Id.* Plaintiffs must prove Rule 23's requirements with evidence, and the Court must "carefully scrutinize" that evidence in a "rigorous analysis." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (quoting in part *Dukes*, 564 U.S. at 350–351). Plaintiffs must satisfy each prerequisite of Rule 23(a) and, depending on the nature of each putative class, the applicable requirements of Rules 23(b)(2) and 23(b)(3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). For each element, the Court should ask "whether Plaintiffs have provided sufficient *proof* to support their arguments." *Bond v. Antero Res. Corp.*, 328 F.R.D. 187, 191 (S.D. Ohio 2018).

For a damages class, Rule 23 requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Common questions do not predominate over individual questions where the means by which plaintiffs would seek to prove essential elements of their claims exhibit "some fatal dissimilarity." *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013) (citation omitted). A class action is not superior to other adjudicative methods where "many individual inquiries are necessary," *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012), or where other avenues for relief obviate the class-action device, *see*, *e.g.*, *Toldy v. Fifth Third Mortg. Co.*, 2011 WL 4634154, at *2 (N.D. Ohio Sept. 30, 2011).

For an injunctive class, Rule 23 requires that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Injunctive relief sought under Rule 23(b)(2) must

be "indivisible," meaning that the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation omitted). Relief is inherently divisible where the propriety of a defendant's actions depends on individual circumstances. *Shook v. Bd. of Cnty. Comm'rs of El Paso*, 543 F.3d 597, 607 (10th Cir. 2008). And a request for "individualized damages awards" "cannot be certified under subrule (b)(2)." *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 281 (6th Cir. 2018).

### Argument

Plaintiffs' attempt to transform a handful of individual disputes into a sweeping 70,000-person class action collapses under scrutiny. Never mind, Plaintiffs say, that Buckeye never promised a particular provider count; the network had 10.6% fewer providers than customers expected.

No court has ever embraced this theory of liability. And for good reason. Under Plaintiffs' theory, sprawling class actions could be perpetually certified against every health insurer. After all, according to Plaintiffs' own expert, directories average 13% inaccuracy across the industry.

Plaintiffs' dubious theory runs headlong into Rule 23's predominance, superiority, and indivisibility requirements. *First*, Plaintiffs' "primary class" fails because it depends on Dr. Block's damages model, which suffers from a litany of methodological errors and fails the *Comcast* "fit" test. *Second*, individualized inquiries would be needed to determine which class members were injured, by how much, and whether the issue already has been addressed through the contractual mechanisms to address such issues. *Third*, Buckeye's dispute-resolution procedures and Ohio's Health Insurance Assistance Program are superior avenues to address any such issues. *Fourth*, to the extent that Plaintiffs have not abandoned their putative injunctive class, the injunctions they seek also crumble into individual adjudications.

# I. No Fit Under *Comcast*: Plaintiffs' Damages Model Ignores Their Theory of Liability and Relies on Leaps in Logic.

For a class to be certified under Rule 23 based on an economic model, the model must reliably translate the plaintiff's theory of liability into analysis of the effects of the alleged wrong-doing. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–38 (2013). That rule is distinct from the separate question of whether individual damages questions predominate over common questions. *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020). If the Court finds that Plaintiffs' model departs from their theory of liability, the Court "*must*" deny certification of any class that depends on that model. *See id.* (emphasis added); *see also, e.g.*, *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *21–25 (M.D. Tenn. Feb. 24, 2023) (citations omitted); *In re Auto Parts Antitrust Litig.*, 2019 WL 626143, at *14–15 (E.D. Mich. Jan. 7, 2019) (citation omitted).

But the damages model offered in this case is unrelated to the Plaintiffs' theory of liability, and the model errs so often that its output is unreliable and arbitrary. That is especially significant in this case because Plaintiffs rely on their model to prove *liability*—not just damages.[6] And a model necessary to prove liability must be held to higher standards of precision and fit. *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 422–23 (5th Cir. 2023). For the following reasons, Dr. Block's overcharge model is neither apt nor precise.[7]

---

[6] Plaintiffs assert their overcharge-related claims (breach of contract and fraudulent inducement) on behalf of the putative primary class. *See* Compl. ¶¶ 133–45, 151–70. An Ohio breach-of-contract claim requires that "the non-breaching party suffers damages as a result of [a contractual] breach." *Dudley v. Stonecroft Ministries, Inc.*, 142 F. Supp. 3d 653, 663 (S.D. Ohio 2015). Similarly, a fraudulent-inducement claim requires "an injury proximately caused" by reasonable reliance on a misrepresentation. *Stuckey v. Online Res. Corp.*, 819 F. Supp. 2d 673, 682 (S.D. Ohio 2011). Plaintiffs rely on Dr. Block's model to prove those elements. ECF No. 36 at 520–21.

[7] Plaintiffs suggest that criticisms of Dr. Blocks' methodology must be raised in "a *Daubert* challenge." ECF No. 49 at 1824–25. Not so. The questions are analytically distinct. *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018). Even if the court considers the testimony admissible, that leaves open the question whether the opinion can *prove* satisfaction of Rule 23(b)(3). *See, e.g.*, *J&R*

## A. Plaintiffs' Damages Model Fails To Translate Their Theory of Liability Into a Reliable Measure of Damages.

A model must begin with a "translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 569 U.S. at 38 (citation and emphasis omitted). To do that, a model must compare the real world to a world "exactly the same but without [the challenged conduct]." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 460 (S.D. Cal. 2014). Thus, a model such as Plaintiffs' "must isolate the price premium attributable only to overcharges due to misrepresentations." *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061, at *3 (N.D. Cal. July 29, 2022).[8] A model that fails to do so creates the unacceptable possibility that liability will be established or that damages will be awarded based on events that were not "the result of the wrong." *See Auto Parts*, 2019 WL 626143, at *15 (quoting *Comcast*, 569 U.S. at 37).

Plaintiffs' model "does not even attempt to do that." *Comcast*, 569 U.S. at 35. In a breach-of-contract case, a model must begin with the nature of the alleged breach. *See, e.g., LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597, at *11–12 (C.D. Cal. Aug. 4, 2022) (finding that a model flouted *Comcast* where it ignored variation among the terms allegedly breached). For the primary class, Plaintiffs allege only two specific breaches: failure to provide (1) "an accurate and current list of network providers" or (2) "adequate access to qualified medical practitioners, treatment, and/or services." Compl. ¶¶ 51–55, 142, 161. Neither theory appears in Dr. Block's model.

