**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MISTY DUFF, *et al.*, | : | |
| *Plaintiffs*, | : | Case No. 1:19-cv-750 |
| v. | : | Judge Jeffery P. Hopkins |
| CENTENE CORPORATION, *et al.*, | : | |
| *Defendants*. | : | |

# OPINION AND ORDER

The relevant facts and background of this case are incorporated as set out in this Court's prior Order. Doc. 74. As relevant to this Order, Defendants move to exclude Dr. Adam Block's testimony, arguing that it is irrelevant and unreliable. Docs. 52, 65. Plaintiffs contend that it is not. Doc. 59. Defendants' motion to exclude is now fully briefed and ripe for the Court's consideration. For the reasons that follow, the Court **GRANTS** Defendants' Motion to Exclude Dr. Block's Testimony (Doc. 52).

## I. LEGAL STANDARD

Federal Rule of Evidence 702 permits certain witnesses with specialized knowledge to testify as experts at trial:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Because juries tend to place extra weight on expert opinions, courts play an important gatekeeper role when it comes to expert witnesses. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The gatekeeper role is two-fold. First, the Court must decide whether the expert's testimony is relevant. *Daubert*, 509 U.S. at 589. Second, the Court must consider whether the expert's testimony is reliable. *Id.* at 589–90. Relevance is a liberal standard. *Id.* at 587. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Reliability is a "flexible" inquiry. *Kumho*, 526 U.S. at 141–42. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. (emphasis in original).

## II. LAW AND ANALYSIS

Expert testimony carries special weight with a jury. So the Supreme Court and the Federal Rules instruct this Court to admit such testimony only if it is both relevant and reliable. *See Daubert*, 509 U.S. at 589; Fed. R. Evid. 702. Plaintiffs shoulder the burden of showing that Dr. Block's testimony satisfies both prongs "by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline*, 243 F.3d 244, 251 (6th Cir. 2001); *see also Daubert*, 509 U.S. at 592 n.10. Plaintiffs have not carried their burden of making this requisite showing.

**A. Relevance**

Expert testimony must be "relevant to the task at hand." *Daubert*, 509 U.S. at 597. That means the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Dr. Block's testimony doesn't do so.

Dr. Block's damages model suffers from a fatal methodological flaw that kneecaps the relevance of his testimony to this case. His model attempts to establish a causal link between statewide in-network provider count and the premium prices Plaintiffs would have paid if Buckeye's provider directory was accurate. But network breadth, not provider count, is the metric relevant to the hypothetical-premium calculation and to this case.

Start with what the two metrics are. In-network provider count is simply the number of medical providers that are in Buckeye's network across Ohio. Network breadth indicates the number of providers in Buckeye's network in a particular region or locality of Ohio. The value any potential or actual Buckeye customer attaches to a Buckeye policy will turn on the concentration of providers in the immediate area where they are likely to seek care—not the number of providers across the state. As an example, assume Buckeye has 10,005 in-network providers. Ten thousand of those providers are in the Cincinnati area, while the remaining five are in Cleveland. A woman living in Cincinnati will be willing to pay, let's say, X dollars for her Buckeye policy because of its rich concentration of in-network providers in her city. But a similarly situated woman in Cleveland probably won't pay as much as X dollars for Buckeye's anemic network in her city. In thinking about how much to value the same Buckeye policy, neither woman cares about the statewide number of in-network providers as much as she cares about the number of in-network providers in the geographical vicinity where she is

likely to seek care. So it makes sense that the academic articles on which Dr. Block relies also focus on network breadth, not provider count. *See* Docs. 52-5, 52-6. But Dr. Block has explained neither how provider count affects premium prices nor how the articles he cites support his reliance on provider counts. Thus, Dr. Block's exclusive focus on statewide provider count undercuts his testimony's relevance to this case and its utility to the jury.

Plaintiffs try to resist this conclusion in two ways. First, they argue that they relied on "the best evidence" they could muster for their position, *i.e.*, the academic articles discussing network concentration. Doc. 59, PageID 2620–21. But the standards *Daubert* and Rule 702 establish require the testimony to be relevant and helpful to the jury. That requirement can't be relaxed just because this is allegedly "the best evidence" Plaintiffs can locate. *Id.*

Second, Plaintiffs argue that challenges to "Dr. Block's methodology" should "go to the weight, not admissibility, of his opinions." Doc. 59, PageID 2621. But that argument runs headfirst into *Daubert*, which requires this Court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93; *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008); Fed. R. Evid. 702(c) & (d). This Court thus has the duty to ensure that Dr. Block's methodology is sufficiently sound in order to allow it before a jury. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Court concludes that it isn't.

There is another fundamental problem with Dr. Block's testimony: None of the academic literature Dr. Block surveyed and built his damages model on studied either Buckeye or any insurance product in Ohio. *See* Doc. 52, PageID 1853–54. So Dr. Block's model is built on an across-the-board industry average error rate in provider directories. But

Plaintiffs don't explain why or how a model built on industry averages across out-of-state insurance products is relevant to the central factual dispute in this case: what *Ohio* consumers expected and received from *Buckeye*. Absent that explanation, it seems Dr. Block's model proves far too much: applying an industry average error rate would result in a damages award against *any* insurance company *anywhere* in the country, no matter the accuracy of its provider directory.