---

*Passmore, LLC v. Rice Drilling D, LLC*, 2023 WL 2667749, at *5, *18–21 (S.D. Ohio Mar. 28, 2023) (denying a motion to exclude an expert's report but finding it insufficient to establish predominance). In any event, Defendants have moved to exclude Dr. Block's opinions on *Daubert* grounds. ECF No. 52. If the Court grants that motion, it should deny certification for that reason alone—Plaintiffs will be left without any evidence to support their certification request. If the Court denies that motion or declines to consider it first, it should nevertheless deny certification for the reasons explained here.

[8] *See also Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *11 (N.D. Cal. Dec. 15, 2014); *In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*, 2014 WL 1225184, at *1 (C.D. Cal. Mar. 25, 2014).

14

The second alleged breach is easily discarded. Dr. Block does not mention network adequacy in his discussion of supposed overcharges. *See id.* at 31–44. His overcharge theory is based entirely on the overall number of providers in Buckeye's network, Ex. 6 (Block Rpt.) at 35, and he admits he "did not say one way or another whether the Ambetter network meets adequacy requirements," Ex. 8 (Block Dep. Tr.) at 22:8–18. So his model does not fit this alleged breach.

As to the first alleged breach, "an accurate and current list of network providers": Dr. Block did not try to measure that either. Instead, he tried to measure damages based on how many fewer in-network providers Buckeye had statewide than Buckeye "represented." But Buckeye's provider directory is a search engine that cannot be used to discern the number of providers, and Buckeye does not communicate the number of providers to customers or potential customers *at all*, as Dr. Block conceded at his deposition. Ex. 1 (2d Hoyt Rpt.) ¶ 56, 62 & Ex. 8 (Block Dep. Tr.) at 72:8–16. That information is not relevant to customers because customers' needs are local to them and specific to their condition, which presumably is why the government does not provide that information on healthcare.gov. Because Dr. Block's model measures damages from information that customers do not have, and is different from Plaintiffs' theory of liability, it fails the *Comcast* "fit" test.

Plaintiffs' allegations illustrate this point. Plaintiffs say they were concerned with the network status of specific providers, not with the number of providers in Buckeye's network statewide. Plaintiff Duff, for example, alleges that she "would not have purchased the Ambetter policy" if she had known that her "rheumatologist was an out-of-network provider." ECF No. 36-2 at 531 ¶ 11. Yet Dr. Block's model assumes that the value Plaintiff Duff derives from her insurance arises from the total number of providers anywhere in Ohio. *See* Ex. 6 (Block Rpt.) at 35. Take a baseline network that includes Plaintiff Duff's rheumatologist, for example. If that network

15

were to lose Plaintiff Duff's rheumatologist, but add ten pediatricians in another city (or perhaps thousands of providers, as Buckeye has done since Ms. Duff enrolled in 2019, *see* Ex. 1 (2d Hoyt Rpt.) ¶ 70), Dr. Block's model assumes that the network's value to Plaintiff Duff would *increase*. But Plaintiff Duff herself says such a network would be unacceptable. Her breach-of-contract allegation related to directory accuracy (which, to be clear, Defendants contest) is that her rheumatologist—one provider—allegedly inaccurately appeared in Buckeye's provider directory. Compl. ¶¶ 65–66. Unlike provider count, such a representation could, of course, be communicated by the provider directory. But whether such an inaccuracy would constitute an actionable breach and what, if any, damages flowed from it would be individualized issues that Dr. Block's model does not address.

Dr. Block's myopic devotion to provider count is inexplicable. Plaintiffs' complaint does not so much as mention Buckeye's provider count. Courts readily reject class certification where there is such a disconnect between plaintiffs' theories and their damages model. For example, in *Phillips v. Ford Motor Co.*, an expert acknowledged that the plaintiffs' theory of harm implied a difference between consumers' expected utility and actual utility, but offered "an entirely different model that [did] not attempt to measure expected utility." 2016 WL 7428810, at *22 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018). Here, as in *Phillips*, such a blatant mismatch flunks *Comcast*'s test. Dr. Block's model "has no way of linking the price difference, if any, to the allegedly unlawful [conduct]," and so it fails to meet Plaintiffs' Rule 23(b)(3) burden. *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *16 (N.D. Cal. May 30, 2014).

### B. Logical Leaps and Baseless Assumptions Further Separate Plaintiffs' Damages Model from Their Theory of Liability.

Profound implementation errors magnify the conceptual mismatch between Dr. Block's primary-class model and Plaintiffs' allegations. The critical claim underlying his attempt to

quantify damages is that a "network that is 1% bigger [is] worth an additional 0.29%." Ex. 6 (Block Rpt.) at 35. That claim is meritless for at least three reasons. *First*, the two articles from which Dr. Block derived that number measured correlations between price and network breadth (i.e., local networks with a higher percent of providers in-network tend to be more expensive). But Dr. Block measured statewide provider count, rather than local network breadth. *Second*, Dr. Block unjustifiably treated those articles as having established a causal link between provider count and premiums, but in fact, they report only a correlation. *Third*, Dr. Block relies on indefensible (and undefended) assumptions about consumers' knowledge and expectations regarding how many providers are in Buckeye's network. For those reasons, Dr. Block's model cannot isolate damages attributable to the alleged wrong because it lacks valid "evidence of what consumers' behavior might otherwise have been." *POM Wonderful*, 2014 WL 1225184, at *5.

### 1. Dr. Block's model conflates provider count and network breadth.

A model cannot satisfy Plaintiffs' burden unless its predictions are meaningful and reasonably accurate. Accepting an "arbitrary" measurement for this purpose "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 35–36. Thus, "[a] flawed model may result in denial of class certification" if it lacks "scientific rigor." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020). For example, a model that is "misspecified" because it uses inappropriate explanatory variables rests on a "significant and fundamental error," and is too "unsound[]" to pass muster under *Comcast*. *Miami Prods. & Chem. Co. v. Olin Corp.*, 2023 WL 8946114, at *14–16 (W.D.N.Y. Dec. 28, 2023).