At the end of the day, Dr. Block's methodology exclusively turns on a metric that is orthogonal to this case. And his model is built far too generically to shed any light on whether and to what extent Ohio consumers were short-changed by Buckeye. So Plaintiffs haven't shown by a preponderance of proof that Dr. Block's testimony is "relevant to the task at hand," *Daubert*, 509 U.S. at 597, and that it can "'assist the trier of fact in understanding and disposing of [the relevant] issues," *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). They also haven't shown that Dr. Block's testimony makes it more probable that Plaintiffs overpaid for their Buckeye plans than it would be without his testimony. *See* Fed. R. Evid. 401. Thus, Dr. Block's testimony fails even the "liberal" relevance requirement, *Daubert*, 509 U.S. at 587, and must be excluded.

**B. Reliability**

The reliability of expert testimony centers on "four inquiries." *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 767 (6th Cir. 2025). "Is the technique testable? Has it been subjected to peer review? What is the error rate and are there standards for lowering it? Is the technique generally accepted in the relevant scientific community?" *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021). And a proffered expert's "overreliance on

unhelpful studies unconnected to causation" justifies exclusion of his testimony. *Baker*, 141 F.4th at 767.

Plaintiffs have not shown the reliability of Dr. Block's testimony by a preponderance of proof. Take testability. While Dr. Block's methodology appears to be testable, Defendants show that it failed replication. For example, Dr. Block was able to match only 35.7% of his sampled providers to Buckeye's contracts. Doc. 52-2, PageID 1948. But Defendants' expert, Mr. Hoyt, was able to match virtually all the sampled providers to the same contracts. Doc. 52-4, PageID 2021–23. The few late-produced contracts Plaintiffs blame for the chasmic difference don't account for such a large discrepancy.

Plaintiffs have also put forward no proof (as is their burden) that Dr. Block's model of connecting provider count to insurance prices has been peer reviewed, that the model has a manageable error rate, or that it is accepted in the academic field. Indeed, Dr. Block's reliance on the "industry average" of provider directory errors across other insurers means his model proves far too much to be reliable in this case. His testimony doesn't shed any light on *Buckeye*'s directory and would hold any insurance company liable for even a perfectly maintained directory simply because a proffered expert couldn't tell for sure how many physicians were out of network. Doc. 52-1, PageID 1914–15.

But there are at least two more reliability concerns. First, as Dr. Block himself admitted, he "tinkered with" his model's data to reverse engineer certain outputs. Block Dep., Doc. 52-3, 202:10–13. Plaintiffs justify Dr. Block's tinkering by contending it was necessary to account for the additional contracts Defendants produced. But Plaintiffs' contention misconceives the point of modeling—its usefulness lies in its ability to accurately forecast in the absence of certainty. A model that needs to be "tinkered with" because its forecast was

disproven is too unreliable to put before a jury. *Id*. Second, Dr. Block's testimony heavily relies on two articles to establish causation between provider count and premium prices. That reliance is doubly deficient. First, as discussed, those articles discuss network breadth, not the distinct metric of provider count. *See* Docs. 52-5, 52-6. But even if Dr. Block relied on those articles for the metric they actually study, they still wouldn't help him establish causation because the articles' authors themselves disclaim a causal relationship between network breadth and premium prices. One article says that it "could not establish a causal effect of changes in [network] breadth on premiums," Doc. 52-6, PageID 2064, while the other warns that the relationships it studied "might have picked up unmeasured and correlated factors" and that premium prices could reflect "the quality of the providers in the network." Doc. 52-5, PageID 2055. Dr. Block's reliance on these articles to build his damages model is thus an "overreliance on unhelpful studies unconnected to causation." *Baker*, 141 F.4th at 767. So his testimony is unreliable, which provides an independent basis for exclusion.

Finally, even beyond irrelevance and unreliability, there is an overarching inconsistency in Plaintiffs' theory of their own case and how they think Dr. Block's testimony fits into it. Plaintiffs' whole theory of compensatory damages rests on their claim that they paid more in premiums than they would have if Buckeye's provider directory was accurate. Dr. Block's testimony can only advance that claim if it makes some scientifically grounded prediction about what Buckeye's insurance prices *would be* if its directory was accurate. But that's exactly what Plaintiffs say Dr. Block is "<u>not</u>" doing. Doc. 59, PageID 2622 (emphasis in original). Instead, they say, Dr. Block "is starting with the insurance premiums he knows were paid by the Class Members and calculating the percentage by which the premiums were too high because of the out-of-network providers included in the directory." *Id.* But

"calculating the percentage by which the premiums were too high because of the out-of-network providers included in the directory" *necessarily requires* predicting Buckeye's insurance prices. *Id*. As a matter of logic, Dr. Block can't say an insurance price is "too high" without "predicting any prices for insurance." *Id.* It's the actual price *relative to the predicted price* that tells us whether that actual price is too high, too low, or just as expected. Plaintiffs' confusion on this basic point is bound to confuse the jury.

## III. CONCLUSION

For the reasons stated, the Court **GRANTS** Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Dr. Adam Block (Doc. 52).

**IT IS SO ORDERED.**

August 31, 2026

Jeffery P. Hopkins
United States District Judge