Dr. Block's model is a quintessential example of such a misspecification. Dr. Block's model has two inputs: (i) a numerator: the number of providers he counted in the network, and (ii) the denominator: the number of providers that Buckeye allegedly "represented" to be in the network. Ex. 6 (Block Rpt.) at 44. Dr. Block purported to measure these two inputs, and found the

difference to be 10.6% (i.e., the network has 10.6% fewer providers than represented). In doing so, Dr. Block measured provider *count*. But he used two articles regarding network *breadth*—a distinct concept that measures what percent of providers are in the network in a particular service area—to measure the effect of provider count on prices. Ex. 1 (2d Hoyt Rpt.) ¶ 30. Because his model used the wrong variable, it is "misspecified" and inadequate under Rule 23(b)(3) and *Comcast*. *See Miami Prods.*, 2023 WL 8946114, at *16 (citation omitted).[9]

### 2. Dr. Block's model conflates correlation and causation.

Dr. Block further misuses the same two articles by pushing far beyond their authors' conclusions. Those articles, as Defendants' expert explains in greater detail, measured the correlation between network breadth and insurance premiums among different plans—not Buckeye's plans or Ohio ACA plans. Ex. 1 (2d Hoyt Rpt.) ¶¶ 35–42. The articles recognized that they had established neither causation nor "the mechanisms that generated the estimates [they] obtained." *Id.* ¶ 35 (quotation omitted). Yet Dr. Block tries to use the articles to predict how changes to Buckeye's provider count would affect *its* premiums. "That is, his methodology relies on *causation* between network size and premiums." *Id.* ¶ 41 (emphasis in original).

Dr. Block's failure to distinguish correlation and causation makes his model akin to the one that the Ninth Circuit recently rejected in *Mier v. CVS Health*, 2023 WL 4837851 (9th Cir. July 28, 2023) (unpublished). In *Mier*, the court explained that, under *Comcast*, an adequate model of what "market value" would have been "but for [a] misrepresentation" must "account for market supply." *Id.* at *1. But the expert in that case ignored how market supply might have changed over time, or how changes in the defendant's behavior might have affected its costs. *See id.* For

---

[9] If Dr. Block had used network *breadth* data, his model would still fail the *Comcast* test. Just as with network count, Plaintiffs do not allege that Buckeye promised them a network of any particular breadth.

that reason, the expert's model did not accurately measure prices in the but-for world, and the court affirmed a denial of class certification. *See id.*

Similarly, the articles that Dr. Block relies on provides at most an illusory picture of supply in the but-for world. Ex. 1 (2d Hoyt Rpt.) ¶ 42. He fails entirely to consider the marginal cost of changes to Buckeye's provider count or breadths, or whether Buckeye could have offered a net-work of the same count or breadths at a lower price without incurring a loss. *Id.* ¶ 45. Dr. Block admits that he did not analyze such questions. Ex. 8 (Block Dep. Tr.) at 46:16–47:16. Thus, Dr. Block's model "does not adequately account for market supply" and fails to establish any causal link. *Mier*, 2023 WL 4837851, at *1.

Dr. Block's problems go deeper because he also fails to analyze demand in the but-for world. He erroneously claims that the articles show "elasticity of demand," meaning the sensitivity of consumers' willingness to pay to changes in price. Ex. 1 (2d Hoyt Rpt.) ¶ 33 & n.20. But again, the articles are observational and reflect only a correlation in different markets at a particular time, *id.* ¶¶ 35–42, so Dr. Block has nothing more than "bald assertions" about how Buckeye's consum-ers would have valued changes in provider count statewide. *See Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *6–7 (C.D. Cal. Dec. 18, 2014) (rejecting certification under *Comcast* where the plaintiffs' expert failed to measure consumers' valuation of the product in the but-for world).

Dr. Block also disregards regulatory factors. Health insurance is a highly regulated indus-try; premiums must be approved by "various state-level regulators," including in Ohio. Ex. 1 (2d Hoyt Rpt.) ¶ 42. That is a further flaw in Dr. Block's reliance on the two articles to establish causation: he fails to consider the extent to which the aggregate prices the articles reflect were influenced by the decisions of dozens of regulators irrelevant to this market and this case. *See id.* ¶¶ 35–36, 42. He also makes no effort to consider whether the Ohio Department of Insurance

19

would have approved the premiums he predicts would have been charged in the but-for world; would they be actuarially sound?  *See id.* ¶ 42.

All that is to say that Dr. Block's exclusive reliance on two articles that he treats as providing causal evidence—though the articles explicitly disavow this claim—leaves him without any plausible predictions about the world but for the alleged conduct.  Because he has overlooked the details of the market to which his analysis should have been tailored, Dr. Block has "not even attempt[ed] to control for confounding variables" relevant here, dooming his estimate.  *See Freitas*, 2022 WL 3018061, at *3–6.

### 3. Dr. Block's model falsely assumes that Buckeye made a representation regarding how many providers were in-network statewide.

Finally, Dr. Block's prediction of a price decrease in the but-for world relies on an unexplained, implausible mechanism.  His central claim is that, in a world where Buckeye's network directory contained fewer overall entries, the market price of its product would have been lower.  Ex. 6 (Block Rpt.) at 35.  But as previously explained, Buckeye does not publicize how many providers are in-network statewide, and consumers have no realistic way of obtaining it.  Ex. 1 (2d Hoyt Rpt.) ¶ 62.  It is a red flag that Dr. Block's model predicts prices based on information that consumers "do not have."  *Id.* ¶ 56.  And he concedes this information deficit.  Ex. 8 (Block Dep. Tr.) at 72:8–16.  Far from predicting prices in a world "but for the [alleged] misrepresentation," *Mier*, 2023 WL 4837851, at *1, Dr. Block has predicted prices in a but-for world that cannot exist.

Dr. Block also ignores consumers' baseline expectations.  He assumes that if consumers in the but-for world had somehow learned that Buckeye's provider network had fewer providers statewide than its provider directory had somehow represented, they would have perceived the product differently.  But he also opines that *all* health insurers' provider directories are inaccurate by an average of 13%.  Ex. 6 (Block Rpt.) at 43.  Dr. Block acknowledged during his deposition

that prices in the real world reflect consumers' expectations—"their understanding . . . of the product . . . [that] they believe they are paying for." Ex. 8 (Block Dep. Tr.) at 191:13–192:5. Yet he did not consider whether their expectations might reflect their experiences with an industry in which, according to Dr. Block, provider directories sometimes have inaccuracies. So he unjustifiably assumes that real-world prices do not already reflect real world experiences.[10] Because consumer expectations are the cornerstone of his damages theory, he cannot omit such considerations without explanation. *See Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at \*24 (M.D. Tenn. Feb. 24, 2023).

*        *        *

In sum, Plaintiffs' damages model fails several times over to meet Plaintiffs' Rule 23(b)(3) burden. Far from "translat[ing]" Plaintiffs' theory of liability into economic analysis, *Comcast*, 569 U.S. at 38, or isolating the effects of the alleged wrong, *Freitas*, 2022 WL 3018061, at \*3, Dr. Block talks past Plaintiffs' complaint from the start. From there, he bounces from error to error, landing on a (revised) number that is arbitrary. This fails to meet Rule 23(b)(3) standards.

## II.    No Predominance: Individualized Issues Overwhelm Common Issues.

For a class to be certified, a plaintiff must prove that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). A class cannot be certified unless, after carefully scrutinizing the relationship between common and individual questions, the Court determines that "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotations omitted).

---

[10] In other words, there may be no product free from the alleged wrong against which Buckeye's plan can be compared to assess the market-price effect of the supposed inaccuracy. *See Algarin*, 300 F.R.D. at 460 ("[T]he Court must use a product, exactly the same but without the [challenged] claim.").

This test is "far more demanding" than Rule 23(a)(2)'s commonality requirement, *Amchem Prods.*, 521 U.S. at 624, which itself is not satisfied by just any common question, but only by a question the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  Even one element can defeat predominance: for example, if Plaintiffs lack a common method for measuring damages.  *Comcast*, 569 U.S. at 34.

Neither putative class satisfies predominance.  Each of Plaintiffs' three causes of action must be proven, and their damages assessed, by individualized evidence.  That is true whether the alleged injury is inflated premiums (primary class) or out-of-pocket costs (subclass).  Plaintiffs thus fail to meet their burden of demonstrating that common questions predominate.

> **A.**   **The "Primary Class" Fails Because Individual Analyses Would Be Required To Determine Which Customers Were Harmed (if Any), and To Measure Their Damages.**

The putative "primary class" totals some 70,000 individuals: every person who purchased Buckeye's ACA health insurance since September 9, 2015.  Each claim's theory of injury relies on the idea that Buckeye provided customers with a materially inaccurate provider directory, causing customers to overpay premiums.  *See* ECF No. 43 at 1715.  Even ignoring Plaintiffs' model's conceptual mismatch, proving liability and damages for each class member under the model would be a hopelessly individualized and fact-bound endeavor.

> **1.**   **Breach of contract: unsuitable for certification because only individual inquiry can prove performance, breach, or damages.**

The elements of a breach of contract are: (1) the existence of a contract; (2) performance by plaintiff; (3) breach by defendant; and (4) damages resulting from the breach.  *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012).  The latter three elements all require individualized inquiries to each of 70,000 putative class members, dwarfing any common questions.

22

*Performance: Engagement in Internal Dispute-Resolution Process*

As Judge Cole wrote in his opinion on the motion to dismiss, "the availability of internal grievance mechanisms may present issues for Plaintiffs . . . in showing that any breach is amenable to treatment on a class-wide basis." ECF No. 24 at 386. Judge Cole was right. A customer who disregards that process has not performed under the insurance policy.[11] Ex. 3 (2022 Contract) at 88 (forbidding suits "under the contract for any reason" before exhaustion).

Ascertaining whether class members fulfilled these obligations is necessarily the type of fact-bound inquiry that the Sixth Circuit has held defeats predominance. *See, e.g.*, *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (issue of whether advertisements were transmitted without permission was "undoubtedly one of individual consent" that precluded predominance); *cf. Fox v. Saginaw Cnty.*, 67 F.4th 284, 301 (6th Cir. 2023) (warning district court on remand that applicability of unique defenses against class members may prevent predominance). If the primary class were certified, this court would have to evaluate the factual circumstances of 70,000 individual customers to determine which had met their obligation to engage in Buckeye's internal dispute-resolution process—the very type of mini trials the predominance requirement is designed to avoid. *See Amchem*, 521 U.S. at 615–16.

*Breach: Temporal, Geographic, and Specialty Dissimilarities*

Analysis of the element of breach would need to be highly individualized, too. Plaintiffs allege that Buckeye breached its promises to provide an accurate directory and adequate access to

---

[11] Plaintiffs protest that "the Court has already held that Plaintiffs are not required to follow this administrative process prior to filing a lawsuit." ECF No. 43 at 1717 n.5. That allegation misunderstands the Court's holding. What plaintiffs must *allege* at the pleading stage and what they must *prove* at this stage are distinct. That is why this Court declined to dismiss Plaintiffs' complaint, but emphasized that "the availability of internal grievance mechanisms may present issues for Plaintiffs in their efforts to show that a breach occurred." ECF No. 24 at 386.

medical care.  Compl. ¶¶ 51–55, 142, 161.  But accuracy can be measured only for a particular provider search, and adequacy is unique to each customer, and is assessed by different standards depending on whether the customer lives in a rural or urban area.

As explained in the insurance contract, the directory is not a static list of all in-network providers.  Rather, it is a search engine that tailors its output based on the input search criteria. Search results are tailored to the town or ZIP code entered by the customer, as well as the type of provider needed.[12]  When, where, and what the customer searches determines the unique list they are provided.  Ex. 5 (Lukaszewicz Decl.) ¶ 5.  Because of this, each customer's experience is different.  Ex. 1 (2d Hoyt Rpt.) ¶ 62.

Like all insurers, Buckeye's provider directory changes daily, as providers join and leave the network.  Ex. 5 (Lukaszewicz Decl.) ¶ 3.  For that reason alone, the "accuracy" of the directory depends on the reference point.  Even if the named Plaintiffs could demonstrate that the directory was inaccurate when they searched, this would not establish inaccuracy at any other time or for any other customer.  And as the Sixth Circuit has explained, such a temporal mismatch precludes predominance because individual determinations "likely will dominate the proceedings."  *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1107 (6th Cir. 2022) (no predominance due to temporal mismatch between the time of appraisal and time of the transfer); *see also Woodall v. Wayne Cnty.*, 2021 WL 5298537, at *7 (6th Cir. Nov. 15, 2021) (unpublished) (finding that "[i]nsurmountable timing issues" caused individual questions to predominate).

Geography and provider specialty further individualize the inquiry.  Two customers who searched the database simultaneously would get different results based on where they lived.  Two

---

[12] Customers must enter their (1) address, city, county, or zip code; and (2) a name, specialty, NPI, or procedure.  Ex. 1 (2d Hoyt Rpt.) ¶ 62.

customers who lived together and searched at the same time would also get different results if one searched for a primary care doctor and the other a cardiologist. Simply put, whether one customer's search yields an accurate list says nothing about whether another customer seeking a different type of care or living in another region will be provided with an accurate list.[13]

Network adequacy is even less susceptible to class-wide determinations. Adequacy is a customer-by-customer analysis, and under the ACA, adequacy requirements are different for rural and urban regions. In urban regions, networks must have providers for certain specialties within tight time-and-distance standards. By contrast, in rural regions the regulations adjust time-and-distance standards, recognizing the reality that people in rural areas must travel further for many services, including healthcare. *See* 45 C.F.R. § 156.230(a)(2)(ii) & (a)(3). Ignoring these varying standards and certifying a statewide class would be just as objectionable as certifying nationwide classes where different state's laws would apply to class member's claims. *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946–48 (6th Cir. 2011) (no predominance where healthcare program's offerings "var[ied] from place to place and from region to region").

*Expectation Damages: Fact-Intensive Inquiries Required*

Plaintiffs misstate the law by claiming that "individualized damages do not preclude class certification." ECF No. 43 at 1724–25. True, the need for "individual damages *calculations*" is

---

[13] These critical facts distinguish this case from *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 859 (6th Cir. 2013). The predominant issue in *Whirlpool* was "whether . . . alleged design defects" existed, as the plaintiffs claimed. *Id.* Under the substantive law, the *Whirlpool* plaintiffs did not have to prove that the defects "manifested" in individual cases; the inquiry was about the design itself. *See id.* at 857. So the same, centralized evidence would "either prove or disprove" that theory as to all plaintiffs. *Id.* at 859. This case is different, because commonality is absent here: each customer saw different representations when searching the provider directory (rather than the single alleged design defect in the *Whirlpool* case). Further, *Whirlpool* concerned a liability-only class. As the Sixth Circuit made clear, the liability-only nature of the *Whirlpool* class was crucial to its decision. 722 F.3d at 859. *Whirlpool* is not instructive here because, as explained herein, individualized damages issues also weigh against predominance.

no per se barrier to certification. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (emphasis added). But that does not mean damages may vary infinitely with no effect on the predominance inquiry. If "individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *see also Tarrify*, 37 F.4th at 1107. There is a key difference between being able to calculate aggregate damages and "the ability to prove damages for each putative class member through a common method." *See Ladd v. Nashville Booting, LLC*, 2023 WL 3400485, at *14 n.20 (M.D. Tenn. May 11, 2023) (explaining the difference). A failure on the latter front precludes certification. *Woodall*, 2021 WL 5298537, at *8; *see also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016).

Plaintiffs lack a common *method* for calculating damages because, even if they could prove liability, any harm that a customer suffered depended on "the unique [and] complex circumstances of each class member." *Hooker v. Citadel Salisbury LLC*, 2023 WL 3020967, at *14 (M.D.N.C. Apr. 20, 2023) (quoting 1 McLaughlin on Class Actions § 4:19 (19th ed.)). Plaintiffs seek expectation damages, which must be calculated to put each class member in the "position" she "would have been in had the contract been fully performed." *Hanuman Chalisa, LLC v. BoMar Contracting, Inc.*, 187 N.E.3d 1108, 1115 (Ohio Ct. App. 2022). So each customer—like each property in *Tarrify*—requires "proof that is variable in nature and ripe for variation in application" to show what their individual positions would have been. *See* 37 F.4th at 1107.

Recognizing this problem, Plaintiffs' supposed price-premium model seeks to paper over crucial individual differences. But their model doesn't account for the fact that the vast majority of Buckeye customers got the care they needed, when and where they needed it, which explains

26

why most Buckeye customers have continued to enroll in the plan, year after year—at rates approved by the regulator.  That reality undermines any pretense that all customers overpaid, much less to the same degree.  *See Pilgrim*, 660 F.3d at 948 (no predominance where some customers kept using the challenged program, meaning the plaintiffs would have to make "particularized showings" of harm in different regions).[14]

Plaintiffs' model also fails to account for the reality that different customers have different needs and live in different places, and they value the accuracy and adequacy of the network differently.  A vast network of pediatricians in Cleveland may matter more to a mother in Shaker Heights than it would to a retiree in Cincinnati.  Because customers' geography and healthcare needs vary, so too does the value they place on particular plan features.  Evaluating the value of Buckeye's network, like determining the value of property, is full of "shifting facts and circumstances" that must be assessed case-by-case.  *Tarrify*, 37 F.4th at 1107; *accord Fleming v. Select Portfolio Servicing*, 342 F.R.D. 361, 367 (D. Mass. 2022).  Dr. Block conceded that consumer value "varies all over the place" and that "there could be lots of consumers who would value the plan . . . much higher than what the price was."  Ex. 8 (Block Dep. Tr.) at 183:19–185:24.  Plaintiffs cannot wave away this reality by "project[ing] a measure of damages, for all the class members, that in no way accounts for the vast differences among those class members."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005); *In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 92 (S.D.N.Y. 2017).

---

[14] Putative class members' alleged damages are further individualized by federal subsidies many of them received.  The government paid about 65% of all premiums, many putative class members paid less than $40 per month, and some paid nothing.  Ex. 1 (2d Hoyt Rpt.) ¶ 72.  Plaintiffs' proposed class errs in not accounting for this because "expectation damages are not designed to make the injured party *better off* than it would have been had the contract been performed."  *Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 591 (6th Cir. 2021) (unpublished).  Moreover, the ACA requires health plans to provide medical-loss ratio rebates to customers under certain circumstances, which Plaintiffs also fail to analyze.

Plaintiffs' damages model premised on counting the number of providers statewide fails this hurdle.

### 2. Fraudulent inducement: unsuitable for certification because only individual inquiry can prove reliance.

Plaintiffs' fraudulent-inducement claim requires them to prove that Buckeye made a material and false representation to each customer and that each customer justifiably relied upon the representation. *See Levy v. Seiber*, 57 N.E.3d 331, 338 (Ohio Ct. App. 2016). As the framers of Rule 23(b)(3) cautioned, "a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Rules Advisory Committee Notes, 39 F.R.D. 69, 103 (1966). Following this guidance, courts have widely found predominance lacking in fraud cases. *See* 2 Newberg and Rubenstein on Class Actions, § 4:58 (6th ed. 2023). Here, the content of the representation, whether it was material, and whether a customer justifiably relied on it would all depend on individual circumstances. Each variation independently predominates over common questions.

Start with the representation: Again, Buckeye made no representation about the number of providers or any local network breadth. Moreover, Buckeye does not provide customers with a single network directory. Instead, when customers input their ZIP code and a specialty, Buckeye displays a list of in-network providers matching those criteria. That representation and its significance vary based on when, where, and for what care customers searched. Ex. 5 (Lukaszewicz Decl.) ¶ 5.[15]

Reliance also prevents predominance. It is blackletter law that a "fraud class action cannot

---

[15] Plaintiffs' only rebuttal is that Buckeye's plan brochures made identical representations about the general accuracy of the directory to each member of the class. ECF No. 43 at 1720. That is irrelevant. Plaintiffs, of course, say nothing about specific providers and thus cannot explain why this generic representation is material or how they would prove it inaccurate with class-wide evidence.

be certified when individual reliance will be an issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 718

(6th Cir. 2000) (quotation omitted); *see also Metz v. Unizan Bank*, 2009 WL 10713772, at *3 (N.D.

Ohio Mar. 24, 2009) (collecting cases).[16]

The plaintiffs in *Stout* alleged that a car dealership fraudulently concealed damage to cars.

228 F.3d at 717. Class treatment was inappropriate because of the need for individual assessments

of "what documents the customer reviewed and in what manner, what representations Defendants

made to each customer, and whether the customer selected [a challenged term]." *Id.* at 718. Re-

solving Plaintiffs' fraudulent-inducement claims with class-wide evidence is similarly unworkable

here. Whether a customer searched the directory before enrolling, and if so what she searched and

saw (and the extent to which she relied on any inaccuracies) all require individualized inquiries.[17]

Seeking to evade *Stout*, Plaintiffs cite two inapposite sets of cases. The first set involves

identical or "standardized" misrepresentations that were made to *every* member of the proposed

class. *E.g.*, *Cantlin v. Smythe Cramer Co.*, 114 N.E.3d 1260, 1270–71 (Ohio Ct. App. 2018). In

*Cantlin*, the court found that reliance could be presumed class-wide because every member of the

class signed one of four forms containing the same misrepresentations about an additional fee. *Id.*

By contrast, here, customers didn't see the same directory listings because Buckeye's directory

displays results tailored to the customer based on what she searched for and where she is located.

---

[16] *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015), is entirely consistent with this principle. In *Rikos*, plaintiffs proceeded under five state false-advertising laws, not common law fraudulent inducement. The *Rikos* court concluded that under those laws, individual reliance was not required because reliance was an objective rather than subjective standard and the alleged misrepresentation was made to the class in a uniform manner. *Id.* at 512. Here, the subjective characteristics of the customers are relevant to the reliance inquiry, *and* Buckeye's representations (such as they were) varied from customer to customer.

[17] Even if, hypothetically, a customer saw and relied on an inaccuracy, those facts still leave open the separate question whether such reliance was justified. That inquiry is multifaceted and discretionary. *Bender v. Logan*, 76 N.E. 3d 336, 353 (Ohio Ct. App. 2016) (listing nonexclusive factors).

Complicating matters further, customers who searched the directory in 2018, for example, would likely have seen different results than those who searched using identical criteria in 2020. These differences make adjudication with class-wide evidence impossible.[18]

The second set of inapposite cases involves material omissions. *E.g.*, *Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506 (N.D. Ohio 2008) (class-wide presumption of reliance where Travelers failed to disclose the availability of lower-priced, otherwise identical policies). Reliance can be presumed in such cases because it is impossible to prove reliance on an omission. *See Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir. 1991). But the objective materiality of the information provides a basis for the presumption—the inquiry is framed such that a reasonable person would have wanted to know what was omitted. *See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 835 (6th Cir. 2018). Here, Plaintiffs allege that Buckeye's directory contained affirmative inaccuracies discoverable only by particular searches. *See* Compl. ¶¶ 55, 161. So unlike the material omission cases, it cannot be presumed class-wide that individual customers relied on (or even saw) Buckeye's alleged misrepresentations.

### 3. Good faith and fair dealing: unsuitable for certification because only individual inquiry can prove "bad faith."

A plaintiff alleging that an insurer acted in "bad faith" in denying an insured's claim must show that "the defendant's conclusion to deny benefits . . . was arbitrary or capricious." *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). This requires an individualized inquiry.

---

[18] Plaintiffs suggest that *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), supports a presumption of reliance. ECF No. 43 at 1721. But that decision is limited to securities-fraud cases. *See* Newberg and Rubenstein on Class Actions § 4:60 (6th ed. 2023) (collecting cases and observing that most courts asked to extend *Basic*'s treatment of reliance "fraud-on-the-market doctrine from the securities field to garden variety common law fraud claims have declined the invitation"); *see also Faktor v. Lifestyle Lift*, 2010 WL 271346, at *6 (N.D. Ohio Jan. 15, 2010) ("[E]ven assuming that the Defendants made [uniform misrepresentations], the class members' reliance would . . . need [to] be determined on an individual basis. This fact alone prevents class certification . . . .").

Every customer whose claim was denied as out-of-network would have to show that there was no "reasonable justification for the denial." *Thomas*, 974 F.2d at 711.[19] That a provider was listed in Buckeye's provider directory is not sufficient to infer bad faith. A claim submitted by a provider listed in Buckeye's provider directory may be denied as out-of-network for multiple reasons, including that a provider is out of network for a particular service, or that Buckeye simply made a mistake that can be corrected by paying the claim. Ex. 2 (1st Hoyt Rpt.) ¶¶ 55–60. To know whether the circumstances meet the context-sensitive definition of bad faith, the Court would need to examine each claim denial.

Plaintiffs also allege that Defendants acted in bad faith by "misrepresent[ing] the scope of providers in-network." ECF No. 36 at 519. But Buckeye never represented the number of providers in its network. Ex. 1 (2d Hoyt Rpt.) ¶ 50. And even if the erroneous inclusion of a specific out-of-network provider constituted such a misrepresentation, it would not follow that the only possible explanation is bad faith—including because Buckeye has a policy of making customers whole if they incur costs as a result of an error in the directory that was Buckeye's fault. Ex. 5 (Lukaszewicz Decl.) ¶ 4. Buckeye's network is so large that its directory is "updated daily." Ex. 5 (Lukaszewicz Decl.) ¶ 3. So an obvious potential alternative explanation for any inaccuracies is a simple mistake, which does not constitute bad faith. *See Hicks v. Leffler*, 695 N.E.2d 777, 780 (Ohio Ct. App. 1997). Each inaccuracy, too—if Plaintiffs could prove any—would need to be examined in its particular context, including to see whether the error was Buckeye's fault (or, perhaps, the provider's fault); whether Buckeye was on notice of the error; and whether Buckeye has fixed the error.

---

[19] Note that the vast majority of customers *never* had a claim denied for this reason.

### B.     The "Sub Class" Fails Because Individual Analyses Would Be Required To Determine Which Customers Paid Unjustified, Unremedied Out-of-Pocket Costs.

As a fallback, Plaintiffs originally proposed a "sub-class" of about 3,200 customers associated with roughly 7,000 insurance-claim lines that were denied as out of network.  Plaintiffs' supplemental brief does not mention this group of class members.  *See* ECF No. 49.  Thus, Plaintiffs have abandoned this request.  *See supra* note 5.

In any event, the sub-class is even more fractured than the primary class.  Plaintiffs allege that for each of these 3,200 customers, the relevant provider was listed in the directory near-in-time to the denial.  ECF No. 36 at 495.  Plaintiffs assume that these denied claims resulted in out-of-pocket costs to the customers, but their assumption skips the highly individualized analysis needed to reach this conclusion.

To determine which of the 3,200 customers have out-of-pocket costs associated with these denied claims, a customer-specific analysis would be needed to determine whether Buckeye made an error with respect to the claim, and whether the customer was harmed.  If so, Buckeye will hold the customer harmless.  *See* Ohio Admin. Code § 3901-8-16(E)(1); Ex. 5 (Lukaszewicz Decl.) ¶ 4.  In most situations, providers follow up with health-insurance companies when they believe the insurance company erred in denying a claim.  In only rare circumstances, which do not appear to be applicable here based on available data, do customers receive a "surprise" bill from a provider and pay it.  Ex. 2 (1st Hoyt Rpt.) ¶¶ 53–60; Ex. 1 (2d Hoyt Rpt.) ¶ 96.  Data show that barely 1% of putative "sub-class" members have contacted Buckeye to raise such issues, and Buckeye worked to resolve the problems in those instances.  Ex. 2 (1st Hoyt Rpt.) ¶¶ 58–60.

If the Court were to certify the sub-class, the factfinder would have to hold mini-trials on the circumstances of these customers to determine: (1) whether the customer was harmed from an inaccurate directory listing; (2) whether that directory listing caused the customer to see the out-

of-network provider; (3) whether the customer received a "surprise" bill in connection with the service; (4) whether the customer paid some or all of the cost listed in the surprise bill; (4) the amount of any applicable deductible; (5) whether Buckeye already reimbursed the customer; and (6) the appropriate reimbursement amount.  *See* Ex. 1 (2d Hoyt Rpt.) ¶ 96; Ex. 2 (1st Hoyt Rpt.) ¶ 60 ("[A]n insurance claim denial is just the start of the story.").  This work would be necessary to address each unique request because in some circumstances, the customer is entitled to reimbursement (e.g., if the out-of-pocket cost was caused by an error by Buckeye); in others, the customer is not (e.g., if Buckeye and the provider already resolved the claim, or if the customer chose to go out-of-network).  For this reason, out-of-pocket costs must be analyzed case-by-case.

Moreover, Plaintiffs make no attempt to limit sub-class membership to those who actually have out-of-pocket costs.  Many of the claims initially denied as out-of-network were resolved after the claims were resubmitted to Buckeye.  Ex. 2 (1st Hoyt Rpt.) ¶ 60.  Still others were never even pursued by the provider.  *See, e.g.*, Compl. ¶ 115. The individualized nature of damages here is yet another badge of a lack of predominance.  Plaintiffs have made no attempt "to prevent[ ] the class from degenerating into a series of individual trials."  *Desai v. Geico Cas. Co.*, 574 F. Supp. 3d 507, 533 (N.D. Ohio 2021) (citation omitted).  So Rule 23(b)(3)'s predominance requirement is not satisfied as to the putative sub-class either.

### III.    No Superiority: Alternative Mechanisms Can Resolve Disputes Without the Problems Created by Class Treatment.

Class actions require a "huge amount of judicial resources."  *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630 (6th Cir. 2011).  Rule 23 thus directs the Court to consider alternatives to ensure "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  It also provides four nonexclusive factors to be considered, including "the likely difficulties in managing a class

action." FED. R. CIV. P. 23(b)(3)(A)–(D). The superiority inquiry compares the same individual-ized inquiries relevant to the predominance inquiries against available alternatives. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).[20] For example, the need to examine "contract terms and funding arrangements of 550 to 875 class members" was sufficiently burdensome that "a class action cannot be a superior form of adjudication." *Pipefitters*, 654 F.3d at 631.

This case presents myriad individual inquiries for the reasons explained in the prior section. Thus, it is also uniquely unsuitable for class treatment because two overlapping mechanisms allow Plaintiffs to pursue their claims individually at no cost. The first is the dispute-resolution process mandated by the insurance contracts. The second is the Department of Insurance's Health Insur-ance Assistance Program.

Another district court confronted with a similar case found such alternatives superior. The plaintiff in *Harvey v. Centene Management Co.* sought class certification after alleging that De-fendant Centene's Ambetter insurance network in Washington was inadequate. *See* 2020 WL 2411510, at *1–2 (E.D. Wash. May 12, 2020). But as in this case, plan members could bring such a dispute to Centene and have the resolution externally reviewed, or could bring the dispute to Washington's insurance regulator. *See id.* at *3–4. So the court refused to certify the class, noting that health insurance's highly-regulated nature made alternative relief superior to the "laborious, record-intensive task" of a federal class action. *See id.* at *4–7. The same reasoning applies here.

### A. The Contract's Dispute-Resolution Process Is Superior to a Class Action.

Buckeye's insurance contracts require customers to try to resolve disputes directly with

---

[20] Relevant alternatives need not be judicial. 7A Charles Alan Wright, Arthur Raphael Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1779 (3d ed. 2023). The question is simply whether Plaintiffs face "any potential financial bar to pursuing individual claims." *See Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir. 2002).

Buckeye.  Ex. 3 (2022 Contract) at 88.  "[M]ost concerns can be resolved with one phone call," *id.* at 89, but the process is not simply a complaint hotline.  Instead, the customer may escalate the dispute for binding review, at Buckeye's expense, to an outside reviewer certified by the Department of Insurance.  *Id.* at 90–91.  This process has efficiently resolved out-of-network-cost disputes in nearly every instance in which a customer has used it.  Ex. 5 (Lukaszewicz Decl.) ¶¶ 4, 8.

That process is superior to this litigation because it costs customers nothing and can get them faster relief.  If this case proceeds as a class action, by contrast, anything Plaintiffs recover "would be reduced by the costs of suit and attorneys' fees."  *Brown v. Blue Cross and Blue Shield of Mich., Inc.*, 167 F.R.D. 40, 45 (E.D. Mich. 1996) (citation omitted).  The "principal, if not the only, beneficiaries," would be class counsel, which is the hallmark of inferiority.  *See Holland v. Goodyear Tire & Rubber Co.*, 75 F.R.D. 743, 748 (N.D. Ohio 1975).

Plaintiffs protest that Buckeye's dispute-resolution process cannot resolve complaints about "the inaccurate provider directory as a whole."  ECF No. 43 at 18.  If so, that is only because no member sees the whole provider directory when they search for providers.  Ex. 5 (Lukaszewicz Decl.) ¶ 5.  The only conceivable complaints arising from the directory are complaints about specific providers it does not contain, or specific providers that it contains inaccurately—as Plaintiffs' allegations show.  *See* Compl. ¶¶ 65–66, 74–75, 84–85, 95–97, 114.  Buckeye's dispute-resolution procedures can resolve any such complaints by helping members locate providers, including by contracting with additional providers if necessary.  Ex. 2 (1st Hoyt Rpt.) ¶¶ 45–46.  And in the unlikely event that an out-of-network provider, whom a member saw inaccurately displayed in a search of Buckeye's provider directory, balance bills that member for covered services, Buckeye will "make the member whole."  Ex. 5 (Lukaszewicz Decl.) ¶ 4.

## B.    The Health Insurance Assistance Program Is Superior to a Class Action.

The Department of Insurance backstops Buckeye's procedures with its oversight and its

Health Insurance Assistance Program.  Any member who believes Buckeye has not followed the contract can formally complain to the Department.  *File a Consumer Complaint*, OHIO DEP'T OF INS., https://insurance.ohio.gov/about-us/complaint-center/file-a-consumer-complaint.  The Department can address "cancellations, refunds, sales practices, misrepresentation, [and] claim and benefit disputes."  *Id.*  Plaintiff Zinn's allegations show this process's efficacy:  She used it to help arrange "a single-case agreement" between Buckeye and a provider so she "could obtain in-network care in the Cincinnati area."  *See* Compl. ¶¶ 88–89.

Once again, Plaintiffs betray their lack of concern with potential real-world issues by pointing to supposed "complaints regarding the entirety of . . . [the] provider directory."  *See* ECF No. 43 at 18–19.  But they have not identified (and cannot identify) any instance of such a complaint for the reasons already explained.  The Department of Insurance could, if necessary, help members with the types of "claim and benefits disputes" Plaintiffs actually allege.

That fact distinguishes this case from *Stanich*, 249 F.R.D. at 522, on which Plaintiffs rely.  ECF No. 43 at 1729.  The plaintiffs in *Stanich* claimed fraud in policies' *prices*, which they argued had "nothing to do with underwriting factors" that measured the risks incurred by those policies.  249 F.R.D. at 510–11.  That is, the alleged scheme was about underwriting risk and insurance-agents' incentives, and in that context, the court concluded it was outside the Department's expertise.  *See id.* at 522.  Similarly, *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d at 535–36, was about the applicability of "a local government tax" charged as part of the plans' premiums.

Plaintiffs' "fraudulent inducement" claims here, however, are based solely on the providers available in Buckeye's network and network directory.  ECF No. 43 at 1729; *see also* Compl. ¶ 161.  Such claims lie in the heartland of the Department of Insurance's expertise.  *Cf. Harvey*, 2020 WL 2411510, at *4.  Its oversight is thus superior to the fractured, expensive, and

burdensome process that would result from certifying Plaintiffs' putative classes.

## IV. No Indivisibility: The Injunctive Relief Plaintiffs Seek Is Atomistic and Monetary.

Plaintiffs spent barely a page at the end of their initial motion discussing their request for an injunctive class under Rule 23(b)(2). *See* ECF No. 36 at 524–25. They have not mentioned that request in any filing since. *See* ECF Nos. 43, 49. Thus, they abandoned it. *See supra* note 5.

In any event, Plaintiffs' injunctive class flops. The specific orders they request lack class-wide meaning, breaking down into individualized review of providers' contracts and customers' claims. And their demand for specific insurance claims to be paid is precisely the kind of individual damages claim that forecloses certification under Rule 23(b)(2). *See* 7A Charles Alan Wright, Arthur Raphael Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 (3d ed. 2023).

\*     \*     \*

This case is unworkable as a class action. Plaintiffs' contrary notion ignores every inconvenient fact. The real provider lists generated by Buckeye's provider search engine are too complex, so they built a model based on provider count instead. They could not find literature about provider count, so they used literature about network breadth instead. They could not get enough data about the ACA market in Ohio, so they pretended that their literature showed causation. They could not confirm Buckeye providers' in-network statuses, so they turned to supposed industry averages. They could not trace each denied claim to its resolution, so they stopped at the beginning of the story. And Buckeye's internal dispute-resolution procedures solve actual complaints, so they invented complaints that no customer—not even these named Plaintiffs—has ever raised.

Plaintiffs can ignore those facts in a model or a motion, but they cannot make them disappear. If this Court were to certify their proposed classes, those facts would mire this case in a grinding sequence of mini-trials for each customer, search, and claim. As the above authority demonstrates, Rule 23 bars that outcome.

**Conclusion**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: March 22, 2024

Respectfully submitted,

Williams & Connolly LLP

By: */s/ Steven M. Cady*
George A. Borden
Steven M. Cady (pro hac vice)
Dylan C. McDevitt (pro hac vice)
Jacob T. Young (pro hac vice)
680 Maine Avenue SW
Washington, DC 20024
T: (202) 434-5321
F: (202) 434-5029
scady@wc.com

– and –

Thompson Hine, LLP

By: */s/ Robert P. Johnson*
Robert P. Johnson (0040109)
312 Walnut Street, 14th Floor
Cincinnati, Ohio 45202
T: (513) 352-6769
F: (513) 241-4771
robert.johnson@thompsonhine.com

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that on March 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing.

By: */s/ Steven M. Cady*
Steven M. Cady